**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MARISSA HOECHSTETTER, JANE DOE 8, JANE DOE 9,      **Civ. Action No.**
JANE DOE 10, JANE DOE 11, JANE DOE 12, JANE DOE 13,     **19-cv-02978**
JANE DOE 14, JANE DOE 15, JANE DOE 17, JANE DOE 18,
JANE DOE 19, JANE DOE 21, JANE DOE 22, JANE DOE 23,
JANE DOE 26, JANE DOE 27, JANE DOE 28, JANE DOE 30,

*Plaintiffs,*

— against —

COLUMBIA UNIVERSITY; THE NEW YORK AND      **FIRST**
PRESBYTERIAN HOSPITAL; COLUMBIA      **AMENDED**
PRESBYTERIAN MEDICAL CENTER; COLUMBIA      **COMPLAINT**
UNIVERSITY MEDICAL CENTER;
COLUMBIA-PRESBYTERIAN MEDICAL CENTER,
EAST SIDE ASSOCIATES; EAST SIDE ASSOCIATES;
ROBERT HADDEN; THE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF NEW YORK;
COLUMBIA UNIVERSITY COLLEGE OF PHYSICIANS
AND SURGEONS; PRESBYTERIAN HOSPITAL
PHYSICIAN SERVICES ORGANIZATION, INC.;
COLUMBIA-CORNELL CARE, LLC; COLUMBIA
CORNELL NETWORK PHYSICIANS, INC.;
SLOANE HOSPITAL FOR WOMEN,

*Defendants.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

---

**Content Warning:** This First Amended Complaint contains graphic descriptions of sexual assault, sexual violence, and sexual abuse, including minor victims. Such descriptions may be disturbing or upsetting to some readers.  Reader discretion is advised.

Plaintiffs Marissa Hoechstetter, Jane Doe 8, Jane Doe 9, Jane Doe 10, Jane Doe 11, Jane Doe 12, Jane Doe 13, Jane Doe 14, Jane Doe 15, Jane Doe 17, Jane Doe 18, Jane Doe 19, Jane Doe 21, Jane Doe 22, (Jane Doe 23 is represented by other counsel), Jane Doe 26, Jane Doe 27, Jane Doe 28, and Jane Doe 30 (collectively "Plaintiffs"), through their undersigned counsel, for this Second Amended Complaint, allege as follows against Defendants Columbia University, The Trustees of Columbia University in the City of New York ("Trustees"), Columbia University Vagelos College of Physicians and Surgeons ("CUCPS"), The New York Presbyterian Hospital ("NYPH"), Sloane Hospital for Women ("Sloan"), Columbia University Irving Medical Center f/k/a Columbia-Presbyterian Medical Center ("CPMC"), Presbyterian Hospital Physician Services Organization, Inc., Columbia Cornell Network Physicians, Inc., Columbia-Presbyterian Medical Center, East Side Associates, East Side Associates, (collectively, "COLUMBIA" or "CORP. ENTITIES"), and Robert Hadden ("HADDEN", and collectively with the Columbia defendants, "DEFENDANTS"), based upon personal knowledge as to themselves, and, as to all other matters, upon information and belief, including their counsel's investigation. Plaintiffs believe additional evidentiary support exists for their allegations, given an opportunity for discovery.

## NATURE OF THE ACTION

1. *Primum non nocere* – first do no harm. These important words are perhaps the best known part of the Hippocratic Oath, the ancient precursor to the oaths of ethics taken today by doctors across the world, including those at Columbia. In fact, in 1993, CUCPS was credited with holding the first-ever White Coat Ceremony, where a similar oath is recited, and has since become a rite of passage tradition at 99% of Association of American Medical Colleges-

accredited medical schools across the United States.[1] This case is about the Corp. Entities Defendants' repeated violations of these fundamental ideals, over a two-decades-long period where their administrators, chairpeople, and trustees failed, repeatedly, to protect vulnerable and unsuspecting female patients, from predatory sexual abuse, by turning a willfully blind eye to the serial sexual assaults being committed, under the guise of legitimate medical care, by one of their own employees, named Robert Hadden.

2.      From 1987, through at least 2012, the Corp. Entities employed Hadden to provide obstetrics and gynecology ("OB/GYN") services to Corp. Entities Defendants' patients, including Plaintiffs herein.

3.      Hadden, however, is no ordinary OB/GYN. He is, in fact, a disgusting, sadistic, and perverted sexual predator who used his esteemed and trusted position with the Corp. Entities Defendants to sexually exploit, abuse, rape, molest, fondle, and commit assault and battery on thousands of patients, including Plaintiffs, all under the pretense of providing legitimate, medically necessary, medical services. What's arguably worse is that, as an institution, the Corp. Entities Defendants knew early on what Hadden was doing to their patients. But instead of taking action against Hadden, reporting him to the State Office of Professional Medical Conduct (as legally mandated), reporting him to law enforcement (as ethically mandated), and reporting back to the patients themselves (as morally mandated), what the Corp. Entities Defendants did instead was conspire with Robert Hadden, conceal his abuse from the authorities, gas-light their patients, enable and aid Hadden in becoming the most prolific serial sexual predator in the history of New York State.

---

[1]    Two years earlier, in 1991, the Corp Entities hired serial sexual predator Robert Hadden (Residency started in 1987).

4.      The abuse these unsuspecting patients suffered is almost indescribable. Hadden, sometimes in the presence of other Corp. Entities' employees, digitally penetrated, digitally raped, fondled, groped, pinched and twisted the nipples of, squeezed out breast milk from, surreptitiously licked the vaginas, and inappropriately touched, stroked and/or rubbed the clitorises and g-spots of his patients. Oftentimes, Hadden intentionally inflicted pain upon women in a manner designed to indulge his sadistic tendencies. Roughly *half* of the known victims and survivors that Hadden sexually abused were pregnant, while the abuse was being inflicted upon them, on the Corp. Entities Defendants' watch.

5.      Hadden also performed wholly unnecessary, gratuitous, serial PAP smears on young women, virgins, and female children, who continually received negative pathology results; he performed serial and unwarranted "mole checks" of patients for no legitimate medical purpose; and routinely directed women and young girls to unnecessarily strip down, to be completely naked in his presence, for fake scoliosis exams, where he would require patients to bend over and grab their ankles while he ogled their naked bodies from behind. Hadden was often ungloved when performing these bogus examinations, which were done to indulge his own perverted interests.

6.      Indeed, according to one of the Corp Entities' nurses, she once returned, unexpectedly, to an exam room where Hadden was seeing a young, Spanish-only speaking patient, and witnessed Hadden, sitting at the base of the patient's body, beneath the drape that covered the patient's naked body, with "his eyes fully closed", "his face red and tight", "moving his fingers up and down and in and out of the patient's vagina". When this nurse reported

Hadden's actions, to two supervisors employed by the Corp Entities' Defendants, **nothing** happened and Hadden was allowed to continue his abuse unabated.

7.     Hadden's *modus operandi* was to first break down his patients' boundaries through a grooming process[2] that is typical of prolific serial sexual predators like Hadden. This process involves the infliction of mental and emotional abuse, including wily, inappropriate, invasive, exploitive and confusing statements about, among other things, a patient's appearance (including statements such as "you look like a porn star") their body, sexual history, and sexual activity (such as whether the patients were still "virgins", how well endowed their husbands were, whether they used "toys" during sex, and whether their partners were able to please them). Once his patients were adequately "groomed", and their defenses had been broken down, Hadden would then proceed to physically, sexually exploit and abuse them.[3]

8.     Unfortunately, this grotesque story is nothing new. Universities, colleges, and hospitals across the country have employed physicians who have similarly, serially, sexually groomed and abused their patients including places like the University of Michigan, Rockefeller University Hospital, Michigan State University, University of California Los Angeles, and the University of Southern California.

---

[2]     Grooming is defined as "manipulative behaviors that the abuser uses to gain access to a potential victim, coerce them to agree to the abuse, and reduce the risk of being caught." SEXUAL ASSAULT, *Grooming: Know the Warning Signs*, RAINN (July 10, 2020), https://www.rainn.org/news/grooming-know-warning-signs ("Grooming"). Grooming is "usually employed" by someone "in the victim's circle of trust," and while it can take place in many different forms, it often follows a similar pattern, where abusers observe and select their victims based on ease of access to them or their perceived vulnerability, physically isolate them from those protecting them, attempt to gain trust through relationship building, desensitize to touch, discuss sexual topics, and attempt to make their behavior seem natural. *Id.*

[3]     In physician sexual offenders, grooming behaviors include "test[ing] the waters to establish a general atmosphere of forced intimacy and to see if his target will protest." *See* James M. DuBois, Heidi A. Walsh, et al., *Sexual Violations of Patients by Physicians: A Mixed-Methods, Exploratory Analysis of 101 Cases*, 31(5) SEXUAL ABUSE: A JOURNAL OF RESEARCH & TREATMENT 503, 506 (Aug. 2019) ("*Sexual Violations of Patients by Physicians*").

9.     Over one billion dollars of compensation has been paid out to victims and survivors as a result of these grotesque encounters at University of Southern California alone. But, the Corp Entities Defendants stand alone in refusing to admit to their complicity, conspiracy, concealment, and cover-up of Robert Hadden's two-decades-long history of the sexual abuse that was happening right in front of them.

10.     The Corp Entities Defendants' direct knowledge of, and involvement in, Hadden's abuse makes these cases even more disturbing than what we've seen happen at other U.S. Universities.

11.   **First**, the Corp Entities Defendants **knew as early as 1994** that Robert Hadden was a dangerous sexual predator, yet inexplicably allowed Hadden to continue abusing and traumatizing female patients for **two more decades**. *See,* e.g., CNN Report about the letter that a sexual assault survivor and whistleblower, sent to Dr. Harold Fox, then Acting Chairman of the Department of Obstetrics and Gynecology, dated May 30, 1994, along with the letter response from Chairman Harold Fox, back to sexual assault survivor/whistleblower, dated June 14, 1994, attached as **Exhibit 'A'**.

12.   **Second**, the Corp Entities Defendants engaged in a well-orchestrated and long-term cover-up of Hadden's serial abuse for the purpose of deceiving and duping the plaintiffs, and the public at large, into believing at varying times, and on countless occasions, that their employee, Robert Hadden had done nothing wrong, that he was simply providing legitimate and medically necessary OB/GYN services, and even that his later absence from the OB/GYN practice in 2012 was nothing out of the ordinary, and the product of his "health issues", "family issues", or his own "voluntary choice" to close his private practice and retire.

13.  ***Third***, when the Corp Entities Defendants incontrovertibly learned in 2012, through their General Counsel, Chairperson of the OB/GYN Department, and others, of Hadden's criminal arrest by the New York City Police for sexually abusing a patient at 4 p.m. on Friday, June 29, 2012, *at their own medical clinic*, the Corp Entities Defendants incredibly (and amorally) appear to have helped *scramble a criminal defense lawyer to assist Robert Hadden* in overreaching the Manhattan District Attorney's Office, and the New York City Police Department, who then vacated Hadden's arrest, and permitted Hadden to return to their medical clinic the following week, such that he could ***continue sexually abusing even more women for the next six weeks.*** Not surprisingly, Hadden continued his sick pattern of sexual abuse, including the abuse of pregnant women, recent mothers, and minor children. Corp. Entities Defendants knew full well that allowing Hadden to continue seeing patients was dangerous, wrong, and knowingly placed wholly unsuspecting female patients at risk. But, they also felt the need to keep Hadden close, in an effort to prevent Hadden from revealing to the authorities the full extent of the Corp. Entities Defendants' knowledge and involvement in the abuse. For this egregious misconduct, the only thing the Corp. Entities Defendants have been able to muster to date is a hollow, half-hearted "regret that he saw patients again for several [more] weeks" after his arrest.[4]

14.  In their ongoing course of fraud, and fraudulent concealment, the Corp. Entities Defendants have continued to blatantly lie to their patients by stating in a "Dear Valued Patient"

---

[4]   Laura Collins, *EXCLUSIVE: Former Broadway dancer describes abuse at the hands of Columbia University staff gynecologist charged with sexually assaulting dozens of women including Andrew Yang's wife: She is now suing the institution for concealing it*, DAILY MAIL (Feb. 10, 2022), https://www.dailymail.co.uk/news/article-10465637/Former-Broadway-dancer-describes-abuse-hands-disgraced-Columbia-gynecologist.html (last visited Feb. 15, 2022).

letter, dated April 24, 2013, that "Hadden has closed his practice at Columbia University Medical Center" [as if to say this was his "choice"] and that the Corp. Entities Defendants would "offer you the opportunity to continue your care at our facility with one of his excellent partners". All the while, omitting the key detail that Hadden was no longer there because he was caught surreptitiously licking a patient's vagina during a bogus pelvic examination, was caught with lewd imagery on his office computers, had images of another patient's anatomy on his personal cell phone which he took without her knowledge or consent, had a 20 year history of sexually exploiting and abusing female patients, was known to sexually assault a pregnant patient in 1993, was arrested at their medical clinic by the New York City Police Department for sexual assault in 2012, and was under an active criminal investigation by the Manhattan District Attorney's Office —an investigation that ultimately led to Hadden's felony conviction for assaulting multiple patients under the guise of medical care and treatment. *See,* Letter from Dr. Katrina Eisinger, MD, dated April 24, 2013, attached hereto as ***Exhibit "B"***.

15.   Two years after Hadden's arrest in 2012, he was indicted by the Manhattan District Attorney's Office in June, 2014, on charges of sexual abuse, criminal sex acts, and forcible touching. Two years later in 2016, Hadden pled guilty to felony sexual assault (licking a patient during a bogus pelvic examination—which, according to the criminal indictment, was actually the second time Hadden assaulted that particular patient in that manner). Only then was Hadden forced to surrender his medical license. Incredibly, right up until the time of Hadden's guilty plea in the criminal case, the Corp. Entities Defendants continued to actively gas-light, lie to, and defraud the plaintiffs, the victims and survivors, law enforcement, and the public at large, by prominently maintaining Robert Hadden's professional profile and photograph on their website

as a "Columbia OB/GYN". According to the ongoing criminal investigation, the FBI has revealed that defendant Corp. Entities allowed Robert Hadden to create, and use, a new Columbia University email address, as recently as 2015, in order to communicate with members of the public, and presumably former patients, co-workers, administrators, victims, and survivors, while continuing to hold himself out as a bonafide, and respected, Columbia University OB/GYN. *See*, Order dated May 4, 2022, by Judge Richard M. Berman, United States District Court, S.D.N.Y., at Page 5, attached hereto, as ***Exhibit "C"***.

16.   Despite an Order, issued by the New York State Office of Professional Medical Conduct ("OPMC") in 2016, that requires all of Corp. Entities Defendants' patients to be informed of Hadden's loss of license, to practice medicine, the circumstances surrounding the surrender, and that fact that the Corp. Entities Defendants are the sole and exclusive custodians of Robert Hadden's patient-lists—to date, no such letter was ever sent by the Corp. Entities Defendants, or Robert Hadden, to all the patients. Columbia's decision to not comply with the OPMC's mandate of informing all of their patients is not an accident. The Corp. Entities Defendants' refusal to inform their patients is part of Columbia's intentional, conscious, and ongoing effort to defraud, and fraudulently conceal, Hadden's sexual exploitation and abuse from each and every former patient, such that the patients are unaware, and unable, to file a lawsuit within the statute of limitations period. The Corp. Entities Defendants' reprehensible conduct is knowingly, and intentionally, designed and calculated, to cause their patients to forbear from filing timely civil claims, and block victims' and survivors' access to the courts. *See*, OPMC Order dated February 26, 2016, attached hereto as ***Exhibit "D"***.

17.  On September 8, 2020, Hadden was indicted again, this time by the U.S. Attorney for the Southern District of New York, on six separate counts of enticing and inducing (trafficking) statutory victims, as well as "dozens of other victims" (including minors) to travel to his medical offices in New York, where he subjected them to unlawful sexual abuse, from about 1993 to 2012.  *See,* Criminal Indictment, attached as ***Exhibit "E"***, *United States v. Hadden*, No. 1: 20-cr-00468-RMB (S.D.N.Y. Sept. 8, 2020), ECF No. 1.

18.  In a Press Release announcing Hadden's federal indictment, Audrey Strauss, Acting U.S. Attorney for the Southern District of New York, described Hadden as:

> A predator in a white coat [who] **used the cover of conducting medical examinations to engage in sexual abuse that he passed off as normal and medically necessary**, when it was neither normal nor necessary – it was criminal.[5]

> According to other news reports, "[t]he Manhattan District Attorney's Office is [currently] pursuing a ***criminal investigation*** into ***Columbia University's*** handling of incidents involving [Hadden]."[6]

---

[5]  Press Release and Conference, *Former Obstetrician/Gynecologist Robert Hadden Charged In Manhattan Federal Court With Sexually Abusing Patients*, DEP'T OF JUSTICE, U.S. ATTY'S OFF., S.D.N.Y. (Sept. 9, 2020), https://www.justice.gov/usao-sdny/pr/former-obstetriciangynecologist-robert-hadden-charged-manhattan-federal-court-sexually



[6]  Graham Kates, *Columbia University under criminal investigation for its handling of sex assault allegations against doctor*, CBS NEWS (Sept. 11, 2020), https://www.cbsnews.com/news/columbia-university-investigation-robert-hadden-sexual-assault-allegations/?ftag=CNM-0010aab7e&linkId=99410609

19.     Plaintiffs now bring the following causes of action against Hadden, the

Corp. Entities Defendants, or both for and under:

COA 1:          Title IX 20 USC 1681

COA 2:          Committing & Enabling Gender Violence in Violation of New
                York City Victims of Gender-Motivated Violence Protection Law,
                N.Y.C. ADMIN. CODE § 10-1101, *et seq.*

COA 3:          Committing & Enabling Sexual Harassment, Predatory Grooming,
                Sexual Exploitation & Sexual Abuse

COA 4:          Committing & Enabling Criminal & Civil Sexual Battery

COA 5:          Committing & Enabling Criminal & Civil Sexual Assault

COA 6:          Unfair and deceptive business practices, N.Y. GEN. BUS. LAW § 349

COA 7:          Committing & Enabling Negligent Infliction of Emotional Distress

COA 8:          Committing & Enabling Intentional Infliction of Emotional Distress

COA 9:          Fraud, Constructive Fraud, and Fraudulent Concealment

COA 10:         Committing & Enabling Negligence, Sexual Assault, and Rape of the
                Plaintiffs

COA 11:         Negligent Supervision

COA 12:         Negligent Per Se Conduct in Violation of Mandatory Reporting Laws &
                Breach of Mandated Duty to Report, N.Y. SOC. SERV. LAW §§ 413, 420;

COA 13:         Negligent Hiring, Retention & Ratification

COA 14:         Failure to Warn, Train, Educate

COA 15:         Gross Negligence, Wanton, Willful & Reckless Conduct

COA 16:         Invasion of Privacy

COA 17:         Violation of New York State Human Rights Law, N.Y. EXEC. LAW § 290,
                *et seq.*;

COA 18:    Violation of New York City Human Rights Law, N.Y.C. ADMIN. CODE § 8-101, *et seq.*;

COA 19:    Aiding and Abetting;

COA 20:    False advertising, N.Y. Gen. Bus. Law § 350

20.    In bringing these causes of action, plaintiffs seek reasonable reparations totaling hundreds of millions of dollars for the damage caused and created by the Corp. Entities Defendants who willingly enabled, aided, abetted, concealed, and repeatedly covered up, Robert Hadden's abuse for over two-decades. Not only did the Corp. Entities Defendants expose a countless number of unsuspecting women and girls to a known sexual predator—creating what is believed to be thousands of victims and survivors—the Corp. Entities Defendants also knowingly, and willingly, profited from Robert Hadden's sexual exploitation and abuse by scamming dozens of health insurance companies, and patients, out of what is estimated to be in excess of a billion dollars by engaging in a pattern of illegal billing for wholly medically-unnecessary tests and physical examinations such as: serial PAP smears, serial vaginal cultures, non-indicated and invasive cervical cautery procedures, short-interval serial clinical follow-up examinations, routinely billing for extended clinical office examinations, and other bogus medical appointments, testing, and examinations, including forcing patients to repeatedly return for office appointments—where they were subjected to invasive and sexually exploitative physical examinations by Hadden—in exchange for 30 to 60 days worth of free contraception, none of which has any actual medical justification or basis.

## PARTIES

### *The Defendants*

21.   Defendant Columbia University is a corporation organized under the laws of the State of New York and has its principal place of business in the State of New York, county of New York, located at 116th and Broadway, New York, NY 10027.  Plaintiffs were all patients of Columbia University or its agents, servants, employees at all times material to this Complaint.

22.   Defendant Trustees of Columbia University in the City of New York is a domestic, not-for-profit corporation organized under the laws of the State of New York and has its principal place of business in the State of New York, County of New York, located at Low Memorial Library, 535 West 116th Street, New York, NY 10027.   Trustees is sometimes referred to as "Columbia Corporation." The Board of Trustees is the governing body of Columbia University and exercises the ultimate dominion and control of Columbia University.  The Board of Trustees is comprised of a collection of well-established, politically connected, businesspeople from within, and outside of, the city of New York. Upon information and belief, Trustees oversees, operates, manages, or controls the obstetrics and gynecological service within, among other places, Columbia University, NYPH, and the Department of Obstetrics and Gynecology of CUCPS and Sloan.

23.   Defendant Columbia University Vagelos College of Physicians and Surgeons is a domestic, not-for-profit corporation organized under the laws of the state of New York and has its principal place of business in the state of New York, located at 630 West 168th Street, New York, NY  10032.

24.     Defendant The New York Presbyterian Hospital is a domestic, not-for-profit corporation organized under the laws of the state of New York and has its principal place of business in the state of New York, located at 630 West 168th Street, New York, NY 10032.

25.     Defendant Sloane Hospital for Women provides OB/GYN services within and for NYPH, and runs the Department of Obstetrics and Gynecology of CUCPS. Sloane's principal place of business is located at 3959 Broadway at 165th Street, New York, NY 10032.

26.     Defendant Columbia University Irving Medical Center f/k/a Columbia-Presbyterian Medical Center is a domestic, not-for-profit corporation organized under the laws of the State of New York with its principal offices located at 630 West 168th Street, New York, NY 10032.

27.     Defendant Presbyterian Hospital Physicians Services Organization, Inc. is a domestic, not-for-profit corporation organized under the laws of the State of New York with its principal offices located at 630 West 168th Street, New York, NY 10032.

28.     Defendant Columbia Cornell Network Physicians, Inc. is a domestic, not-for-profit corporation organized under the laws of the State of New York with its principal offices located at 900 Third Avenue, Suite 500, New York, NY 10022.

29.     Defendant Columbia-Presbyterian East Side Associates is a domestic, not-for-profit corporation organized under the laws of the State of New York with its principal offices located at 16 East 60th Street, New York, NY 10022.

30.     Defendant East Side Associates is a domestic, not-for-profit corporation organized under the laws of the State of New York with its principal offices located at 16 East 60th Street, New York, NY 10022.

31.   Defendant Robert Hadden is, and was, at all material times a resident of the state of New Jersey, residing, upon information and belief, in Tenafly, New Jersey.  At all material times, Hadden was an agent, servant, or employee of the Corp. Entities Defendants. Hadden was a physician licensed to practice medicine in the State of New York. Beginning in approximately 1987, Hadden began a residency at what was then known as New York Presbyterian in the City of New York, in Obstetrics and Gynecology, and completed his residency on June 30, 1991. In July, 1991, Hadden was an assistant professor of clinical OB/GYN at Columbia University College of Physicians and Surgeons, and was an assistant attending at what is now known as New York Presbyterian Hospital. Hadden was assigned to the OB/GYN department of the Audubon Clinic, an entity of Columbia Presbyterian Medical Center, from 1991 to the mid-to-late 1990's.   Hadden was hired, employed, credentialed, or enlisted by the Corp. Entities Defendants to render Gynecologic and Obstetric care to their patients. Hadden is a sexual predator who serially sexually assaulted and abused Plaintiffs, and countless other unsuspecting female patients, on the premises, and with knowledge, of the Corp. Entities Defendants. On or about February 22, 2016, Hadden pled guilty to (and was convicted of) the criminal and felonious sexual assault of patients that he sexually exploited and abused on the premises, and at the offices of the Corp. Entities Defendants, and with knowledge, and permission, of the Corp. Entities Defendants. Specifically, Hadden pled guilty to sexually abusing two female patients, one by licking her vagina during a bogus postpartum vaginal examination – which was the second time that Hadden assaulted this patient—and the other by sexually abusing a female patient with his ungloved hands. Hadden was sentenced on March 29, 2016.

32.   On September 8, 2020, Hadden was indicted by a Grand Jury in the United States District Court, for the Southern District of New York on six counts relating to the unlawful sexual abuse of different patients. On July 15, 2021, a superseding indictment against Hadden was filed in the Southern District of New York, increasing the number of counts to seven (7). Jury selection is scheduled for September 12, 2022.

***The Plaintiffs***

33.   Plaintiff Marissa Hoechstetter is a resident and citizen of the State of Massachusetts. At all times material to this complaint, Marissa Hoechstetter was a gynecologic and obstetrics patient of the Corp. Entities Defendants and their agent, servant, and/or employee, Hadden, who, while in the scope of his employment with the Corp. Entities Defendants, and while performing services for the Corp. Entities Defendants, repeatedly groomed, sexually exploited, assaulted and abused Marissa Hoechstetter under the guise of medical care and treatment between approximately 2009 and 2012, which was enabled by the acts and omissions of the Corp. Entities Defendants.

34.   Plaintiff Jane Doe 8 is a resident and citizen of the State of New York. At all times material to this complaint, Jane Doe 8 was a gynecologic and obstetrics patient of the Corp. Entities Defendants and their agent, servant, and/or employee, Hadden, who, while in the scope of his employment with the Corp. Entities Defendants, and while performing services for the Corp. Entities Defendants, repeatedly groomed, sexually exploited, assaulted and abused Jane Doe 8 under the guise of medical care and treatment between approximately 2006 and 2011, which was enabled by the acts and omissions of the Corp. Entities Defendants.

35.     Plaintiff Jane Doe 9 is a resident and citizen of the State of New York. At all times material to this complaint, Jane Doe 9 was a gynecologic and obstetrics patient of the Corp. Entities Defendants and their agent, servant, and/or employee, Hadden, who, while in the scope of his employment with the Corp. Entities Defendants, and while performing services for the Corp. Entities Defendants, repeatedly groomed, sexually exploited, assaulted and abused Jane Doe 9 under the guise of medical care and treatment between approximately 2003 and 2010, which was enabled by the acts and omissions of the Corp. Entities Defendants.

36.     Plaintiff Jane Doe 10 is a resident and citizen of the State of Texas. At all times material to this complaint, Jane Doe 10 was an obstetrics patient of the Corp. Entities Defendants and their agent, servant, and/or employee, Hadden, who, while in the scope of his employment with the Corp. Entities Defendants, and while performing services for the Corp. Entities Defendants, repeatedly groomed, sexually exploited, assaulted and abused Jane Doe 10 under the guise of medical care and treatment between approximately 2010 and 2011, which was enabled by the acts and omissions of the Corp. Entities Defendants.

37.     Plaintiff Jane Doe 11 is a resident and citizen of the State of Florida. At all times material to this complaint, Jane Doe 11 was a gynecologic and obstetrics patient of the Corp. Entities Defendants and their agent, servant, and/or employee, Hadden, who, while in the scope of his employment with the Corp. Entities Defendants, and while performing services for the Corp. Entities Defendants, repeatedly groomed, sexually exploited, assaulted and abused Jane Doe 11 under the guise of medical care and treatment between approximately 2006 and 2010, which was enabled by the acts and omissions of the Corp. Entities Defendants.

38.     Plaintiff Jane Doe 12 is a resident and citizen of the State of New York. At all times material to this complaint, Jane Doe 12 was an obstetrics patient of the Corp. Entities Defendants and their agent, servant, and/or employee, Hadden, who, while in the scope of his employment with the Corp. Entities Defendants, and while performing services for the Corp. Entities Defendants, repeatedly groomed, sexually exploited, assaulted and abused Jane Doe 12 under the guise of medical care and treatment between approximately May, 2012 and July, 2012, which was enabled by the acts and omissions of the Corp. Entities Defendants.

39.     Plaintiff Jane Doe 13 is a resident and citizen of the State of New York. At all times material to this complaint, Jane Doe 13 was a gynecologic and obstetrics patient of the Corp. Entities Defendants and their agent, servant, and/or employee, Hadden, who, while in the scope of his employment with the Corp. Entities Defendants, and while performing services for the Corp. Entities Defendants, repeatedly groomed, sexually exploited, assaulted and abused Jane Doe 13 under the guise of medical care and treatment between approximately 2000 and 2011, which was enabled by the acts and omissions of the Corp. Entities Defendants.

40.     Plaintiff Jane Doe 14 is a resident and citizen of the State of New York. At all times material to this complaint, Jane Doe 14 was a gynecologic and obstetrics patient of the Corp. Entities Defendants and their agent, servant, and/or employee, Hadden, who, while in the scope of his employment with the Corp. Entities Defendants, and while performing services for the Corp. Entities Defendants, repeatedly groomed, sexually exploited, assaulted and abused Jane Doe 14 under the guise of medical care and treatment between approximately 1998 and 2010, which was enabled by the acts and omissions of the Corp. Entities Defendants.

41.     Jane Doe 15 is a resident and citizen of the State of Florida. At all times material to this complaint, Jane Doe 15 was a gynecologic and obstetrics patient of the Corp. Entities Defendants and their agent, servant, and/or employee, Hadden, who, while in the scope of his employment with the Corp. Entities Defendants, and while performing services for the Corp. Entities Defendants, repeatedly groomed, sexually exploited, assaulted and abused Jane Doe 15 under the guise of medical care and treatment between approximately 2002 and 2009 which was enabled by the acts and omissions of the Corp. Entities Defendants.

42.     Jane Doe 17 is a resident and citizen of the State of New York. At all times material to this complaint, Jane Doe 17 was an obstetrics patient of the Corp. Entities Defendants and their agent, servant, and/or employee, Hadden, who, while in the scope of his employment with the Corp. Entities Defendants, and while performing services for the Corp. Entities Defendants, repeatedly groomed, sexually exploited, assaulted and abused Jane Doe 17 under the guise of medical care and treatment in 2005, which was enabled by the acts and omissions of the Corp. Entities Defendants.

43.     Jane Doe 18 is a resident and citizen of the State of Maryland. At all times material to this complaint, Jane Doe 18 was an obstetrics patient off the Corp. Entities Defendants and their agent, servant, and/or employee, Hadden, who, while in the scope of his employment with the Corp. Entities Defendants, and while performing services for the Corp. Entities Defendants, repeatedly groomed, sexually exploited, assaulted and abused Jane Doe 18 under the guise of medical care and treatment in 1998, which was enabled by the acts and omissions of the Corp. Entities Defendants.

44.     Plaintiff Jane Doe 19 is a resident and citizen of the State of New Jersey. At all times material to this complaint, Jane Doe 19 was a gynecologic and obstetrics patient of the Corp. Entities Defendants and their agent, servant, and/or employee, Hadden, who, while in the scope of his employment with the Corp. Entities Defendants, and while performing services for the Corp. Entities Defendants, repeatedly groomed, sexually exploited, assaulted and abused Jane Doe 19 under the guise of medical care and treatment between approximately 1993 and 2012, which was enabled by the acts and omissions of the Corp. Entities Defendants.

45.     Plaintiff Jane Doe 21 is a resident and citizen of the State of New York. At all times material to this complaint, Jane Doe 21 was a gynecologic and obstetrics patient of the Corp. Entities Defendants and their agent, servant, and/or employee, Hadden, who, while in the scope of his employment with the Corp. Entities Defendants, and while performing services for the Corp. Entities Defendants, repeatedly groomed, sexually exploited, assaulted and abused Jane Doe 21 under the guise of medical care and treatment between approximately guise of medical care and treatment between approximately 2003 and 2011, which was enabled by the acts and omissions of the Corp. Entities Defendants.

46.     Plaintiff Jane Doe 22 is a resident and citizen of the State of New York. At all times material to this complaint, Jane Doe 22 was a gynecologic and obstetrics patient of the Corp. Entities Defendants and their agent, servant, and/or employee, Hadden, who, while in the scope of his employment with the Corp. Entities Defendants, and while performing services for the Corp. Entities Defendants, repeatedly groomed, sexually exploited, assaulted and abused Jane Doe 22 under the guise of medical care and treatment between approximately guise of

medical care and treatment between approximately 1998 and 2012, which was enabled by the acts and omissions of the Corp. Entities Defendants.

47.     Plaintiff Jane Doe 23 is represented by other counsel.

48.     Plaintiff Jane Doe 26 is a resident and citizen of the State of New York. At all times material to this complaint, Jane Doe 26 was a gynecologic and obstetrics patient of the Corp. Entities Defendants and their agent, servant, and/or employee, Hadden, who while in the scope of his employment with the Corp. Entities Defendants, and while performing services for the Corp. Entities Defendants, repeatedly groomed, sexually exploited, assaulted and abused Jane Doe 26 under the guise of medical care and treatment between approximately 2004 and 2007, which was enabled by the acts and omissions of the Corp. Entities Defendants.

49.     Plaintiff Jane Doe 27 is a resident and citizen of the State of New York. At all times material to this complaint, Jane Doe 27 was a gynecologic patient of the Corp. Entities Defendants and their agent, servant, and/or employee, Hadden, who while in the scope of his employment with the Corp. Entities Defendants, and while performing services for the Corp. Entities Defendants, repeatedly groomed, sexually exploited, assaulted and abused Jane Doe 27 under the guise of medical care and treatment between approximately 2004 and 2012, which was enabled by the acts and omissions of the Corp. Entities Defendants.

50.     Plaintiff Jane Doe 28 is a resident and citizen of the State of New York. At all times material to this complaint, Jane Doe 28 was a gynecologic and obstetrics patient of the Corp. Entities Defendants and their agent, servant, and/or employee, Hadden, who while in the scope of his employment with the Corp. Entities Defendants, and while performing services for the Corp. Entities Defendants, repeatedly groomed, sexually exploited, assaulted and abused

Jane Doe 28 under the guise of medical care and treatment between approximately 2003 and 2012, which was enabled by the acts and omissions of the Corp. Entities Defendants.

51.     Plaintiff Jane Doe 30 is a resident and citizen of the State of South Carolina. At all times material to this complaint, Jane Doe 30 was a gynecologic and obstetrics patient of the Corp. Entities Defendants and their agent, servant, and/or employee, Hadden, who while in the scope of his employment with the Corp. Entities Defendants, and while performing services for the Corp. Entities Defendants, repeatedly groomed, sexually exploited, assaulted and abused Jane Doe 30 under the guise of medical care and treatment between approximately 2002 and 2010, which was enabled by the acts and omissions of the Corp. Entities Defendants.

## JURISDICTION AND VENUE

**THE COURT HAS SUBJECT-MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS UNDER 28 U.S.C. § 1331, BECAUSE IT ARISES UNDER THE LAWS OF THE UNITED STATES.**

52.     Venue is proper under 28 U.S.C. §1391(b)(2) because all of the events and omissions giving rise to these claims occurred in this District, and the Corp. Entities Defendants reside or have their principle place of business in this District.

## GENERAL ALLEGATIONS

53.     The American Medical Association's Principles of Medical Ethics commits its members to "providing competent medical care, with compassion and respect for human dignity and rights," reporting "physicians deficient in character," and regarding "responsibility to the patient as paramount."[7] Columbia's Robert Hadden not only pleaded guilty to sexually assaulting

---

[7]     AMA Code of Medical Ethics, *AMA Principles of Medical Ethics*, AM. MED. ASS'N (Revised June 2011),   https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/principles-of-medical-ethics.pdf

two unsuspecting patients under the guise of medical care, but the New York OPMC also found Hadden guilty of engaging in "inappropriate physical or verbal conduct, for other than a good faith medical purpose." See, **Exhibit** "**D**", OPMC Order of February 26, 2016.

54.    Although data indicates that most physicians practice medicine with integrity, sexual misconduct is one of the common reasons for disciplinary action by medical boards.[8]

55.    Moreover, OB/GYN doctors, such as Hadden, are among the most frequent to commit sexual violations, representing 12.9% of all cases[9] while only representing 4.6% of the physician population as a whole.[10]

56.    Psychological conditions caused by sexual misconduct against patients are profound and damaging, and include depression, anger, shame, betrayal, divorce, drug and alcohol abuse, trust issues, post-traumatic stress symptoms, and suicide, similar to those observed in the general population of survivors of sexual violence.[11] All of which appear to have been experienced, including suicide, by at least one or more of the victims of the Corp. Entities' 20-year history of enabling of Robert Hadden's sexual exploitation and abuse.

57.    However, one significant difference between patient-victims and non-patient victims in the general population is that fewer than one in ten patient-victims report sexual

---

[8]    *See Sexual Violations of Patients by Physicians*, *supra* Footnote 3 (FN 3), at 504.

[9]    *See id.* at 506, 513.

[10]    *See* Association of American Medical Colleges, *Active Physicians in the Largest Specialties, 2017*, https://www.aamc.org/data-reports/workforce/interactive-data/active-physicians-largest-specialties-2017 (last visited Feb. 28, 2022)

[11]    *See Sexual Violations of Patients by Physicians*, *supra* FN 3, at 504.

violations by their physicians, while the overall sexual assault reporting rate among non-patient victims is almost four times greater, at 36%.[12]

58.      Reasons for this significantly lower rate of reporting sexual violations against patient-victims includes shame, fear of not being believed, and crucially, ***not being aware of the abuse, and confusion as to whether the abuse occurred***.[13] This concept has been well researched and written about by Dr. Jennifer Freyd, and is called "betrayal blindness[14]".   *See,* "What is Betrayal Trauma? What is Betrayal Trauma Theory?", annexed as ***Exhibit "F".***

59.      Low levels of health literacy[15] are also a significant contributor to a victim's lack of awareness of sexual abuse, as well as their confusion as to whether abuse occurred.[16]

_____

[12]   *See id.*

[13]   *See id.*

[14] See, ***Exhibit "F"*** "What is a Betrayal Trauma? What is Betrayal Trauma Theory?" by Jennifer Freyd, PhD. Betrayal Truma, Betrayal Blindness, and Institutional Betrayal is **the unawareness, not-knowing, rationalizing, and forgetting exhibited by people towards betrayal**. The term "betrayal blindness" was introduced by Dr. Freyd in 1996, expanded by Freyd (1999) and Freyd and Birrell (2013) in the context of Betrayal Trauma Theory. It occurs in situations where the victim is dependent upon the perpetrator for the victim's own well being or survival. This dynamic is commonly seen in relationships between children and parents, athletes and coaches, and patients and their physician. When an act of betrayal, such as sexual abuse, occurs in this setting, the victim, knowing that she/he is dependent upon the perpetrator for their survival, will often rationalize the abuse, tell themselves it's not that bad, or convince themselves that they have somehow misinterpreted what was done to them, because the mere act of acknowledging the abuse for what it is, has the effect of putting other, or all, aspects of the victim's health, well being, and survival in jeopardy. See, Blind to Betrayal: Why We Fool Ourselves We Aren't Being Fooled (2013), by Jennifer Freyd and Pamela Birrell.

[15]   "Health literacy is defined as the degree to which individuals have the 'capacity to obtain, process, and understand basic health information and services needed to make appropriate health decisions.'" Kimberly A. Kilfoyle, MD, MSCR, Michelle Vitko, BA, et al., *Health Literacy and Women's Reproductive Health: A Systematic Review*, J. WOMEN'S HEALTH at 1237 (Dec. 1, 2016) ("*Health Literacy and Women's Reproductive Health*").   While "[m]ore rigorous studies are clearly warranted," some studies have shown as high as "78% of women had less than adequate health literacy skills," and limited health literacy "is likely to be common in reproductive health practices." *Id.* at 1253.

[16]   *See* Richard S. Safeer, MD, Jann Keenan, ED.S, *Health Literacy: The Gap Between Physicians and Patients*, 72(3) AM. FAM. PHYSICIAN (Aug. 1, 2005), at 464 ("*The Gap Between Physicians and Patients*").

60.     Other factors that contribute to the sexual assault of patient-victims include the social authority that physicians have to instruct patients to disrobe and to examine them in a setting often without any oversight,[17] much like Hadden had.

61.     It is axiomatic that lack of institutional oversight is a significant contributing factor to sexual violations of patients by physicians.[18]

62.     Chaperone presence, while a patient is being examined, is not enough to make up for a lack of oversight.  Studies have shown that 19% of sexual assaults committed by physicians occur with a chaperone, parent, nurse, or other individual present. Oftentimes, this is due to the chaperone doing paperwork, or the chaperone intentionally not observing in order to avoid implying mistrust of the physician, or because of the power imbalance that invariably exists between the doctor and the nurse chaperone.[19]

63.     Despite documented patient complaints, documented responses by Department Chairs, and even a New York Police Department arrest of Hadden at one of the Corp. Entities Defendants' medical clinics, no crime by Robert Hadden was too big for Corp. Entities Defendants or Columbia University to cover-up.

64.     Following Hadden's arrest at defendants' medical clinic on June 29, 2012 (Friday afternoon), for licking a patient during a bogus postpartum vaginal exam – ***and with the knowledge and awareness of*** Columbia University's General Counsel, Jane E. Booth ("Booth"), Columbia University's OB/GYN Head Administrator, Genie Delacarrie ("Dellacarrie"), Hadden's OB/GYN superior, John Evanko, MD ("Evanko"), and the actual Chairperson of the

---

[17]     *See Sexual Violations of Patients by Physicians*, *supra* FN 3 at 516.

[18]     *See id.* at 515.

[19]     *See id.* at 518.

Department of Obstetrics & Gynecology at Columbia University, Mary D'Alton, MD ("D'Alton")[20] – sexual predator Hadden was allowed to return to the Corp. Entities Defendants' clinics the following week where he continued to sexually exploit, assault, and abuse single women, married women, pregnant women, recent mothers, and minors **for at least another six weeks—but possibly a year or so longer as two patients have reported being exposed to Hadden at different office locations in 2013**. See attached NYPD Investigative Interview at **Exhibit "G"**.

65.   None of this should have ever happened. Studies show that 96% of cases of sexual violations by physicians involved **repeated abuse**, rather than a one-off incident, with 73% of such continuing for **more than one year**. Moreover, 57% of cases of sexual violations by physicians involved **five or more victims**.[21]

66.   The Corp. Entities Defendants, including their principals, administrators, chairpeople, Provost, Trustees, and, upon information and belief, even the President of Columbia University Lee Bollinger, knew of Hadden's prolific sexual predation of female patients dating back to the early 1990s, and yet did nothing to stop Hadden's abuse of women and children.

---

[20]   These allegations of Columbia's direct knowledge are supported by, among other things, Jane E. Booth's (Columbia University's General Counsel) physical presence at the District Attorney of New York's ("DANY") interview of one of Columbia's chaperones on or about July 11, 2012, during the District Attorney's sex crimes investigation of Hadden, and Evanko and D'Alton's presence at their Columbia offices on East 60th Street, New York, NY, when the investigators appeared at that location on June 30, 2012, to interview the OB/GYN Department Administrator, Genie Delacarrie, regarding Hadden's sex crimes. It is unclear why Booth was even permitted to be present for the confidential chaperone interview (who was employed by New York Presbyterian Hospital—not Columbia University), particularly since the chaperone already had an attorney, Helen Cantwell, representing her for the interview, and the Columbia Defendants themselves had potential criminal liability for Hadden's crimes.

[21]   *See Sexual Violations of Patients by Physicians*, *supra* note 3, at 513.

67.     Instead, the Corp. Entities Defendants and their staff engaged in a 25 year cover-up of Hadden's serial sexual exploitation and abuse, allowing for hundreds, if not thousands, more patients to be victimized by Hadden.

68.     As a result of the collusion, aiding, abetting, enabling, concealment, fraud, and cover-ups by the Corp. Entities Defendants, who all played an integral role, the Corp. Entities Defendants and their agents, servants and employees, are all directly responsible for helping Hadden become the most prolific serial sexual predator in the history of New York.

69.     These events are not isolated, and they were not done outside the knowledge and awareness of the Corp. Entities Defendants. The Corp. Entities Defendants knew that Hadden was known as "a shark" - a doctor who knew how to outmaneuver chaperones, make quick hits at sexually abusing female patients, and keep going – amongst the medical assistants and chaperones with whom he worked.

70.     At least one nurse who worked with Hadden between 1992 and 1993 walked in on Hadden sexually abusing a female patient at Columbia University's Audubon Clinic. However, when the nurse reported the abuse Hadden was committing to her supervisor, the supervisor's response was for her to just "keep quiet," "stay with your doctor," and "don't let him get himself in trouble."

71.     The Corp. Entities Defendants created and fostered an environment that was not only conducive to doctor sexual assaults, but actually enabled it. By failing to properly educate, train, empower, and support its other employees, such as its nurses, medical assistants and chaperones, the Corp. Entities Defendants created and fostered an environment where patients, including minor patients, were duped and lulled into believing that there was someone in the

examination room who would keep them safe. But, in reality, the clear imbalance of power that exists between the chaperones and medical doctors – where the chaperones were afraid to speak-up for fear of losing their jobs – ***had the very real and practical effect of making doctor sexual abuse appear to be legitimate medical care when viewed from the perspective of any reasonable patient***. After all, if what the doctor was doing constituted sexual abuse of the patient, wouldn't the very person whose duty it is to prevent such abuse (the chaperone) do something?

72.     Because the Corp. Entities Defendants' chaperones stood by silently and watched – and effectively participated in the sexual exploitation, abuse and cover-up of Hadden's serial sexual misconduct by failing to prevent or stop Hadden – Plaintiffs reasonably believed that Hadden must have been conducting legitimate and necessary medical treatment while he was ogling, groping, verbally assaulting, and physically abusing, violating, sexually abusing, penetrating, and digitally raping them, although they now know that Hadden's conduct was, in fact, sexual exploitation and abuse.

73.     Despite the Corp. Entities Defendants' chaperones' first-hand observation of the abuse and Hadden's history of evading their observation by telling the chaperones to leave the room, and the Corp. Entities Defendants' prior reports about Hadden's sexual misconduct, the Corp. Entities Defendants and their agents, partners, servants, and employees actively concealed Hadden's sexually exploitative behavior, and inexplicably continued to allow Hadden to have unfettered sexual access to the female and minor female patients at the Corp. Entities Defendants' medical facilities.

74.     Based on the words and conduct of each of the Defendants, their agents, servants, and/or employees, Plaintiffs were lulled into and induced not to file complaints earlier.  Further, Plaintiffs have been emotionally traumatized by Defendants' conduct and abuse, and have lacked the capacity to deal with, and confront, the important legal issues and rights herein until the present.

75.     Moreover, the pervasive sexual abuse of patients in the Corp. Entities Defendants' medical centers has continued unabated, even after Hadden's arrest and termination. In just 2019, pediatric gastroenterologist and tenured professor at CUCPS, Joel Lavine ("Lavine"), was arrested for sexual abuse of a former patient and was subsequently convicted of two counts of sexual abuse in the third degree.[22] Prior to his arrest, Lavine had multiple complaints lodged with the Corp. Entities Defendants against him (including by a female co-worker), but was still allowed to return. And, even now nearly three years since his arrest, Lavine's tenure has not been terminated, he appears to continue living in housing owned and provided by the Corp. Entities Defendants, and continues to enjoy unfettered access to all Corp. Entities Defendants-owned buildings, including the campus at Columbia University.

---

[22]   Graham Kates, *Suspended Columbia University doctor sentences for abusing former patient*, CBS NEWS (Feb. 18, 2022), https://www.cbsnews.com/news/columbia-university-doctor-joel-lavine-sentenced-sexual-abuse-former-patient/.

76.     Perhaps worst of all, Hadden and Lavine's egregious misconduct are not isolated incidents. The Corp. Entities Defendants have repeatedly allowed employees accused and even *convicted* of sexual misconduct to remain employed by them.[23] [24]

## FACTS SPECIFIC TO PLAINTIFFS

*Plaintiff Marissa Hoechstetter:*

77.     Marissa Hoechstetter was born in 1979.

78.     Marissa Hoechstetter was a gynecology and then an obstetrics patient of Corp. Entities Defendants at all times relevant to this complaint.

79.     Marissa Hoechstetter was repeatedly sexually exploited and abused by Hadden, including while Marissa Hoechstetter was pregnant, for the first time, with her twins.

80.     The Corp. Entities Defendants enabled Marissa Hoechstetter's abuse by their acts and omissions.

---

[23]  Karen Xia & Khadija Hussain, *Up against the invincible: A professor was convicted of sexual misconduct. Why is he still on campus?*, COLUMBIA SPECTATOR (Apr. 11, 2019), https://www.columbiaspectator.com/news-features/2019/04/11/up-against-the-invincible-a-professor-was-convicted-of-sexual-misconduct-why-is-he-still-on-campus-2/ (last updated June 9, 2019).

[24]  See, e.g., Thomas Roma <https://hyperallergic.com/419929/thomas-roma-sexual-misconduct-accusations/> - Professor of the Arts - Serial Sexual Harassment of female students for two-decades; Robert Hadden <https://www.atdlaw.com/2013/08/09/the-new-york-and-presbyterian-hospital-fails-to-enforce-basic-patient-safety-rule-resulting-in-serial-sexual-assaults-of-female-patients-by-dr-robert-hadden/> - Obstetrician Gynecologist - Serial Sexual Exploitation and Abuse of female patients for two-decades; William Harris <https://www.nytimes.com/2017/12/18/nyregion/william-harris-columbia-harassment.html> - Professor of History - Sexually assaulted female students for decades through Dec. 2017; Thomas Jessell <https://www.columbiaspectator.com/eye-lead/2018/04/20/under-the-veil-the-silence-surrounding-sexual-harassment-in-labs-at-columbia/> - Neuroscience Professor - Sexually assaulted female researcher from 2014 though 2018; Tom Hartford <https://nypost.com/2018/08/28/bombshell-suit-alleges-columbia-dean-coerced-student-into-sex/> - Dean of Students - Sexually assaulted freshman female student seeking housing in 2018; Geert Bekaert <https://poetsandquants.com/2018/07/27/prof-wins-1-25-million-from-columbia-b-school-professor-geert-bekaert/> - Professor of Business - Sexually harassed female researcher and tried to sabotage her career.

81.     Marissa Hoechstetter saw Hadden at the Corp. Entities Defendants' medical facilities, including NYPH, for what was purported to be gynecologic and obstetrical care and treatment between approximately 2009 and 2012.

82.     Marissa Hoechstetter was referred to Hadden, by a friend of hers, who happened to be Hadden's niece. Hadden knowingly and intentionally exploited Plaintiff's close personal friendship with his own niece to disarm, manipulate and sexually abuse Marissa Hoechstetter.

83.     Beginning with Marissa Hoechstetter's initial office visit as a gynecology patient, Hadden began subjecting her to a course of predatory grooming, boundary violating, mental, emotional, and physical sexual abuse.  During each of her follow-up visits with Hadden, Hadden assailed Marissa Hoechstetter with a barrage of wily, inappropriate, invasive, intrusive, and exploitive questions and statements about her appearance, body, sexual history, and sexual activity including, among other things, questioning Marissa Hoechstetter whether she had any "trouble" having orgasms, and whether or not her partner was able to 'satisfy' her.

84.     Hadden's approach to grooming Marissa Hoechstetter was a mix of being authoritative, awkward, self-deprecating, disarming, self-pitying, alarming, fear mongering, and overtly offensive.  These behaviors are classic "grooming" behaviors.[25]

85.     While Hadden was actively and verbally breaking down Marissa Hoechstetter's boundaries, Hadden forced Marissa Hoechstetter to answer questions about herself, her sex life and sexual activity; and peppered her with a series of irrelevant and medically inappropriate questions for long periods while ogling and groping her unclothed body, breasts, and vagina. While ogling and groping Marissa Hoechstetter's unclothed body, Hadden continued to engage

---

[25]     *Grooming*, *supra* note 2.

in idle chatter about medically irrelevant information. Hadden's incessant chatting was done with the sole intention of grooming and distracting the patient, so he could prolong the time he had access to her body.

86.     During Marissa Hoechstetter's initial visit with Hadden, a chaperone was present in the room at the beginning and witnessed the verbal and physical exploitation, abuse and assaults firsthand, yet did nothing to prevent or stop Hadden's sexual exploitation and abuse of Marissa Hoechstetter. The nurse's presence in the room, and failure to stop Hadden's abuse, left the patient with the impression that Hadden's actions were somehow consistent with a bona fide gynecologic or obstetric examination, and not a form of sexual exploitation or abuse.

87.     During several, if not all, of Marissa Hoechstetter's OB/GYN appointments with Hadden, Hadden performed prolonged breast and vaginal examinations, with his bare, ungloved hands. While performing the serial, prolonged, and medically inappropriate breast examinations, Hadden would continue to groom the patient by disclosing personal and private information about himself and his family. Hadden would routinely perform his invasive and prolonged "examinations" of patient's breasts, while engaging in idle chatter, about his niece, and family, as he would ogle Plaintiff's body, and "examine" the patient's breasts, even throughout the prenatal period, by massaging, fondling, tugging, pulling, squeezing, and pinching Marissa Hoechstetter's breasts and nipples in a manner inconsistent with medical standards. These exams occurred without a nurse, medical assistant, or chaperone present in the room. Hadden conducted serial, medically unnecessary and unwarranted vaginal examinations throughout the patient's prenatal period. The fact that the Chaperone would leave the room caused the patient to believe that Hadden was a reputable and trusted OBGYN within Columbia University, and that his actions

were somehow consistent with a bona fide gynecologic or obstetric examination, and not a form of sexual exploitation or abuse.

88.     Marissa Hoechstetter gave birth to her twins in the spring of 2011. Following the cesarian section delivery of her children, while Marissa Hoechstetter was in her hospital room, alone and recuperating, from major surgery, Hadden strolled into her hospital room, unaccompanied, and under the guise of medical care, opened the front of her hospital gown, exposing her breasts, and remarked to the new mother, "You look like a porn star!"

89.     Marissa Hoechstetter returned to the office in May, 2012, for her first postpartum visit, as she had been instructed upon discharge from the hospital. During the vaginal examination, while the patient was on the exam table, completely naked but covered in a drape, with Hadden sitting on a low stool, and out of the patient's field of vision, Hadden licked Plaintiff's vagina. The patient left the office, paralyzed by shame and fear, and never returned to the practice.

90.     Hadden's name was listed as the delivering doctor on Marissa Hoechstetter's children's birth certificates. Due to the painful memories of Hadden's abuse and the thought that the very hands that had abused her, were the same hands that first touched her babies, Marissa Hoechstetter was compelled to advocate for a change in the law. In 2019, in great part due to the efforts of Ms. Hoechstetter, a law was passed ensuring that if a doctor lost his license through disciplinary review, that doctor's name could be removed from birth certificates.

91.     Marissa Hoechstetter has endured, and continues to endure, indescribable conflict, confusion, and mental injury due to her inability to comprehend the reasons and level of depravity of the abuse inflicted upon her by Hadden.

92.     At all times relevant to Marissa Hoechstetter's experiences with Hadden, Hadden was well aware of the cognitive dissonance that his patients - who he was sexually abusing - would experience with regard to their inability to come to grips with the unfathomable idea that their own medical doctor was sexually exploiting and abusing them.

93.     Hadden used and exploited his position of trust and authority bestowed on him by the Columbia Defendants to his disgusting advantage and his own depraved benefit, and in furtherance of his scheme to sexually abuse and exploit as many women as possible under the guise of performing routine medical procedures.

94.     As a result, Hadden was able (and enabled by the Corp. Entities Defendants) to sexually abuse countless female patients of the Columbia Defendants in a serial fashion, while carrying out his sick and disturbing fantasies surrounding doctor sexual abuse. Columbia University's (and its related entities) active concealment, lies, verbal, non-verbal, and written statements to the plaintiff in particular, and the public at large, were designed to cause, and did cause, plaintiff to forbear on pursing both civil and criminal legal action against the Defendants named here. As a result of the grooming, mental impact, psychological harm, physical trauma, and intentional acts of psychological manipulation that were inflicted upon the plaintiff, by the Corp. Entities Defendants, the plaintiff suffered cognitive dissonance and a qualified deficit that was designed to cause, and did cause, plaintiff to be unable to protect her own legal rights and interests. Finally, on account of Defendants' collective fraud, and fraudulent concealment, committed against Marissa Hoechstetter, the plaintiff did not know, could not have reasonably known, and was not reasonably aware of any possible cause of action that she had against the Corp. Entities Defendants until she spoke with counsel on or about August 20, 2018.

*Plaintiff Jane Doe 8:*

95.     Jane Doe 8 was born in 1985.

96.     Jane Doe 8 was a gynecologic and obstetrics patient of Corp. Entities Defendants at all times relevant to this complaint.

97.     Jane Doe 8 was repeatedly sexually exploited and abused by Hadden, including throughout her three (3) pregnancies.

98.     The Corp. Entities Defendants enabled Jane Doe 8's abuse by their acts and omissions.

99.     Jane Doe 8 saw Hadden at the Corp. Entities Defendants' medical facilities, including NYPH, for what was purported to be gynecologic and obstetrical care and treatment between approximately 2006 and 2011.

100.    Beginning with the patient's initial office visit, defendant Hadden began subjecting her to a course of predatory grooming, boundary violating, mental, emotional, and physical sexual exploitation and abuse. During the visits, Hadden assailed the patient with a barrage of wily, inappropriate, invasive, intrusive and exploitive questions and statements about her body, and physical appearance, sexual history, and the use of pornography. Hadden's approach to grooming was a mix of being awkward, authoritative, self-deprecating, disarming, self-pitying, alarming, and overtly offensive. While Hadden was actively and verbally breaking down the patient's boundaries, he forced the patient to answer questions about her sexuality, and peppered her with a series of irrelevant and medically inappropriate questions for long periods while ogling and groping her breasts and unclothed body.

101.    At her very first office visit, Jane Doe 8 informed Hadden that she had not been to a gynecologist before, and was not sexually active. She further informed Hadden that she held firm to her religious convictions and would remain a virgin until marriage. Hadden used this information to engage in inappropriate, improper, unwelcome, unsolicited, invasive, intrusive, graphic and explicit "sexual advice", asking Jane Doe 8 if she masturbated, probing about her sexual experience, and sketching illustrations of sexual acts and penises for her. Despite the fact Jane Doe was not sexually active, and a virgin, who wanted to remain so until her marriage, Hadden forced her to undergo a vaginal exam and a Pap smear. During the vaginal exam, Hadden told the patient she had a "beautiful vagina".

102.    A Chaperone was present in the room during some of the verbal and physical assaults and witnessed Hadden's verbal and physical sexual abuse firsthand yet did nothing to prevent or stop Hadden's sexual exploitation and abuse of Jane Doe 8. The nurse's presence in the room, and failure to stop Hadden's abuse, left Jane Doe 8 with the impression that Hadden's actions were somehow consistent with a bona fide gynecologic or obstetric examination, and not a form of sexual exploitation or abuse. Other times, a Chaperone was not present - or would leave the room before the "examination" was complete at which point Hadden would continue to physically sexually exploit and abuse Jane Doe 8. This included, performing serial, prolonged, and medically inappropriate breast examinations, culminating in Hadden pulling, groping, squeezing, tugging and pinching Jane Doe 8's breasts and nipples, serial and medically-inappropriate, prolonged and unwarranted PAP smears, and vaginal exams, conducted with ungloved hands. When Plaintiff questioned Hadden as to why he was conducting ungloved vaginal examinations, Hadden told Jane Doe 8 that she was "allergic to latex" as justification for

using his bare hands to grope and probe her vagina. Hadden would use his bare fingers to stroke Jane Doe 8's vagina, and her clitoris, under the guise of "lubricating" the area in preparation for the pelvic exams, all the while divulging wholly improper and inappropriate personal information about himself and his family. Hadden spoke about his daughter, and the "stress" he was under due to his wife's surgery.

103.     When Jane Doe 8 became pregnant with her first child, she presented for prenatal care. At one point, the Plaintiff notified Hadden she had gained weight, and Hadden retorted, "you did not gain 10 lbs. in your breasts". Throughout Jane Doe 8's pregnancies, Hadden performed vaginal examinations to "check dilation" at every visit, in contravention of accepted medical standards, despite the fact Jane Doe 8 was nowhere near her due or delivery dates. During one of Jane Doe 8's pregnancies, she felt decreased fetal movements and expressed her concerns to Hadden, whose response was that she needed to undergo a sonogram, because "what's my finger going to do?" Hadden failed to diagnose Jane Doe 8 with hypertension. Following the delivery of her first child, and after Hadden had finished suturing the laceration caused by the delivery, Hadden commented to Jane Doe 8's husband, while winking at him, that he had "made it [her vagina] tighter". This unauthorized maneuver, referred to as a "husband stitch", or "daddy stitch", involves placing an extra suture in the woman's perineum which is typically performed — as it was here — by an out-of-date misogynist, and sadist, who has zero regard for patient autonomy. This so-called 'procedure' was performed without Jane Doe 8's consent or knowledge, and was done solely for the purpose of creating a smaller opening to the patient's vagina, based on the desires of a sadistic, power-tripping, sexually deviant OB/GYN. The fact that Hadden deployed this procedure upon Jane Doe 8 is yet another example of

Hadden's history of subjugating women as being mere sexual objects, who exist solely for his own sexual gratification, with no personal autonomy or independent decision-making capacity of their own.

104.    At Jane Doe 8's postpartum visit, in 2011, Hadden conducted another prolonged, medically unnecessary breast examination, wherein Hadden squeezed, fondled, massaged, caressed, cupped, pulled, tugged and pinched Jane Doe 8's breasts and nipples until he expressed breast milk. Hadden watched as the breast milk squirted onto his beard, and as it trickled down Jane Doe 8's breasts.  At that point, Jane Doe 8 noticed Hadden had an erection.

105.    Jane Doe 8 left the office, deeply disturbed, confused, and upset. Jane Doe 8 had wanted a large, healthy family. Hadden's predatory behavior, during her pregnancies, caused the Plaintiff anxiety, during what should have been joyous events for her, and she was hesitant to have more children.

106.    Jane Doe 8 has endured, and continues to endure, indescribable conflict, confusion, a profound sense of betrayal and deep and profound mistrust of the medical community, and mental injury due to her inability to comprehend the reasons and level of depravity of the abuse inflicted upon her by Hadden.

107.    At all times relevant to Jane Doe 8's experiences with Hadden, Hadden was well aware of the cognitive dissonance that his patients - who he was sexually abusing - would experience with regard to their inability to come to grips with the unfathomable idea that their own medical doctor was sexually exploiting and abusing them.

108.    Hadden used and exploited his position of trust and authority bestowed on him by the Columbia Defendants to his disgusting advantage and his own depraved benefit, and in

furtherance of his scheme to sexually abuse and exploit as many women as possible under the guise of performing routine medical procedures.

109.    As a result, Hadden was able (and enabled by the Corp. Entities Defendants) to sexually abuse countless female patients of the Columbia Defendants in a serial fashion, while carrying out his sick and disturbing fantasies surrounding doctor sexual abuse. Columbia University's (and its related entities) active concealment, lies, verbal, non-verbal, and written statements to the plaintiff in particular, and the public at large, were designed to cause, and did cause, plaintiff to forbear on pursing both civil and criminal legal action against the Defendants named here. As a result of the grooming, mental impact, psychological harm, physical trauma, and intentional acts of psychological manipulation that were inflicted upon the plaintiff,  by the Corp. Entities Defendants, the plaintiff suffered cognitive dissonance and a qualified deficit that was designed to cause, and did cause, plaintiff to be unable to protect her own legal rights and interests. Finally, on account of Defendants' collective fraud, and fraudulent concealment, committed against Jane Doe 8, the plaintiff did not know, could not have reasonably known, and was not reasonably aware of any possible cause of action that she had against the Corp. Entities Defendants until she spoke with counsel on or about August 20, 2018.

***Plaintiff Jane Doe 9:***

110.    Jane Doe 9 was born in 1971.

111.    Jane Doe 9 was a gynecologic and obstetrics patient of Corp. Entities Defendants at all times relevant to this complaint.

112.    Jane Doe 9 was repeatedly sexually exploited and abused by Hadden, including throughout her three (3) pregnancies.

113.    The Corp. Entities Defendants enabled Jane Doe 9's abuse by their acts and omissions.

114.    Jane Doe 9 saw Hadden at the Corp. Entities Defendants' medical facilities, including NYPH, for what was purported to be gynecologic and obstetrical care and treatment between approximately 2002 and 2010.

115.    A Chaperone was present in the room during some of the verbal and physical assaults and witnessed Hadden's verbal and physical sexual abuse firsthand yet did nothing to prevent or stop Hadden's sexual exploitation and abuse of Jane Doe 9. The nurse's presence in the room, and failure to stop Hadden's abuse, left Jane Doe 9 with the impression that Hadden's actions were somehow consistent with a bona fide gynecologic or obstetric examination, and not a form of sexual exploitation or abuse. Other times, a Chaperone was not present - or would leave the room before the "examination" was complete at which point Hadden would continue to physically sexually exploit and abuse Jane Doe 9. This included, but is not limited to, performing serial, prolonged, medically inappropriate and unwarranted breast examinations, conducted throughout the gynecologic, prenatal and postpartum periods. Hadden massaged, fondled, massaged, groped, squeezed, pulled, tugged and pinched Jane Doe 9's breasts, and nipples, for prolonged periods, as he engaged in idle chatter, divulging wholly improper and inappropriate personal information about himself and his family - all in furtherance of his never-ending sexual exploitation and grooming of female patients. The breast examinations were conducted at every visit, including throughout Jane Doe 9's three pregnancies. Hadden would further comment that Jane Doe 9 liked "the sun", and have her undergo annual "mole checks". During these bogus "exams", Hadden would require the plaintiff to lay on the exam table, unclothed, or stand, naked

before him, while he rubbed his hands up and down her body, spread her buttocks, groped her breasts, and examined her entire body and private areas.

116.    Beginning with the patient's initial office visit, defendant Hadden began subjecting her to a course of predatory grooming, boundary violating, mental, emotional, and physical sexual exploitation and abuse. During the visits, Hadden assailed the patient with a barrage of wily, inappropriate, invasive, intrusive and exploitive questions and statements about her body, and physical appearance, sexual history, and the use of pornography. Hadden's approach to grooming was a mix of being awkward, authoritative, self-deprecating, disarming, self-pitying, alarming, and overtly offensive. While Hadden was actively and verbally breaking down the patient's boundaries, he forced the patient to answer questions about her sexuality, the number of sexual partners and sexual acts she had engaged in, whether her partner was able to "satisfy" her, and peppering Jane Doe 9 with a series of similar irrelevant and medically inappropriate questions for prolonged periods of time, while ogling and groping her breasts and unclothed body.

117.    Hadden would often greet plaintiff Jane Doe 9 with a kiss on the cheek, in an attempt to form a "personal" bond with the plaintiff. Hadden made wholly inappropriate, improper, gratuitous, and unwelcome comments about the Jane Doe 9's body, remarking that she looked "like a Barbie doll, with long legs, small waist and large breasts". Hadden's obsession with Jane Doe 9's body and appearance included probing and medically irrelevant questions about where she had her private area waxed, and would follow up his abuse by "advising" the plaintiff - who had absolutely no interest in knowing - that "a bunch" of his patients had their waxing performed at "J. Sisters", on 57th Street.

118.    At every visit, Hadden required Jane Doe 9 to get completely naked - in his presence - as he ogled and exploited her. A Chaperone was present in the room during some of the verbal and physical assaults and witnessed Hadden's verbal and physical sexual abuse firsthand yet did nothing to prevent or stop Hadden's sexual exploitation and abuse of the patient. Other times, a Chaperone was not present - or would leave the room before the "examination" was complete at which point Hadden would continue to physically sexually exploit and abuse the patient. This included, but is not limited to, performing serial, prolonged, and medically inappropriate breast examinations, even throughout Jane Doe's pregnancies, which culminated in massaging, fondling, groping, squeezing, tugging, pulling and pinching of the plaintiff's nipples.

119.    Hadden conducted serial, prolonged, medically inappropriate and unwarranted vaginal exams and PAP smears, even throughout the prenatal periods. Prior to Jane Doe 9's first pregnancy, Hadden would provide her with birth control pills, without a written prescription, and informed her she would have to return more frequently for "monitoring", and undergo additional vaginal exams as a result of being on oral contraceptives. During the prenatal vaginal exams, Hadden would repeatedly penetrate the plaintiff by inserting his fingers into her vagina in a rough, forceful and aggressive manner, to the point where Jane Doe 9's body would "shoot up the table" in reaction to the pain he was inflicting. The vaginal exams continued in this fashion, and were so intolerably painful, that Jane Doe 9 requested Hadden "be more gentle" with his exams. Hadden's response was that the pain was caused due to the baby being "really low", and continued to conduct his vaginal exams in the same way until Jane Doe 9 requested that another Ob/Gyn conduct future medically necessary prenatal internal exams. Jane Doe 9's future exams, with Hadden's colleagues, were not painful.

120.   In or about 2007, while Jane Doe 9 was pregnant with her second child, and approaching her due date, Hadden conducted a "procedure", inserting his hand in the plaintiff's vagina with such force that caused the plaintiff indescribably excruciating pain, which she has described as feeling like she was being "torn apart". Hadden informed Jane Doe 9 that he was "speeding things up", despite the fact that the plaintiff was not dilated. Hadden's unauthorized "procedure" caused the patient to go into labor eight (8) hours later. The infant was not delivered by Hadden.

121.   During the postpartum periods, Hadden continued to sexually exploit Jane Doe 9, asking her if she was still able to "achieve orgasms" after she had given birth. At one of the postpartum visits, while the plaintiff's breasts were engorged, Hadden insisted a breast examination was necessary. After making Jane Doe 9 remove all her clothing, for no legitimate medical purpose, Hadden proceeded to grope and cup her breasts, squeezing, tugging and pinching her nipples so as to express breast milk while allowing it to run down her breasts.

122.   Jane Doe 9 has endured, and continues to endure, indescribable conflict, confusion, a profound sense of betrayal and deep and profound mistrust of the medical community, and mental injury due to her inability to comprehend the reasons and level of depravity of the abuse inflicted upon her by Hadden.

123.   At all times relevant to Jane Doe 9's experiences with Hadden, Hadden was well aware of the cognitive dissonance that his patients - who he was sexually abusing - would experience with regard to their inability to come to grips with the unfathomable idea that their own medical doctor was sexually exploiting and abusing them.

124.    Hadden used and exploited his position of trust and authority bestowed on him by the Columbia Defendants to his disgusting advantage and his own depraved benefit, and in furtherance of his scheme to sexually abuse and exploit as many women as possible under the guise of performing routine medical procedures.

125.    As a result, Hadden was able (and enabled by the Corp. Entities Defendants) to sexually abuse countless female patients of the Columbia Defendants in a serial fashion, while carrying out his sick and disturbing fantasies surrounding doctor sexual abuse. Columbia University's (and its related entities) active concealment, lies, verbal, non-verbal, and written statements to the plaintiff in particular, and the public at large, were designed to cause, and did cause, plaintiff to forbear on pursing both civil and criminal legal action against the Defendants named here. As a result of the grooming, mental impact, psychological harm, physical trauma, and intentional acts of psychological manipulation that were inflicted upon the plaintiff,  by the Corp. Entities Defendants, the plaintiff suffered cognitive dissonance and a qualified deficit that was designed to cause, and did cause, plaintiff to be unable to protect her own legal rights and interests. Finally, on account of Defendants' collective fraud, and fraudulent concealment, committed against Jane Doe 9, the plaintiff did not know, could not have reasonably known, and was not reasonably aware of any possible cause of action that she had against the Corp. Entities Defendants until she spoke with counsel on or about August 22, 2018.

***Plaintiff Jane Doe 10:***

126.    Jane Doe 10 was born in 1972.

127.    Jane Doe 10 was an obstetrics patient of Corp. Entities Defendants at all times relevant to this complaint.

128.   Jane Doe 10 was repeatedly sexually exploited and abused by Hadden during her first pregnancy.

129.   The Corp. Entities Defendants enabled Jane Doe 10's abuse by their acts and omissions.

130.   Jane Doe 10 saw Hadden at the Corp. Entities Defendants' medical facilities, including NYPH, for what was purported to be obstetrical care and treatment between approximately 2010 and August, 2011.

131.   Beginning with Jane Doe 10's initial office visit, Hadden began subjecting her to a course of predatory grooming, boundary violating, mental, emotional, and physical sexual exploitation and abuse. During the visits, Hadden assailed Jane Doe 10 with a barrage of wily, inappropriate, invasive, intrusive and exploitive questions and statements about her about her body, physical appearance, and sexual history, the number of sexual partners and sexual acts she had engaged in, whether she experienced orgasms, whether her partner was able to "satisfy" her and the use of pornography. Hadden's approach to grooming was a mix of being awkward, authoritative, self-deprecating, disarming, self-pitying, alarming, and overtly offensive. On multiple occasions, Hadden made inappropriate, gratuitous comments about her appearance, declaring several times she was "fit" and "hot" and that her husband had better "appreciate it". Hadden's grooming also included telling Jane Doe 10 that he, and other Columbia physicians, would discuss "which [other] patients were "Nannies" and which were "Moms" based upon how "hot" they were. Hadden expressed shock when he found out Jane Doe 10 was in the "Mom" category because - as he explained - her pregnancy was not obvious until she was in her 20th week.

132.    A Chaperone was rarely, if ever, present in the room during any of the verbal and physical assaults and committed Hadden upon the plaintiff. In fact, the Chaperone would escort Jane Doe 10 into the examination room, instruct her to undress, would leave the room, and did not return. The Chaperone did not remain in the room while Hadden was sexually abusing and exploiting Jane Doe 10. And the fact that the Chaperone would leave the room caused Jane Doe 10 to believe that Hadden's actions were somehow consistent with a bona fide gynecologic or obstetric examination, and not a form of sexual exploitation or abuse. Hadden would take advantage of his position of power and trust by sexually exploiting and abusing the plaintiff. This included, but is not limited to, performing serial, prolonged, and medically inappropriate breast examinations, serial and medically inappropriate PAP smears and vaginal exams, all conducted with ungloved hands. Hadden further advised the patient she had Raynaud's, a disease of the breast, that "required" aggressive pinching of her nipples to determine if blood flow was adequate. That was a lie as the patient underwent subsequent testing, which determined she did not, in fact, suffer from this disease. All the while, Hadden would engage in idle chatter or begin divulging wholly improper and inappropriate personal information about himself and family, and discussions about his own daughter's ballet dancing - all in furtherance of his never-ending sexual exploitation and grooming of female patients during and after the "examinations" Hadden was performing.

133.    At one point around Jane Doe 10's 32nd week of pregnancy, during a prenatal visit, Hadden instructed her to get naked for another examination. After exposing her breasts, Hadden began grabbing, groping, massaging, squeezing, pulling, tugging and pinching her nipples with his ungloved hands in a forceful manner while telling Jane Doe 10 that she needed

to "massage her breasts" like that to get ready for the milk to come out. Due to the fact that the plaintiff had suffered a miscarriage during her first pregnancy, and this was her first pregnancy being carried to term, Jane Doe 10 was anxious about the health and well-being of her unborn child. Jane Doe 10 had no way of knowing how incredibly exploitative and abusive this was - aside from the really painful, rough and forceful nature in which the "examinations" were being performed. Following every exploitative and abusive encounter, Hadden would bring the plaintiff into his office to discuss his own daughter who he claimed was a "ballet dancer".

134.    During the following prenatal visit, Hadden instructed Jane Doe 10 to again get naked because she needed another "vaginal exam". While in stirrups, pregnant, and naked from the waist down, Hadden verbally told Jane Doe 10 that he was performing a PAP smear but instead licked her vagina. Hadden then stated, "Everything tongues good, I mean, looks good". Jane Doe 10 was mortified, confused, conflicted, and unable to process what had just happened. She left the office, and contacted her insurance carrier to request switching medical care providers but was told that she could not transfer care to another obstetrician in the middle of a pregnancy. Jane Doe 10 struggled with what Hadden had done to her, but proceeded to convince herself that the sexual assaults never actually happened, that perhaps she was just mistaken, or her hormones or sensations were off because of her pregnancy. Jane Doe 10, who had miscarried with her prior pregnancy, feared for the health and well-being of her unborn child if she did not receive prenatal care, and felt she had no other option but to continue to see Hadden until her baby was delivered. At her next prenatal visit, Hadden, under the guise of rendering "medical care and treatment", once again, instructed the patient to get naked because she needed another

"vaginal exam". Again, while in stirrups, pregnant, and naked from the waist down, Hadden licked her vagina. Plaintiff was caused to be embarrassed, and humiliated, felt a profound sense of shame and guilt that somehow she was at fault for the actions of her abuser, Hadden. Jane Doe 10 gave birth to her child very soon after and returned for her first postpartum care visit with her newborn in tow, feeling that somehow the sight of the newborn infant would deter Hadden from assaulting and sexually abusing her. During the postpartum visit, Hadden advised the patient that she needed a postpartum "Pap smear'. With her newborn baby in the room, while pretending to perform the medically unnecessary and unwarranted "Pap smear and vaginal examination", Hadden again put his tongue to the patient's vagina, this time in the presence of her child. The patient never returned to Hadden after the third sexual assault on her person.

135.    Hadden further made unwelcome, unsolicited telephone calls to Jane Doe 10 in between appointments. The plaintiff did not provide Hadden with her cell phone number, did not contact to the office or Hadden to inquire about anything, and was not expecting Hadden to contact her. These personal calls were completely unnecessary, and disturbed Jane Doe 10, due to her belief that doctors would only contact her if there was bad news to impart.

136.    Jane Doe 10 has endured, and continues to endure, indescribable conflict, confusion, and mental injury due to her inability to comprehend the reasons and level of depravity of the abuse inflicted upon her by Hadden.

137.    At all times relevant to Jane Doe 10's experiences with Hadden, Hadden was well aware of the cognitive dissonance that his patients - who he was sexually abusing - would experience with regard to their inability to come to grips with the unfathomable idea that their own medical doctor was sexually exploiting and abusing them.

138.     Hadden used and exploited his position of trust and authority bestowed on him by the Columbia Defendants to his disgusting advantage and his own depraved benefit, and in furtherance of his scheme to sexually abuse and exploit as many women as possible under the guise of performing routine medical procedures.

139.     As a result, Hadden was able (and enabled by the Corp. Entities Defendants) to sexually abuse countless female patients of the Columbia Defendants in a serial fashion, while carrying out his sick and disturbing fantasies surrounding doctor sexual abuse. Columbia University's (and its related entities) active concealment, lies, verbal, non-verbal, and written statements to the plaintiff in particular, and the public at large, were designed to cause, and did cause, plaintiff to forbear on pursing both civil and criminal legal action against the Defendants named here. As a result of the grooming, mental impact, psychological harm, physical trauma, and intentional acts of psychological manipulation that were inflicted upon the plaintiff,  by the Corp. Entities Defendants, the plaintiff suffered cognitive dissonance and a qualified deficit that was designed to cause, and did cause, plaintiff to be unable to protect her own legal rights and interests. Finally, on account of Defendants' collective fraud, and fraudulent concealment, committed against Jane Doe 10, the plaintiff did not know, could not have reasonably known, and was not reasonably aware of any possible cause of action that she had against the Columbia Defendants until she spoke with counsel on or about August 23, 2018.

*Plaintiff Jane Doe 11:*

140.     Jane Doe 11 was born in 1972.

141.     Jane Doe 11 was a gynecology and obstetrics patient of Corp. Entities Defendants at all times relevant to this complaint.

142.    Jane Doe 11 was repeatedly sexually exploited and abused by Hadden, including while Jane Doe 11 was pregnant.

143.    The Corp. Entities Defendants enabled Jane Doe 11's abuse by their acts and omissions.

144.    Jane Doe 11 saw Hadden at the Corp. Entities Defendants' medical facilities, including NYPH, for what was purported to be gynecologic and obstetrical care and treatment between approximately 2004 and 2010.

145.    Beginning with Jane Doe 11's initial office visit, Hadden began subjecting her to a course of predatory grooming, boundary violating, mental, emotional, and physical sexual exploitation and abuse. During the visits, while Hadden was verbally breaking down the plaintiff's boundaries, he assailed Jane Doe 11 with a barrage of wily, inappropriate, invasive, intrusive and exploitive questions and statements, while she was unclothed, and peppered her with a series of inappropriate questions for long periods of time while ogling and groping her breasts and naked body. Hadden would ask Jane Doe 11 about her sexual practices throughout her pregnancies and provided unsolicited, unwelcome, unwarranted and medically inappropriate "advice" regarding sexual positions. Hadden's approach to grooming was a mix of being awkward, authoritative, self-deprecating, disarming, self-pitying, alarming, and overtly offensive.

146.    A chaperone would accompany Jane Doe 11 into the exam room and instruct the plaintiff that Hadden would be doing a "full body check", which required Jane Doe 11 to be completely naked under her gown. A chaperone was present in the room during some of the verbal and physical assaults and witnessed Hadden's verbal and physical sexual abuse firsthand,

yet did nothing to prevent, or stop, Hadden's sexual exploitation and abuse of the plaintiff. The nurse's presence in the room, and failure to stop Hadden's abuse, left Jane Doe 11 with the impression that Hadden's actions were somehow consistent with a bona fide gynecologic or obstetric examination, and not a form of sexual exploitation or abuse. Other times, a Chaperone was not present - or would leave the room before the "examination" was complete at which point Hadden would continue to physically sexually exploit and abuse Jane Doe 11. This included performing serial, prolonged, and medically inappropriate breast examinations throughout the plaintiff's pregnancy, wherein Hadden would fondle, massage, grope, squeeze, pull, tug and pinch the plaintiff's breasts and nipples in a sexual manner.

147.    Hadden conducted serial, prolonged and medically-inappropriate vaginal examinations at every, or almost every, visit. Hadden would use his thumb to stroke and/or rub Jane Doe 11's vagina and clitoris during these exams. Hadden would position Jane Doe 11's body on the examination table in such a position that would elevate her pelvis and prevent her from seeing what Hadden was doing during his exams. As Jane Doe 11 was approaching her due date for the delivery of her fist child, Hadden "offered" to accelerate her labor, which the plaintiff declined and refused. The medically inappropriate and unwarranted vaginal exams continued throughout the plaintiff's second pregnancy as well.

148.    After the examinations were completed, Hadden would have Jane Doe 11 sit in his office, where pictures of his children were prominently displayed, and would "coach" the plaintiff about having sex while pregnant, and how engaging in "more sex" would hasten her labor. Sometime in 2010, Jane Doe 11 noticed Hadden had lost weight, and Hadden informed the plaintiff that his mother had passed away, and cried in the plaintiff's presence, to elicit sympathy

for his circumstances. Hadden would engage in chatter, or continue to divulge wholly improper and inappropriate personal information about his family and circumstances - all in furtherance of his never-ending sexual exploitation and grooming of female patients.

149.    Jane Doe 11 is a survivor of childhood sexual abuse and had disclosed this information to Hadden. Hadden took advantage of, and preyed upon the plaintiff, to sexually exploit and abuse Jane Doe 11.

150.    Jane Doe 11 has endured, and continues to endure, indescribable conflict, confusion, and mental injury due to her inability to comprehend the reasons and level of depravity of the abuse inflicted upon her by Hadden.

151.    At all times relevant to Jane Doe 11's experiences with Hadden, Hadden was well aware of the cognitive dissonance that his patients - who he was sexually abusing - would experience with regard to their inability to come to grips with the unfathomable idea that their own medical doctor was sexually exploiting and abusing them.

152.    Hadden used and exploited his position of trust and authority bestowed on him by the Columbia Defendants to his disgusting advantage and his own depraved benefit, and in furtherance of his scheme to sexually abuse and exploit as many women as possible under the guise of performing routine medical procedures.

153.    As a result, Hadden was able (and enabled by the Corp. Entities Defendants) to sexually abuse countless female patients of the Columbia Defendants in a serial fashion, while carrying out his sick and disturbing fantasies surrounding doctor sexual abuse. Columbia University's (and its related entities) active concealment, lies, verbal, non-verbal, and written statements to the plaintiff in particular, and the public at large, were designed to cause, and did

cause, plaintiff to forbear on pursing both civil and criminal legal action against the Defendants named here. As a result of the grooming, mental impact, psychological harm, physical trauma, and intentional acts of psychological manipulation that were inflicted upon the plaintiff, by the Corp. Entities Defendants, the plaintiff suffered cognitive dissonance and a qualified deficit that was designed to cause, and did cause, plaintiff to be unable to protect her own legal rights and interests. Finally, on account of Defendants' collective fraud, and fraudulent concealment, committed against Jane Doe 11, the plaintiff did not know, could not have reasonably known, and was not reasonably aware of any possible cause of action that she had against the Columbia Defendants until she spoke with counsel on or about August 24, 2018.

***Plaintiff Jane Doe 12:***

154.    Jane Doe 12 was born in 1974.

155.    Jane Doe 12 was an obstetrics patient of Corp. Entities Defendants at all times relevant to this complaint.

156.    Jane Doe 12 was repeatedly sexually exploited and abused by Hadden.

157.    The Corp. Entities Defendants enabled Jane Doe 12's abuse by their acts and omissions.

158.    Jane Doe 12 saw Hadden at the Corp. Entities Defendants' medical facilities, including NYPH, for what was purported to be obstetrical care and treatment between approximately May and July, 2012.

159.    A Chaperone was present in the room during some of the verbal and physical assaults and witnessed Hadden's verbal and physical sexual abuse firsthand, yet did nothing to prevent, or stop, Hadden's sexual exploitation and abuse of the patient. The nurse's presence in

the room, and failure to stop Hadden's abuse, left Jane Doe 12 with the impression that Hadden's actions were somehow consistent with a bona fide gynecologic or obstetric examination, and not a form of sexual exploitation or abuse. Other times, a Chaperone was not present - or would leave the room before the "examination" was complete at which point Hadden would continue to physically sexually exploit and abuse the patient.

160.    Hadden performed serial, prolonged, and medically inappropriate breast examinations, and serial and medically unnecessary PAP smears and/or other manual pelvic or vaginal examinations. All the while, Hadden would engage in idle chatter or begin divulging wholly improper and inappropriate personal information about himself and family - all in furtherance of his never-ending sexual exploitation and grooming of female patients. Hadden disclosed details about his personal life, and his disabled son, which caused the plaintiff to feel empathy for him. As Hadden was confiding his secrets surrounding his own family and personal struggles, he was - in reality - engaging in high-level stereotypical grooming behavior wherein his true objective was to trigger as much compassion and sympathy as possible from Jane Doe 12. Hadden's disclosures had the effect of making Jane Doe 12 feel as though Hadden was somewhat of a relatable and trustworthy professional doctor.

161.    During the vaginal examinations, Hadden, instead of lubricating a speculum, would first apply lubricant to the plaintiff's vagina, labia and clitoris, with his bare hands. Then, during her pregnancy, and apropos of nothing, Hadden commented that she would be "back in a bikini" within months of giving birth. The patient had not asked, nor did she desire, to have her body or weight commented on, critiqued or judged by Hadden.

162.    In the middle of Jane Doe 12's pregnancy, Hadden mysteriously disappeared from the practice. When Jane Doe 12 would ask when Hadden was returning, she was initially told by the staff that Hadden would be returning "in a few months". Following "a few months", she was then told Hadden would return in November - a month before the plaintiff's due date. Eventually Corp. Entities Defendants informed Jane Doe 12 that she would have to transfer her care to another obstetrician, but was never provided with an explanation as to why Hadden was no longer returning. Jane Doe 12 was assigned to another obstetrician within the practice, however, every time she asked about Hadden, she was met with avoidance. The physicians and staff merely gave Jane Doe 12 vague and/or evasive responses, while quickly changing the topic of conversation. It wasn't until Jane Doe 12 read the news about Hadden's arrest that she finally learned the truth about Hadden and his unexplained departure.

163.    Jane Doe 12 has endured, and continues to endure, indescribable conflict, confusion, and mental injury due to her inability to comprehend the reasons and level of depravity of the abuse inflicted upon her by Hadden.

164.    At all times relevant to Jane Doe 12's experiences with Hadden, Hadden was well aware of the cognitive dissonance that his patients - who he was sexually abusing - would experience with regard to their inability to come to grips with the unfathomable idea that their own medical doctor was sexually exploiting and abusing them.

165.    Hadden exploited his position of trust and authority bestowed on him by the Corp. Entities Defendants, to his own depraved benefit, and in furtherance of his scheme to sexually abuse and exploit as many women as possible under the guise of performing routine medical procedures.

166.     As a result, Hadden was able (and enabled by the Corp. Entities Defendants) to sexually abuse countless female patients of the Columbia Defendants in a serial fashion, while carrying out his sick and disturbing fantasies surrounding doctor sexual abuse. Columbia University's (and its related entities) active concealment, lies, verbal, non-verbal, and written statements to the plaintiff in particular, and the public at large, were designed to cause, and did cause, plaintiff to forbear on pursing both civil and criminal legal action against the Defendants named here. As a result of the grooming, mental impact, psychological harm, physical trauma, and intentional acts of psychological manipulation that were inflicted upon the plaintiff,  by the Corp. Entities Defendants, the plaintiff suffered cognitive dissonance and a qualified deficit that was designed to cause, and did cause, plaintiff to be unable to protect her own legal rights and interests. Finally, on account of Defendants' collective fraud, and fraudulent concealment, committed against Jane Doe 12, the plaintiff did not know, could not have reasonably known, and was not reasonably aware of any possible cause of action that she had against the Columbia Defendants until she spoke with counsel on or about August 26, 2018.

***Plaintiff Jane Doe 13:***

167.     Jane Doe 13 was born in 1984.

168.     Jane Doe 13 was a gynecologic and obstetrics patient of Corp. Entities Defendants at all times relevant to this complaint.

169.     The Corp. Entities Defendants enabled Jane Doe 13's abuse by their acts and omissions.

170. Jane Doe 13 saw Hadden at the Corp. Entities Defendants' medical facilities, including the Audubon Clinic, and NYPH, for what was purported to be gynecologic and obstetrical care and treatment between approximately 2000 and 2011.

171. Beginning with Jane Doe 13's initial office visit, Hadden began subjecting her to a course of predatory grooming, boundary violating, mental, emotional, and physical sexual exploitation and abuse. During the visits, Hadden assailed the plaintiff with a barrage of wily, inappropriate, invasive, intrusive and exploitive questions and gratuitous statements about her body, and physical appearance, sexual history, her partner and specific sexual acts she engaged in, whether she experienced orgasms and the use of pornography. Hadden's approach to grooming was a mix of being awkward, authoritative, self-deprecating, disarming, self-pitying, alarming, and overtly offensive. While Hadden was actively and verbally breaking down the plaintiff's boundaries, he peppered her with a series of irrelevant and medically inappropriate questions for long periods while ogling and groping her breasts and unclothed body. At every visit Hadden required the patient to get naked as he ogled and exploited her.

172. A Chaperone was present in the room during some of the verbal and physical assaults and witnessed Hadden's verbal and physical sexual abuse firsthand, yet did nothing to prevent, or stop, Hadden's sexual exploitation and abuse of the Jane Doe 13. The nurse's presence in the room, and failure to stop Hadden's abuse, left Jane Doe 13 with the impression that Hadden's actions were somehow consistent with a bona fide gynecologic or obstetric examination, and not a form of sexual exploitation or abuse. Other times, a Chaperone was not present - or would leave the room before the "examination" was complete at which point Hadden

would continue to physically sexually exploit and abuse the plaintiff. This included, but is not limited to, performing serial, prolonged, and medically inappropriate breast examinations, serial and medically-inappropriate PAP smears, vaginal exams, and medically inappropriate, unwarranted and unnecessary "mole-checks" where Hadden would require the patient to either lay on the table unclothed while he rubbed his hands up and down her body, or bend over the table while her spread her buttocks, groped her breasts, and examined her entire body and private areas.

173.    Hadden would repeatedly tell the plaintiff that her PAP smears were abnormal which he used as a pretext to schedule additional visits for "monitoring", and would conduct additional, unnecessary, and unwarranted "testing" and vaginal examinations at every visit. To that end, Hadden would knowingly and intentionally exploit the plaintiff, and betray her trust, as a way to justify his need to chronically examine, and penetrate, her vagina. All the while, Hadden would engage in idle chatter or begin divulging wholly improper and inappropriate personal information about himself and family - all in furtherance of his never-ending sexual exploitation and grooming of female patients.

174.    During the serial, unnecessary, unwarranted and medically non-indicated vaginal examinations that Hadden performed at practically every single visit, under the guise of "lubricating", Hadden would stroke Jane Doe 13's vagina and touch her clitoris, after which Hadden would repeatedly penetrate the patient by inserting his fingers into the patient's vagina in a deviant sexual manner - often with his ungloved hands.  The plaintiff recalls that on at least one occasion, she complained of experiencing back pains. Hadden, under the guise of performing a "scoliosis check", proceeded to instruct Jane Doe 13 to completely disrobe, stand naked in front

of him, turn her back to him and bend over, as he ogled her naked body. Hadden would run his bare hands over her body, asking, "Do you like how this feels? Does this feel good?" Jane Doe 13, feeling something was amiss, turned her head to see what Hadden was doing, and discovered he had an erection, and the groin area of his scrub pants appeared wet.

175.    Hadden notified the patient she had a "retroverted" uterus, which was nothing more than a sham 'diagnosis' routinely employed by Hadden for the purpose of excusing his need to stick his hands deeply inside the vaginas of his unsuspecting victims, "feel around" for prolonged periods of time, and provide the appearance that he was doing something other than engaging in an abject digital-rape of the patient. Following this charade, Hadden would then engage his victims in a dialogue about sexual positions that may feel better, or more intense, for them on account of their wholly made up medical condition. None of this had any basis in medicine. And all of it was simply a ruse concocted by a wily and skillful, serial, sexual felon who, with the help of Columbia University, was given a license to sexually exploit and abuse women and girls on a daily basis.

176.    Throughout the physical examinations, Hadden would hold his pen in his hand, and point to Jane Doe 13's body as if her were providing an "anatomy lesson". As a result of the abuse Hadden inflicted upon her, the patient did not see another gynecologist for years, delayed having another child for over a decade, and sought to be treated by female doctors only.

177.    Jane Doe 13 has endured, and continues to endure, indescribable conflict, confusion, and mental injury due to her inability to comprehend the reasons and level of depravity of the abuse inflicted upon her by Hadden.

178.   At all times relevant to Jane Doe 13's experiences with Hadden, Hadden was well aware of the cognitive dissonance that his patients - who he was sexually abusing - would experience with regard to their inability to come to grips with the unfathomable idea that their own medical doctor was sexually exploiting and abusing them.

179.   Hadden exploited his position of trust and authority bestowed on him by the Corp. Entities Defendants, to his own depraved benefit, and in furtherance of his scheme to sexually abuse and exploit as many women as possible under the guise of performing routine medical procedures.

180.   As a result, Hadden was able (and enabled by the Corp. Entities Defendants) to sexually abuse countless female patients of the Columbia Defendants in a serial fashion, while carrying out his sick and disturbing fantasies surrounding doctor sexual abuse. Columbia University's (and its related entities) active concealment, lies, verbal, non-verbal, and written statements to the plaintiff in particular, and the public at large, were designed to cause, and did cause, plaintiff to forbear on pursing both civil and criminal legal action against the Defendants named here. As a result of the grooming, mental impact, psychological harm, physical trauma, and intentional acts of psychological manipulation that were inflicted upon the plaintiff,  by the Corp. Entities Defendants, the plaintiff suffered cognitive dissonance and a qualified deficit that was designed to cause, and did cause, plaintiff to be unable to protect her own legal rights and interests. Finally, on account of Defendants' collective fraud, and fraudulent concealment, committed against Jane Doe 13, the plaintiff did not know, could not have reasonably known, and was not reasonably aware of any possible cause of action that she had against the Columbia Defendants until she spoke with counsel on or about August 27, 2018.

**Plaintiff Jane Doe 14:**

181.   Jane Doe 14 was born in 1973.

182.   Jane Doe 14 was a gynecologic and obstetrics patient of Corp. Entities Defendants at all times relevant to this complaint.

183.   Jane Doe 14 was repeatedly sexually exploited and abused by Hadden, including during Jane Doe 14's pregnancy.

184.   The Corp. Entities Defendants enabled Jane Doe 14's abuse by their acts and omissions.

185.   Jane Doe 14 saw Hadden at the Corp. Entities Defendants' medical facilities, including NYPH, for what was purported to be gynecologic and obstetrical care and treatment between approximately 1998 and 2010.

186.   Beginning with Jane Doe 14's initial office visit, Hadden began subjecting her to a course of predatory grooming, boundary violating, mental, emotional, and physical sexual exploitation and abuse. During the visits, Hadden assailed Jane Doe 14 with a barrage of wily, inappropriate, invasive, intrusive and exploitive questions and statements about her body, physical appearance, and sexual history. Hadden's approach to grooming was a mix of being awkward, authoritative, self-deprecating, disarming, self-pitying, alarming, and overtly offensive.

187.   A Chaperone was present in the room during some of the verbal and physical assaults and witnessed Hadden's verbal and physical sexual abuse firsthand, yet did nothing to prevent, or stop, Hadden's sexual exploitation and abuse of the patient. The nurse's presence in the room, and failure to stop Hadden's abuse, left Jane Doe 14 with the impression that Hadden's

actions were somehow consistent with a bona fide gynecologic or obstetric examination, and not a form of sexual exploitation or abuse. Other times, a Chaperone was not present - or would leave the room before the "examination" was complete at which point Hadden would continue to physically sexually exploit and abuse Jane Doe 14. This included performing serial, prolonged, and medically inappropriate breast examinations, serial, prolonged and medically-inappropriate PAP smears and vaginal examinations, and rectal exams.

188.    During every office visit, Hadden insisted that a breast examination was necessary. After making Jane Doe 14 remove her clothing, for no legitimate medical purpose, Hadden proceeded to grope and cup Jane Doe 14's breasts. During these prolonged, and wholly medically unnecessary "breast examinations", Hadden would fondle, massage, pinch, pull, tug and squeeze Jane Doe 14's breasts and nipples.  On at least one occasion, Hadden conducted a "scoliosis" or "spine" check, while Jane Doe 14 was gowned, but Hadden required her to stand, turn her back to him, and bend over, so he could "check" the curvature of Jane Doe 14's spine. All the while Hadden would ogle at Jane Doe 14's exposed rear end and groin.

189.    During the serial, prolonged and medically non-indicated vaginal examinations that Hadden performed at practically every single visit, Hadden would "lubricate" Jane Doe 14's vaginal area, using his fingers to stroke her vagina in an "up and down" motion, touching Jane Doe 14's clitoris and g-spot. Hadden would repeatedly penetrate Jane Doe 14 by inserting his fingers into her vagina, and at times, her anus, in a deviant sexual manner. On multiple occasions, Hadden conducted simultaneous digital vaginal and anal exams, penetrating Jane Doe 14 with his fingers, while she stood naked in front of him.  All the while, Hadden would engage in idle chatter or begin divulging wholly improper and inappropriate personal information about

himself and family in order to distract the plaintiff and prolong the length of time he had access to grope the plaintiff's body - all in furtherance of his never-ending sexual exploitation and grooming of female patients.

190.   During her final appointment, in or around 2010, Hadden pretended to be performing a vaginal examination. Jane Doe 14 was on the exam table, naked with her lower extremities covered in a drape, and she felt Hadden touch her vagina with ungloved hands. Hadden then positioned himself so that his head was out of the patient's field of vision, and surreptitiously licked Jane Doe 14's vagina. Jane Doe 14, a survivor of childhood sexual abuse, could not process what was happening and froze. Jane Doe 14 became fearful, distressed, worried and concerned that Hadden's ungloved vaginal exams and the oral contact, could result in STD's or incurable sexually transmitted diseases. *As a result, Jane Doe 14 was compelled to undergo subsequent testing to insure she hadn't been infected, causing her anxiety, distress, fear and consternation.*

191.   Jane Doe 14 was unable to comprehend how or why a medical doctor would sexually abuse her under the guise of medical care and treatment. She became mentally, and physically, paralyzed, as memories of past abuse resurfaced. Hadden, seeing only the surface of the emotional and physical trauma he had just inflicted on Jane Doe 14 proceeded to say he was "sorry for making [her] uncomfortable". Following this sexual attack by Hadden, Jane Doe 14 was unable to subject herself to another gynecological visit for approximately two-years. However, in 2012, Jane Doe 14 found the courage to see another doctor, and her experience and examinations were vastly different then any she had experienced with Hadden. Jane Doe 14 has endured, and continues to endure, indescribable conflict, confusion, and mental injury due to her

inability to comprehend the reasons and level of depravity of the abuse inflicted upon her by Hadden.

192.     At all times relevant to Jane Doe 14r's experiences with Hadden, Hadden was well aware of the cognitive dissonance that his patients - who he was sexually abusing - would experience with regard to their inability to come to grips with the unfathomable idea that their own medical doctor was sexually exploiting and abusing them.

193.     Hadden exploited his position of trust and authority bestowed on him by the Corp. Entities Defendants, to his own depraved benefit, and in furtherance of his scheme to sexually abuse and exploit as many women as possible under the guise of performing routine medical procedures.

194.     As a result, Hadden was able (and enabled by the Corp. Entities Defendants) to sexually abuse countless female patients of the Columbia Defendants in a serial fashion, while carrying out his sick and disturbing fantasies surrounding doctor sexual abuse. Columbia University's (and its related entities) active concealment, lies, verbal, non-verbal, and written statements to the plaintiff in particular, and the public at large, were designed to cause, and did cause, plaintiff to forbear on pursing both civil and criminal legal action against the Defendants named here. As a result of the grooming, mental impact, psychological harm, physical trauma, and intentional acts of psychological manipulation that were inflicted upon the plaintiff,  by the Corp. Entities Defendants, the plaintiff suffered cognitive dissonance and a qualified deficit that was designed to cause, and did cause, plaintiff to be unable to protect her own legal rights and interests. Finally, on account of Defendants' collective fraud, and fraudulent concealment, committed against Jane Doe 14, the plaintiff did not know, could not have reasonably known,

and was not reasonably aware of any possible cause of action that she had against the Columbia

Defendants until she spoke with counsel on or about August 29, 2018.

***Plaintiff Jane Doe 15:***

195.    Jane Doe 15 was born in 1982.

196.    Jane Doe 15 was a gynecologic patient of Corp. Entities Defendants at all times

relevant to this complaint.

197.    Jane Doe 15 was repeatedly sexually exploited and abused by Hadden.

198.    The Corp. Entities Defendants enabled Jane Doe 15's abuse by their acts and

omissions.

199.    Jane Doe 15 saw Hadden at the Corp. Entities Defendants' medical facilities,

including NYPH, for what was purported to be gynecologic care and treatment between

approximately 2002 and 2009.

200.    Beginning with Jane Doe 15's initial office visit, Hadden began subjecting her to

a course of predatory grooming, boundary violating, and mental, emotional, and physical sexual

exploitation and abuse. During the visits, Hadden assailed the patient with a barrage of wily,

inappropriate, invasive, intrusive and exploitive questions and statements about her body,

physical appearance, pornography, whether her partner satisfied her and detailed - and wholly

medically irrelevant questions and comments about the performance of oral sex on men.

Hadden's approach to grooming was a mix of being awkward, authoritative, self-deprecating,

disarming, self-pitying, alarming and overtly offensive. While Hadden was actively and verbally

breaking down Jane Doe 15's  boundaries, he engaged in idle chatter about medically irrelevant

issues and peppered her with a series of irrelevant and medically inappropriate questions for long

periods while ogling and groping her breasts and unclothed body. At each visit Hadden required the patient to get naked as he ogled and exploited her.

201.    A Chaperone was never present in the room. The Chaperone would escort the plaintiff into the examination room, and instruct Jane Doe 15 what to do, then exit the room. The Chaperone would then escort Hadden into the exam room, when he was ready, and leave immediately thereafter, not remaining in the room, and leaving Jane Doe 15 alone with Hadden. The fact that the Chaperone would leave the room caused Jane Doe 15 to believe that Hadden's actions were somehow consistent with a bona fide gynecologic examination, and not a form of sexual exploitation or abuse. After the chaperone exited the room, the exploitation and abuse would continue with Hadden proceeding to perform serial, prolonged, and medically inappropriate breast examinations, which culminated with Hadden massaging, fondling, squeezing, pulling, tugging and pinching Jane Doe 15's breasts and nipples; prolonged, serial and medically-inappropriate PAP smears and vaginal examinations, conducted at nearly every visit, and medically inappropriate "mole-checks" where Hadden would require the plaintiff to lay face-down on the examination table, unclothed, while he rubbed his hands up and down her entire body, and spread her buttocks to "look for moles" in and around her anus. These "mole checks" were conducted at each and every visit.

202.    During the regular - and wholly unnecessary - serial "vaginal exams", Hadden would perform on the plaintiff, he would penetrate the plaintiff's vagina with his fingers in a non- medical way, for non-medical purposes, and often without gloves on his hands. Hadden would also conduct medically unnecessary and unwarranted rectal exams, requiring the plaintiff to lay on her stomach so he could examine her back, buttocks and anus. He also digitally

penetrated the plaintiff's anus. All the while, Hadden would engage in idle chatter or begin divulging wholly improper and inappropriate personal information about himself, his children, and family - all in furtherance of his never-ending sexual exploitation and grooming of female patients.

203. At one office visit, Hadden instructed Jane Doe 15 to come into his office, to "just talk". The lights in Hadden's office were dimmed, and Hadden proceeded to close the door to his office. During this "talk", Hadden informed Jane Doe 15 he was going to administer an HPV vaccine shot. This was Jane Doe 15's third HPV vaccine, however, this time, Hadden instructed the plaintiff to pull down her pants and underwear, and bend over his desk, so he could administer the vaccine into her bare buttocks. When Jane Doe 15 questioned why this vaccine was not being administered in her arm, Hadden responded that she "shouldn't worry", and told her to "just do it".

204. At another appointment, Hadden instructed Jane Doe 15 to stand up, drop the robe that was covering her naked body, then bend over and touch her toes while he stood behind her to "check" [her] spine. Hadden's actions were done solely so he could further have visual access to the Jane Doe 15's naked body, her buttocks and her vaginal area. All the while, Hadden was continuing to groom the plaintiff by engaging in irrelevant prater about his family and son with special needs in his twisted effort to gain her confidence and present the image of himself as a caring, "family man".

205. In her early 20's, Jane Doe 15 felt some lumps in her breast. Although, there was no family history of cancer, the plaintiff reported her findings and expressed her concerns to Hadden. Hadden did not refer Jane Doe 15 for mammogram studies. He did refer the patient for

an ultrasound. However, instead of referring Jane Doe 15 to a breast specialist or a breast surgeon for further diagnosis and treatment, Hadden undertook to perform the breast biopsies himself. Hadden urged the plaintiff's mother to pay cash for the procedures to "reduce" the cost. Hadden performed the biopsies, in the patient room setting, in his office, at the hospital location. Hadden proceeded to make multiple (six) incisions in each breast, removing breast tissue through the slits he had made in both of Jane Doe 15's breasts. The "procedure" resulted in severe scarring to both of Jane Doe 15's breasts. Jane Doe 15 was administered minimal, if any, numbing ingredient to reduce the pain, and was stitched up after the procedure was complete. However, Jane Doe 15 was never provided the results of those "biopsies", nor was there ever any follow-up by Hadden. Hadden did not refer the plaintiff to any specialists, nor did he ever divulge the results of the biopsies he had performed. The plaintiff was not referred for any subsequent breast biopsies, and there are lingering questions regarding the necessity of the breast biopsies, which were conducted in a barbaric manner.

206.    Hadden prescribed Prozac to Jane Doe 15, without benefit of referring her for an appropriate and proper consultation with a qualified medical professional to diagnose and treat the plaintiff's "condition". Hadden did not notify the plaintiff of the risks or benefits of Prozac. As a result, during her subsequent pregnancy, treated at another medical group, Jane Doe 15 was unable to successfully wean off the medication and was forced to seek further medical intervention. Whenever Jane Doe 15 would attempt to stop taking Prozac, she suffered from what she would describe as pain akin to "electrical shocks" to the brain. Despite seeking medical intervention, Jane Doe 15 has been forced to remain on the medication, which has taken a physical and psychological toll on her.

207.    Jane Doe 15 has endured, and continues to endure, indescribable conflict, confusion, and mental injury due to her inability to comprehend the reasons and level of depravity of the abuse inflicted upon her by Hadden.

208.    At all times relevant to Jane Doe 15's experiences with Hadden, Hadden was well aware of the cognitive dissonance that his patients - who he was sexually abusing - would experience with regard to their inability to come to grips with the unfathomable idea that their own medical doctor was sexually exploiting and abusing them.

209.    Hadden exploited his position of trust and authority bestowed on him by the Corp. Entities Defendants, to his own depraved benefit, and in furtherance of his scheme to sexually abuse and exploit as many women as possible under the guise of performing routine medical procedures.

210.    As a result, Hadden was able (and enabled by the Corp. Entities Defendants) to sexually abuse countless female patients of the Columbia Defendants in a serial fashion, while carrying out his sick and disturbing fantasies surrounding doctor sexual abuse. Columbia University's (and its related entities) active concealment, lies, verbal, non-verbal, and written statements to the plaintiff in particular, and the public at large, were designed to cause, and did cause, plaintiff to forbear on pursing both civil and criminal legal action against the Defendants named here. As a result of the grooming, mental impact, psychological harm, physical trauma, and intentional acts of psychological manipulation that were inflicted upon the plaintiff,  by the Corp. Entities Defendants, the plaintiff suffered cognitive dissonance and a qualified deficit that was designed to cause, and did cause, plaintiff to be unable to protect her own legal rights and interests. Finally, on account of Defendants' collective fraud, and fraudulent concealment,

committed against Jane Doe 15, the plaintiff did not know, could not have reasonably known, and was not reasonably aware of any possible cause of action that she had against the Columbia Defendants until she spoke with counsel on or about August 31, 2018.

***Plaintiff Jane Doe 17:***

211.    Jane Doe 17 was born in 1973.

212.    Jane Doe 17 was an obstetrics patient of Corp. Entities Defendants at all times relevant to this complaint.

213.    Jane Doe 17 was sexually exploited and abused by Hadden, while Jane Doe 17 was pregnant.

214.    The Corp. Entities Defendants enabled Jane Doe 17's abuse by their acts and omissions.

215.    Jane Doe 17 saw Hadden at the Corp. Entities Defendants' medical facilities, for what was purported to be obstetrical care and treatment in 2005.

216.    Beginning with Jane Doe 17's only office visit, while pregnant with her first child, defendant Hadden began subjecting her to a course of predatory grooming, boundary violating, and mental, emotional, and physical sexual exploitation and abuse. During the visit, Hadden began assailing the plaintiff with a barrage of wily, inappropriate, invasive, intrusive and exploitative questions and statements about her body, and physical appearance. Hadden's approach to grooming was a mix of being awkward, authoritative, self- deprecating, disarming, self-pitying, alarming, and overtly offensive. While Hadden was actively and verbally breaking down Jane Doe 17's boundaries, he engaged the patient in idle chatter or small talk, for long periods while ogling her breasts and unclothed body.

217.    A Chaperone was present in the room at the beginning of the examination, and then left before the "examination" was complete. The fact that the Chaperone would leave the room caused Jane Doe 17 to believe that Hadden's actions were somehow consistent with a bona fide gynecologic or obstetric examination, and not a form of sexual exploitation or abuse. After the chaperone exited the room, the exploitation and abuse continued with Hadden conducting a prolonged, unwarranted and medically inappropriate breast examination, wherein Hadden massaged, fondled, squeezed, tugged, pulled and pinched the plaintiff's breasts and nipples.

218.    Following the unnecessary physical exam, Hadden had Jane Doe 17 submit to a "scoliosis check". Hadden sat on a low stool, near a corner of the exam room, and instructed the plaintiff to stand up in front of him, completely naked, turn her back to him, and bend over, positioning himself in such a way that Jane Doe 17's exposed buttocks and vaginal area were at Hadden's eye level. Hadden continued to groom the plaintiff, running his ungloved hands all over her body, simultaneously offering her lots of "compliments" about how "great and beautiful" her skin was, how she didn't have to "worry about stretch marks", and engaging in other kinds of irrelevant chatter. Jane Doe 17 was scheduled for an office visit by the staff, however, she never returned to the practice after being subjected to Hadden's sexual exploitation and abuse.

219.    Jane Doe 17 has endured, and continues to endure, indescribable conflict, confusion, and mental injury due to her inability to comprehend the reasons and level of depravity of the abuse inflicted upon her by Hadden.

220.    At all times relevant to Jane Doe 17's experiences with Hadden, Hadden was well aware of the cognitive dissonance that his patients - who he was sexually abusing - would

experience with regard to their inability to come to grips with the unfathomable idea that their own medical doctor was sexually exploiting and abusing them.

221.   Hadden exploited his position of trust and authority bestowed on him by the Corp. Entities Defendants, to his own depraved benefit, and in furtherance of his scheme to sexually abuse and exploit as many women as possible under the guise of performing routine medical procedures.

222.   As a result, Hadden was able (and enabled by the Corp. Entities Defendants) to sexually abuse countless female patients of the Columbia Defendants in a serial fashion, while carrying out his sick and disturbing fantasies surrounding doctor sexual abuse. Columbia University's (and its related entities) active concealment, lies, verbal, non-verbal, and written statements to the plaintiff in particular, and the public at large, were designed to cause, and did cause, plaintiff to forbear on pursing both civil and criminal legal action against the Defendants named here. As a result of the grooming, mental impact, psychological harm, physical trauma, and intentional acts of psychological manipulation that were inflicted upon the plaintiff,  by the Corp. Entities Defendants, the plaintiff suffered cognitive dissonance and a qualified deficit that was designed to cause, and did cause, plaintiff to be unable to protect her own legal rights and interests. Finally, on account of Defendants' collective fraud, and fraudulent concealment, committed against Jane Doe 17, the plaintiff did not know, could not have reasonably known, and was not reasonably aware of any possible cause of action that she had against the Columbia Defendants until she spoke with counsel on or about September 20, 2018.

***Plaintiff Jane Doe 18:***

223.    Jane Doe 18 was born in 1967.

224.    Jane Doe 18 was an obstetrics patient and a student of Corp. Entities Defendants at all times relevant to this complaint.

225.    Jane Doe 18 was repeatedly sexually exploited and abused by Hadden while she was pregnant with her first child.

226.    The Corp. Entities Defendants enabled Jane Doe 18's abuse by their acts and omissions.

227.    Jane Doe 18 saw Hadden at the Corp. Entities Defendants' medical facilities, including NYPH, for what was purported to be obstetrical care and treatment between approximately 1998 and 1999.

228.    Beginning with Jane Doe 18's initial office visit, Hadden began subjecting her to a course of predatory grooming, boundary violating, and mental, emotional, and physical sexual exploitation and abuse. Hadden's approach to grooming was a mix of being awkward, authoritative, self-deprecating, disarming, self-pitying, alarming, and overtly offensive. While Hadden was actively and verbally breaking down the patient's boundaries, he subjected the plaintiff to medically improper and inappropriate questions for long periods while ogling and groping her naked body and breasts.

229.    Jane Doe 18 was seen by Hadden throughout the prenatal period. When the time came for the plaintiff to deliver her baby, Hadden intentionally and maliciously - with scienter and a depraved and evil mind - withheld anesthesia during the labor and delivery, requiring Jane Doe 18 to endure the full pain of a child passing through her birth canal which was too small to

accommodate her baby. During the tortuous and barbaric delivery, Jane Doe 18 asked, then pleaded Hadden for anesthesia, but Hadden — out of sheer vindictiveness and cruelty — told her "no" and that "it will give [her] incentive to deliver" her baby. After her daughter tore her vagina on the way out, Hadden told the plaintiff that he would "sew it up". Petrified, Jane Doe 18 pleaded and begged Hadden for anesthesia to help her tolerate the excruciating pain of having a needle apply sutures to her already torn vagina. Despite her cries and pleas, Hadden inexplicably refused to provide any form of anesthesia during the suturing, and proceeded - in what can only be described as sadism - to "sew up" the plaintiff's vagina and cause her to suffer intolerable and unimaginable pain with each stitch - Hadden's facial expression was one of sheer enjoyment, as he derived some sick, perverted pleasure from witnessing the pain he was unnecessarily inflicting on Jane Doe 18. None of the hospital personnel present in the delivery room uttered a word about the medically inappropriate and barbaric violation of the standards of patient "care' that was being meted out by Hadden.

230.    During the postpartum period, Hadden continued to sexually exploit and abuse the plaintiff. At Jane Doe 18's postpartum visit, with no chaperone in the room, Hadden insisted that a breast examination was necessary, despite the fact the plaintiff had not made any complaints or expressed any concerns regarding her ability to breastfeed her infant. After making the plaintiff remove all her clothing, for no legitimate medical purpose, Hadden proceeded, with ungloved hands, to forcefully and painfully, grope and cup Jane Doe 18's engorged breasts, squeezing, tugging, pulling and pinching the plaintiff's nipples so as to express breast milk, from both her breasts, for several minutes, all for his own deviant sexual gratification, and conducted with Jane Doe 18's newborn infant in the room.

231.   Jane Doe 18 has endured, and continues to endure, indescribable conflict, confusion, and mental injury due to her inability to comprehend the reasons and level of depravity of the abuse inflicted upon her by Hadden.

232.   At all times relevant to Jane Doe 18's experiences with Hadden, Hadden was well aware of the cognitive dissonance that his patients - who he was sexually abusing - would experience with regard to their inability to come to grips with the unfathomable idea that their own medical doctor was sexually exploiting and abusing them.

233.   Hadden exploited his position of trust and authority bestowed on him by the Corp. Entities Defendants, to his own depraved benefit, and in furtherance of his scheme to sexually abuse and exploit as many women as possible under the guise of performing routine medical procedures.

234.   As a result, Hadden was able (and enabled by the Corp. Entities Defendants) to sexually abuse countless female patients of the Columbia Defendants in a serial fashion, while carrying out his sick and disturbing fantasies surrounding doctor sexual abuse. Columbia University's (and its related entities) active concealment, lies, verbal, non-verbal, and written statements to the plaintiff in particular, and the public at large, were designed to cause, and did cause, plaintiff to forbear on pursing both civil and criminal legal action against the Defendants named here. As a result of the grooming, mental impact, psychological harm, physical trauma, and intentional acts of psychological manipulation that were inflicted upon the plaintiff,  by the Corp. Entities Defendants, the plaintiff suffered cognitive dissonance and a qualified deficit that was designed to cause, and did cause, plaintiff to be unable to protect her own legal rights and interests. Finally, on account of Defendants' collective fraud, and fraudulent concealment,

committed against Jane Doe 18, the plaintiff did not know, could not have reasonably known, and was not reasonably aware of any possible cause of action that she had against the Columbia Defendants until she spoke with counsel on or about September 20, 2018.

***Plaintiff Jane Doe 19:***

235.    Jane Doe 19 was born in 1963.

236.    Jane Doe 19 was a gynecology and obstetrics patient of Corp. Entities Defendants at all times relevant to this complaint.

237.    Jane Doe 19 was repeatedly sexually exploited and abused by Hadden, including while Jane Doe 19 was pregnant.

238.    The Corp. Entities Defendants enabled Jane Doe 19's abuse by their acts and omissions.

239.    Jane Doe 19 saw Hadden at the Corp. Entities Defendants' medical facilities, including NYPH, for what was purported to be gynecologic and obstetrical care and treatment between approximately 1993 and 2012.

240.    Beginning with Jane Doe 19's initial office visit, Hadden began subjecting her to a course of predatory grooming, boundary violating, mental, emotional, and physical sexual exploitation and abuse. During the visits, Hadden assailed the plaintiff with a barrage of wily, inappropriate, invasive, intrusive and exploitive questions and statements about her body, physical appearance, her sexuality, use of pornography and sexual positions she engaged in with her partner. Hadden knowingly, and intentionally, exploited Jane Doe 19's professional involvement in the care of children with disabilities - and indirectly, his own son's care - to disarm, manipulate and sexually exploit and abuse the plaintiff. Hadden's approach to grooming

was a mix of being awkward, authoritative, self-deprecating, disarming, self-pitying, alarming, and overtly offensive.

241.     A Chaperone was present in the room during some of the verbal and physical assaults and witnessed Hadden's verbal and physical sexual abuse firsthand, yet did nothing to prevent, or stop, Hadden's sexual exploitation and abuse of the Jane Doe 19. The nurse's presence in the room, and failure to stop Hadden's abuse, left Jane Doe 19 with the impression that Hadden's actions were somehow consistent with a bona fide gynecologic or obstetric examination, and not a form of sexual exploitation or abuse. Other times, a Chaperone was not present - or would leave the room before the "examination" was complete - in this case, Hadden would dismiss the Chaperone while he was in the examination room with the plaintiff - at which point Hadden would continue to physically sexually exploit and abuse Jane Doe 19. While Hadden was actively and verbally breaking down Jane Doe 19's boundaries, he forced her to answer questions about the number of sexual partners and sexual acts she had engaged in and peppered her with a series of irrelevant and medically inappropriate questions for long periods while ogling and groping her breasts and unclothed body. At each visit Hadden required the plaintiff to get naked - in his presence - as he ogled and exploited her.

242.     During the prolonged, serial, and medically non-indicated, unwarranted and unnecessary breast examinations that Hadden performed at practically every visit, Hadden would fondle, caress, grope, squeeze, pull, tug, and pinch the plaintiff's breasts and nipples for prolonged periods of time while making idle chatter about irrelevant topics. Hadden would compliment the plaintiff's breasts, their appearance, and how they felt to him. Hadden conducted unwarranted, unnecessary and medically-inappropriate PAP smears and vaginal exams at every

visit. Hadden would inappropriately and improperly stroke and touch the plaintiff's vagina, claiming to be "lubricating" the area for the exam, and would penetrate Jane Doe 19's vagina by inserting his fingers — with ungloved hands — in a rough, deep and forceful manner.  Each of these exams were, in reality, being conducted with his ungloved hands so that Hadden could see, touch, penetrate, and abuse the plaintiff. While Jane Doe 19 was on the examination table, undergoing pelvic examinations, Hadden would talk about laser hair removal, explicitly describing the different "styles" of hair removal as "landing strip" or "Dorito chip". All the while, Hadden would engage in idle chatter or continue divulging wholly improper and inappropriate personal information about himself, his family, and his disabled child - all in furtherance of his never-ending sexual exploitation and grooming of female patients.

243.    Hadden informed Jane Doe 19 that she had a "tilted" uterus, which was nothing more than a sham 'diagnosis' routinely employed by Hadden for the purpose of excusing his need to stick his hands deeply inside the vaginas of his unsuspecting victims, "feel around" for prolonged periods of time, and provide the appearance that he was doing something other than engaging in an abject digital-rape of the plaintiff. Following this charade, Hadden would then engage his victims in a dialogue about sexual positions that may feel better, or more intense, for them on account of their wholly made up medical condition. None of this had any basis in medicine. And all of it was simply a ruse concocted by a wily and skillful, serial, sexual felon who, with the help of Columbia University, was given a license to sexually exploit and abuse women and girls on a daily basis.

244.    Beginning in or around 1997, Hadden started asking probing, invasive, intrusive, improper and inappropriate sexual questions at every visit, and despite the plaintiff's attempts to

change the subject, Hadden would continue to pepper her with medically inappropriate, unwarranted, unsolicited and unwelcome, graphic and explicit sexual questions, pretending to write "notes" into the patient's chart, and sweating as he tried to elicit graphic responses from the patient.

245.   Hadden was listed as the physician in attendance at the births of Jane Doe 19's three children. During the postpartum periods, Hadden continued to sexually exploit and abuse the plaintiff. During these visits Hadden continued to instruct the plaintiff that serial breast examinations, PAP smears, and vaginal "examinations" were needed -- when in fact, they were being performed so that Hadden could continue to ogle, grope, and sexually exploit and abuse the plaintiff.

246.   Hadden delivered Jane Doe 19's daughter in 1994.  Beginning in or about 2005, when the plaintiff's daughter was 11 years of age, Hadden would pepper the plaintiff with wholly inappropriate and explicit questions about her daughter, constantly asking the plaintiff if her daughter had begun menstruating, and encouraging Jane Doe 19 to schedule her daughter for an appointment with him.   Hadden's intent was to groom, sexually abuse, exploit and assault a minor child - the medical community recommends women undergo Pap smears beginning at age 21.  Hadden's intent was not the health and well being of the child, but rather to use the child for his own deviant, sexual gratification, to ogle, grope, physically and mentally abuse a minor child, and satisfy his sadistic, pedophiliac urges.   The fact that Hadden regularly used his own son's disabilities in furtherance of his scheme to sexually exploit female patients - including Jane Doe 19, who had direct and personal knowledge of his son, and his son's care - constitutes a degree of depravity that is incomprehensible and abhorrent.

247.    Jane Doe 19 has endured, and continues to endure, indescribable conflict, confusion, and mental injury due to her inability to comprehend the reasons and level of depravity of the abuse inflicted upon her by Hadden.

248.    At all times relevant to Jane Doe 19's experiences with Hadden, Hadden was well aware of the cognitive dissonance that his patients - who he was sexually abusing - would experience with regard to their inability to come to grips with the unfathomable idea that their own medical doctor was sexually exploiting and abusing them.

249.    Hadden exploited his position of trust and authority bestowed on him by the Corp. Entities Defendants, to his own depraved benefit, and in furtherance of his scheme to sexually abuse and exploit as many women as possible under the guise of performing routine medical procedures.

250.    As a result, Hadden was able (and enabled by the Corp. Entities Defendants) to sexually abuse countless female patients of the Columbia Defendants in a serial fashion, while carrying out his sick and disturbing fantasies surrounding doctor sexual abuse. Columbia University's (and its related entities) active concealment, lies, verbal, non-verbal, and written statements to the plaintiff in particular, and the public at large, were designed to cause, and did cause, plaintiff to forbear on pursing both civil and criminal legal action against the Defendants named here. As a result of the grooming, mental impact, psychological harm, physical trauma, and intentional acts of psychological manipulation that were inflicted upon the plaintiff,  by the Corp. Entities Defendants, the plaintiff suffered cognitive dissonance and a qualified deficit that was designed to cause, and did cause, plaintiff to be unable to protect her own legal rights and interests. Finally, on account of Defendants' collective fraud, and fraudulent concealment,

committed against Jane Doe 19, the plaintiff did not know, could not have reasonably known, and was not reasonably aware of any possible cause of action that she had against the Columbia Defendants until she spoke with counsel on or about September 20, 2018.

***Plaintiff Jane Doe 21:***

251.    Jane Doe 21 was born in 1972.

252.    Jane Doe 21 was a gynecologic and obstetrics patient of Corp. Entities Defendants at all times relevant to this complaint.

253.    Jane Doe 21 was repeatedly sexually exploited and abused by Hadden, including throughout Jane Doe 21's three (3) pregnancies.

254.    The Corp. Entities Defendants enabled Jane Doe 21's abuse by their acts and omissions.

255.    Jane Doe 21 saw Hadden at the Corp. Entities Defendants' medical facilities, including NYPH, for what was purported to be gynecologic and obstetrical care and treatment between approximately 2003 and 2011.

256.    Beginning with the patient's initial office visit, defendant Hadden began subjecting her to a course of predatory grooming, boundary violating, mental, emotional, and physical sexual exploitation and abuse. During the visits, Hadden assailed the patient with a barrage of wily, inappropriate, invasive, intrusive and exploitive questions and statements about her body, and physical appearance, sexual history, the number of sexual partners she had, and the types of sexual acts she engaged in. Hadden's approach to grooming was a mix of being awkward, authoritative, self-deprecating, disarming, self-pitying, alarming, and overtly offensive. While Hadden was actively and verbally breaking down the patient's boundaries, he

forced the patient to answer questions about her sexuality, and peppered her with a series of irrelevant and medically inappropriate questions for long periods while ogling and groping her breasts and unclothed body.

257.    A Chaperone was present in the room during some of the verbal and physical assaults and witnessed Hadden's verbal and physical sexual abuse firsthand yet did nothing to prevent or stop Hadden's sexual exploitation and abuse of Jane Doe 21. The nurse's presence in the room, and failure to stop Hadden's abuse, left Jane Doe 21 with the impression that Hadden's actions were somehow consistent with a bona fide gynecologic or obstetric examination, and not a form of sexual exploitation or abuse. Other times, a Chaperone was not present - or would leave the room before the "examination" was complete at which point Hadden would continue to physically sexually exploit and abuse Jane Doe 21. This included, but is not limited to, performing serial, prolonged, medically inappropriate and unwarranted breast examinations during which Hadden would "compliment" the appearance of Jane Doe 21's breasts, and how they "felt" to him. Hadden massaged, fondled, squeezed, pulled, tugged and pinched her breasts, and nipples, for prolonged periods, as he engaged in idle chatter, divulging wholly improper and inappropriate personal information about himself and his family, in order to distract the patient and prolong the length of time he had access to grope the patient's body - all in furtherance of his never-ending sexual exploitation and grooming of female patients. The breast examinations were conducted at every visit, including throughout Jane Doe 21's three pregnancies, wherein Hadden would express breast milk.

258.     Hadden performed medically unnecessary and unwarranted, prolonged and serial, vaginal examinations, and PAP smears. Hadden would penetrate Jane Doe 21 by inserting his fingers - with ungloved hands - into Jane Doe 21's vagina in a non-medical manner.

259.     On at least one occasion, while the patient was naked, covered in a gown, Hadden had her sit on the edge of the exam table, and while standing behind her, untied her gown, and whipped it off her body, and proceeded to inappropriately and improperly examine and touch her back and naked body.

260.     Despite the fact Jane Doe 21 desired natural childbirth, Hadden recommended that she undergo a cesarian section with her first child, although no reason was provided, other than that he "thought" she would have trouble with delivery. Jane Doe 21 endured excruciating pain during the cesarian section, as she could feel the scalpel cutting through skin and muscle. The Plaintiff could also feel the needle pushing through her insides as Hadden was stitching her up following the delivery of her first child. Jane Doe 21's mother, who was present in the delivery room, and witnessed the torture her daughter was being subjected to, pleaded with Hadden to help alleviate her daughter's pain. Jane Doe 21 was screaming, crying and yelling out in pain, due to the fact that Hadden failed to properly administer anesthesia. Hadden did not express any concern or take any action to alleviate Jane Doe 21's pain. During her postpartum visit, Hadden told Jane Doe 21 that he gave her "the most thorough internal exam - I held your uterus in my hands."

261.     During her last office visit with Hadden in 2011, Jane Doe 21 observed Hadden acting abnormal - even for Robert Hadden. She had the impression that perhaps Hadden was on drugs. After the births of her children, in 2004, and 2007, respectively, Jane Doe 21 was

compelled to seek medical care from a gastroenterologist in an effort to relieve persistent and unrelenting abdominal pain, which had affected her following her first cesarian section.

262.    Jane Doe 21 has endured, and continues to endure, indescribable conflict, confusion, and mental injury due to her inability to comprehend the reasons and level of depravity of the abuse inflicted upon her by Hadden.

263.    At all times relevant to Jane Doe 21's experiences with Hadden, Hadden was well aware of the cognitive dissonance that his patients - who he was sexually abusing - would experience with regard to their inability to come to grips with the unfathomable idea that their own medical doctor was sexually exploiting and abusing them.

264.    Hadden exploited his position of trust and authority bestowed on him by the Columbia Defendants, to his own depraved benefit, and in furtherance of his scheme to sexually abuse and exploit as many women as possible under the guise of performing routine medical procedures.

265.    As a result, Hadden was able (and enabled by the Corp. Entities Defendants) to sexually abuse countless female patients of the Columbia Defendants in a serial fashion, while carrying out his sick and disturbing fantasies surrounding doctor sexual abuse. Columbia University's (and its related entities) active concealment, lies, verbal, non-verbal, and written statements to the plaintiff in particular, and the public at large, were designed to cause, and did cause, plaintiff to forbear on pursing both civil and criminal legal action against the Defendants named here. As a result of the grooming, mental impact, psychological harm, physical trauma, and intentional acts of psychological manipulation that were inflicted upon the plaintiff,  by the Corp. Entities Defendants, the plaintiff suffered cognitive dissonance and a qualified deficit that

was designed to cause, and did cause, plaintiff to be unable to protect her own legal rights and interests. Finally, on account of Defendants' collective fraud, and fraudulent concealment, committed against Jane Doe 21, the plaintiff did not know, could not have reasonably known, and was not reasonably aware of any possible cause of action that she had against the Columbia Defendants until she spoke with counsel on or about September 7, 2018.

***Plaintiff Jane Doe 22:***

266.    Jane Doe 22 was born in 1978.

267.    Jane Doe 22 was a gynecologic and obstetrics patient of Corp. Entities Defendants at all times relevant to this Complaint.

268.    Jane Doe 22 was repeatedly sexually exploited and abused by Hadden, including throughout the plaintiff's pregnancies.

269.    The Corp. Entities Defendants enabled Jane Doe 22's abuse by their acts and omissions.

270.    Jane Doe 22 saw Hadden at the Corp. Entities Defendants' medical facilities, including NYPH, for what was supposed to be OB/GYN care and treatment between approximately 1998 and 2012.

271.    Beginning with Jane Doe 22's initial office visit, Hadden began subjecting her to a course of predatory grooming, boundary violating, mental, emotional, and physical sexual exploitation and abuse. During the visits, Hadden assailed the plaintiff with a barrage of wily, inappropriate, invasive, intrusive and exploitive questions and gratuitous statements about her body, and physical appearance, sexual history, whether her partner "satisfied" her, whether she experienced orgasms and the use of pornography and sex "toys". Hadden's approach to

grooming was a mix of being awkward, authoritative, self-deprecating, disarming, self-pitying, alarming, and overtly offensive. While Hadden was actively and verbally breaking down the plaintiff's boundaries, he peppered her with a series of irrelevant and medically inappropriate questions for long periods while ogling and groping her breasts and unclothed body. At every visit, Hadden required the patient to get completely naked - in his presence - as he ogled and exploited her.

272.    A Chaperone was present in the room during some of the verbal and physical assaults and witnessed Hadden's verbal and physical sexual abuse firsthand yet did nothing to prevent or stop Hadden's sexual exploitation and abuse of Jane Doe 22. The nurse's presence in the room, and failure to stop Hadden's abuse, left Jane Doe 22 with the impression that Hadden's actions were somehow consistent with a bona fide gynecologic or obstetric examination, and not a form of sexual exploitation or abuse. Often times the Chaperone would leave the room before the "examination" was complete, at which point Hadden would continue to physically sexually exploit and abuse the plaintiff. The fact that the Chaperone would leave the room, again, caused Jane Doe 22 to believe that Hadden's actions were somehow consistent with a bona fide gynecologic or obstetric examination, and not a form of sexual exploitation or abuse. This included, but is not limited to, performing serial, prolonged, and medically inappropriate breast examinations, and prolonged, serial, unwarranted, unnecessary, and medically inappropriate PAP smears and vaginal examinations, wherein Hadden would repeatedly penetrate the plaintiff by inserting his fingers into her vagina. All the while, Hadden would engage in idle chatter or begin divulging wholly improper and inappropriate personal information about himself and his family - all in furtherance of his never-ending sexual exploitation and grooming of female patients.

273.    Hadden conducted "scoliosis" or "spine" checks, instructing the plaintiff to stand before him, completely naked, turn her back to him and bend over so he could "check" her spine, when in reality, Hadden was ogling and gazing at the plaintiff's exposed buttocks and vaginal area, all for the express purpose of satisfying his prurient and deviant sexual desires.

274.    During the postpartum period, Hadden continued to sexually exploit and abuse the Jane Doe 22. While the plaintiff's breasts were engorged, Hadden insisted that breast examinations were necessary - despite the fact that she stated unequivocally that she was not experiencing any problems breastfeeding her babies. After making Jane Doe 22 remove her clothing, for no legitimate medical purpose, Hadden proceeded to grope and cup her breasts. During this prolonged, and wholly medically unnecessary "breast examination", Hadden began to squeeze, pull, tug and pinch the plaintiff's breasts and nipples, expressing breast milk.

275.    Jane Doe 22 has endured, and continues to endure, indescribable conflict, confusion, and mental injury due to her inability to comprehend the reasons and level of depravity of the abuse inflicted upon her by Hadden.

276.    At all times relevant to Jane Doe 22's experiences with Hadden, Hadden was well aware of the cognitive dissonance that his patients - who he was sexually abusing - would experience with regard to their inability to come to grips with the unfathomable idea that their own medical doctor was sexually exploiting and abusing them.

277.    Hadden exploited his position of trust and authority bestowed on him by the Corp. Entities Defendants, to his own depraved benefit, and in furtherance of his scheme to sexually abuse and exploit as many women as possible under the guise of performing routine medical procedures.

278.    As a result, Hadden was able (and enabled by the Corp. Entities Defendants) to sexually abuse countless female patients of the Columbia Defendants in a serial fashion, while carrying out his sick and disturbing fantasies surrounding doctor sexual abuse. Columbia University's (and its related entities) active concealment, lies, verbal, non-verbal, and written statements to the plaintiff in particular, and the public at large, were designed to cause, and did cause, plaintiff to forbear on pursing both civil and criminal legal action against the Defendants named here. As a result of the grooming, mental impact, psychological harm, physical trauma, and intentional acts of psychological manipulation that were inflicted upon the plaintiff,  by the Corp. Entities Defendants, the plaintiff suffered cognitive dissonance and a qualified deficit that was designed to cause, and did cause, plaintiff to be unable to protect her own legal rights and interests. Finally, on account of Defendants' collective fraud, and fraudulent concealment, committed against Jane Doe 22, the plaintiff did not know, could not have reasonably known, and was not reasonably aware of any possible cause of action that she had against the Columbia Defendants until she spoke with counsel on or about September 7, 2018.

***Plaintiff Jane Doe 26***

279.    Jane Doe 26 was born in 1977.

280.    Jane Doe 26 was a gynecologic and obstetrics patient of Corp. Entities Defendants at all times relevant to this Complaint.

281.    Jane Doe 26 was repeatedly sexually exploited and abused by Hadden, including while Jane Doe 26 was pregnant with her first child.

282.    The Corp. Entities Defendants enabled Jane Doe 26's abuse by their acts and omissions.

283.    Jane Doe 26 saw Hadden at the Corp. Entities Defendants' medical facilities, including NYPH, for what was supposed to be OB/GYN care and treatment between approximately December 2004 and May 2007.

284.    Beginning with Jane Doe 26's initial office visit as an OB/GYN patient, Hadden began subjecting her to a course of predatory grooming, boundary violating, mental, emotional, and physical sexual abuse. During each of her follow-up visits with Hadden, Hadden assailed Jane Doe 26 with a barrage of wily, inappropriate, invasive, intrusive and exploitive questions and statements about her appearance, body, sexual history, and sexual activity including, among other things, questioning Jane Doe 26 about her use of pornography. Hadden's approach to grooming Jane Doe 26 was a mix of being authoritative, awkward, self-deprecating, disarming, self-pitying, alarming, fear mongering, and overtly offensive. These behaviors are classic "grooming" behaviors.[26] While Hadden was actively and verbally breaking down Jane Doe 26's boundaries, Hadden forced her to answer questions about herself, and peppered her with a series of irrelevant and medically inappropriate questions for long periods while ogling and groping her unclothed body, breasts, and vagina. Hadden continued to engage in idle chatter about medically irrelevant information, including orgasms she had experienced, and whether or not her husband was able to "satisfy" her.

285.    During several of Jane Doe 26's OB/GYN appointments with Hadden, Hadden performed prolonged breast and vaginal examinations in a rough and domineering manner, with his bare, ungloved hands.  While performing the serial, prolonged, and medically inappropriate breast examinations, Hadden would continue to groom the patient by disclosing personal and

_____

[26]   *Grooming*, *supra* note 2.

private information about himself and his family meant to distract the patient so he could prolong the time he had access to grope her body. Hadden would routinely perform his invasive and prolonged "examinations" of patient's breasts while making her stand before him, completely naked, as he would ogle her body, and "examine" the patient's breasts, by massaging, fondling, tugging, pulling, squeezing, and pinching Jane Doe 26's breasts and nipples in a sexual and not clinical or medical fashion. These exams occurred without a nurse, medical assistant, or chaperone present in the room. The fact that a Chaperone wasn't present in the room caused Jane Doe 26 to believe that Hadden was a well qualified and trusted OBGYN within Columbia University, and that Hadden's actions were somehow consistent with a bona fide gynecologic or obstetric examination, and not a form of sexual exploitation or abuse.

286.    At nearly **all** of Jane Doe 26's visits with Hadden, Hadden conducted pelvic and/ or vaginal examinations, often using his fingers to stroke the patient's vagina, under the guise of "lubricating" the area, and inappropriately touching Jane Doe 26's clitoris. Hadden informed the Jane Doe 26 she had a "retroverted" uterus, which was nothing more than a sham 'diagnosis' routinely employed by Hadden, for the purpose of excusing his desire to stick his hands deeply inside the vaginas of his unsuspecting victims, "feel around" for prolonged periods of time, and provide the appearance that he was doing something other than engaging in an abject digital-rape of the patient. Following this charade, Hadden would then engage his victims in a dialogue about sexual positions that may feel better, or more intense, for them on account of their wholly made up medical condition. None of this had any basis in medicine. And all of it was simply a ruse concocted by a wily and skillful, serial, sexual felon who, with the help of Columbia University,

and Corp. Entities Defendants, was given a license to sexually exploit and abuse women and girls on a daily basis.

287.    During one particular appointment with Hadden, Hadden made wholly inappropriate comments about Jane Doe 26's breasts, while remarking about inappropriate sexual activity, sexual positions, and making unprofessional, offensive "dirty jokes" – all while Jane Doe 26 was unclothed and just trying to obtain basic medical care.

288.    Jane Doe 26 has endured, and continues to endure, indescribable conflict, confusion, and mental injury due to her inability to comprehend the reasons and level of depravity of the abuse inflicted upon her by Hadden.

289.    At all times relevant to Jane Doe 26's experiences with Hadden, Hadden was well aware of the cognitive dissonance that his patients – who he was sexually abusing – would experience with regard to their inability to come to grips with the unfathomable idea that their own medical doctor was sexually exploiting and abusing them.

290.    Hadden used and exploited his position of trust and authority bestowed on him by the Corp. Entities Defendants to his disgusting advantage and his own depraved benefit, and in furtherance of his scheme to sexually abuse and exploit as many women as possible under the guise of performing routine medical procedures.

291.    As a result, Hadden was able (and enabled by the Corp. Entities Defendants) to sexually abuse countless female patients of the Corp. Entities Defendants in a serial fashion, while carrying out his sick and disturbing fantasies surrounding doctor sexual abuse. Columbia University's (and its related entities) active concealment, lies, verbal, non-verbal, and written statements to the plaintiff in particular, and the public at large, were designed to cause, and did

cause, plaintiff to forbear on pursing both civil and criminal legal action against the Defendants named here. As a result of the grooming, mental impact, psychological harm, physical trauma, and intentional acts of psychological manipulation that were inflicted upon the plaintiff,  by the Corp. Entities Defendants, the plaintiff suffered cognitive dissonance and a qualified deficit that was designed to cause, and did cause, plaintiff to be unable to protect her own legal rights and interests. Finally, on account of Defendants' collective fraud, and fraudulent concealment, committed against Jane Doe 26, the plaintiff did not know, could not have reasonably known, and was not reasonably aware of any possible cause of action that she had against the Columbia Defendants until she spoke with counsel on or about August 29, 2018.

***Plaintiff Jane Doe 27:***

292.    Jane Doe 27 was born in 1972.

293.    Jane Doe 27 was a gynecologic patient of Corp. Entities Defendants at all times relevant to this Complaint.

294.    Jane Doe 27 was repeatedly sexually exploited and abused by Hadden.

295.    The Corp. Entities Defendants enabled Jane Doe 27's abuse by their acts and omissions.

296.    Jane Doe 27 saw Hadden at the Corp. Entities Defendants' medical facilities, including NYPH, for what was supposed to be gynecologic care and treatment between approximately 2004 and 2012.

297.    Beginning with Jane Doe 27's initial office visit, Hadden began subjecting her to a course of predatory grooming, boundary violating, mental, emotional, and physical sexual exploitation and abuse. During the visits, Hadden assailed the patient with a barrage of wily,

inappropriate, invasive and exploitive questions and statements about her body and physical appearance. While Hadden was actively and verbally breaking down the plaintiff's boundaries, he would perform prolonged, serial vaginal examinations and physical examinations for no medical purpose. A Chaperone was present in the room during some of the verbal and physical assaults and witnessed Hadden's verbal and physical sexual abuse firsthand, yet did nothing to prevent, or stop, Hadden's sexual exploitation and abuse of Jane Doe 27. The nurse's presence in the room, and failure to stop Hadden's abuse, left Jane Doe 27 with the impression that Hadden's actions were somehow consistent with a bona fide gynecologic examination, and not a form of sexual exploitation or abuse.

298.    Hadden obligated Jane Doe 27 to return to him every six (6) months, prompting the plaintiff to ask why it was necessary to be seen so often, and Hadden responded that it was because she was on birth control, and needed to be "monitored", which was a smokescreen for Hadden to continue to have visual and physical access to Jane Doe 27's body. Prior to the plaintiff's initial appointment with Hadden, she had undergone a colposcopy and although Hadden told Jane Doe 27 that her Pap smears were normal in 2008, he had her undergo at least one (1), if not two (2) biopsies, which was/were performed without the benefit of anesthesia or pain medication, causing the plaintiff to endure unnecessary and excruciating pain, which she described as feeling like Hadden was was "cutting a piece" out of her body. The procedure(s) was/were done in a barbaric and cruel manner, for the sole purpose of Hadden's own deviant, sadistic sexual gratification.

299.    Hadden subjected the plaintiff to medically unnecessary, unwarranted serial vaginal examinations every six (6) months. During at least one of the vaginal exams Hadden

performed, he improperly and inappropriately stroked, touched and/or fondled Jane Doe 27's vagina, under the guise of "lubricating" the area, and stroked/rubbed and/or touched her clitoris in a sexual manner. The vaginal examinations occurred during every visit. Although Hadden notified the plaintiff that the Pap smear results were "normal", they were, in fact, abnormal, resulting in Jane Doe 27 developing cancer of the cervix, requiring surgical removal of the cervix in or about 2009, and reparative surgery to create a pseudo-cervix to permit Jane Doe 27 to safely carry a pregnancy to term. The plaintiff was never notified, either by verbally or by mail, of the abnormal findings in her prior Pap smears.

300.    Hadden conducted prolonged, serial, medically unnecessary and unwarranted breast examinations at every visit.  At her final medical appointment with Hadden, he conducted a breast exam by squeezing, groping, tugging, pulling and pinching the plaintiff's breasts and nipples.

301.    Hadden conducted "scoliosis checks", wherein he would have the plaintiff stand before him, completely naked, turn so her back was to him, and bend over, while he ogled and gazed at Jane Doe 27's exposed buttocks and vaginal area. At one of the plaintiff's appointments, which occurred in 2009, prior to any physical exam occurring, Hadden informed her that " no, no, we have to wait for a nurse", and he seemed annoyed and disturbed by the fact that a nurse/ chaperone would have to be present during the examination.

302.    In 2013, Jane Doe 27 discovered she was pregnant, and contacted Columbia Doctors, to schedule an appointment with one of their OB/GYNS. When it became clear to the plaintiff that Hadden was still associated with the ob/gyn group, she asked why Hadden was still there,   immediately requested a copy of her medical records, and informed the staff that she

would be seeking obstetrical care from another facility. A staff member repeatedly asked Jane Doe 27 why she she was leaving, however, Jane Doe 27 was so unnerved by the fact that Hadden's name still appeared on the group's sign, that she was rendered speechless. After Jane Doe 27's departure, she received an unwelcome and unsolicited telephone call from Mary D'Alton, Chair of the Department of Obstetrics & Gynecology, beseeching the plaintiff to tell her why she no longer wanted to be a patient of the group. Jane Doe 27 did not respond to Mary D'Alton's call, and did not return to the practice.

303.   Jane Doe 27 has endured, and continues to endure, indescribable conflict, confusion, and mental injury due to her inability to comprehend the reasons and level of depravity of the abuse inflicted upon her by Hadden.

304.   At all times relevant to Jane Doe 27's experiences with Hadden, Hadden was well aware of the cognitive dissonance that his patients - who he was sexually abusing - would experience with regard to their inability to come to grips with the unfathomable idea that their own medical doctor was sexually exploiting and abusing them.

305.   Hadden exploited his position of trust and authority bestowed on him by the Corp. Entities Defendants, to his own depraved benefit, and in furtherance of his scheme to sexually abuse and exploit as many women as possible under the guise of performing routine medical procedures.

306.   As a result, Hadden was able (and enabled by the Corp. Entities Defendants) to sexually abuse countless female patients of the Columbia Defendants in a serial fashion, while carrying out his sick and disturbing fantasies surrounding doctor sexual abuse. Columbia University's (and its related entities) active concealment, lies, verbal, non-verbal, and written

statements to the plaintiff in particular, and the public at large, were designed to cause, and did cause, plaintiff to forbear on pursing both civil and criminal legal action against the Defendants named here. As a result of the grooming, mental impact, psychological harm, physical trauma, and intentional acts of psychological manipulation that were inflicted upon the plaintiff,  by the Corp. Entities Defendants, the plaintiff suffered cognitive dissonance and a qualified deficit that was designed to cause, and did cause, plaintiff to be unable to protect her own legal rights and interests. Finally, on account of Defendants' collective fraud, and fraudulent concealment, committed against Jane Doe 27, the plaintiff did not know, could not have reasonably known, and was not reasonably aware of any possible cause of action that she had against the Columbia Defendants until she spoke with counsel on or about December 5, 2018.

***Plaintiff Jane Doe 28:***

307.    Jane Doe 28 was born in 1980.

308.    Jane Doe 28 was a gynecology and obstetrics patient of Corp. Entities Defendants at all times relevant to this complaint.

309.    Jane Doe 28 was repeatedly sexually exploited and abused by Hadden, including while she was pregnant.

310.    The Corp. Entities Defendants enabled Jane Doe 28's abuse by their acts and omissions.

311.    Jane Doe 27 saw Hadden at the Corp. Entities Defendants' medical facilities, including NYPH, for what was purported to be gynecologic and obstetrical care and treatment between approximately 2003 and 2012.

312.    Beginning with Jane Doe 28's initial office visit, Hadden began subjecting her to a course of predatory grooming, boundary violating, mental, emotional, and physical sexual abuse. During the visits, Hadden assailed the plaintiff with a barrage of wily, inappropriate, invasive, intrusive and exploitive questions and statements about her body, appearance, sexual history, and sexual activity. Hadden's approach to grooming the patient was a mix of being authoritative, professional, awkward, self-deprecating, disarming, self-pitying, and sexually inappropriate. While Hadden was actively and verbally breaking down the patient's boundaries, he forced her to answer questions about herself, her partner, her sexuality and race, and peppered her with a series of irrelevant and medically inappropriate questions for long periods while ogling and groping her breasts and unclothed body.

313.    A Chaperone was present in the room during many of the verbal and physical assaults and witnessed Hadden's verbal and physical sexual abuse firsthand yet did nothing to prevent or stop Hadden's sexual exploitation and abuse of the plaintiff. The nurse's presence in the room, and failure to stop Hadden's abuse, left Jane Doe 28 with the impression that Hadden's actions were somehow consistent with a bona fide gynecologic or obstetric examination, and not a form of sexual exploitation or abuse.

314.    The abuse perpetrated by Hadden upon the plaintiff includes, but is not limited to, performing serial, prolonged, medically-inappropriate, unnecessary and unwarranted, PAP Smears and unnecessarily painful vaginal exams, with ungloved hands, at every visit, including throughout the plaintiff's pregnancy, wherein Hadden would use his fingers to stroke her vagina and clitoris in a sexual fashion, and attempted to touch her g-spot.

315.    Hadden advised Jane Doe 28 that she had a "retroverted" or "backward tilted" uterus, which he claimed to have diagnosed by penetrating her vagina with one hand, while pushing on her stomach, with his other hand, which would cause the plaintiff to experience unnecessary pain. Hadden further conducted medically inappropriate and unwarranted rectal exams, claiming they were necessary due to her "condition". At times, Hadden would penetrate and probe Jane Doe 28's anus simultaneously while penetrating her vagina. Hadden "advised" the plaintiff about various sexual positions she could engage in to avoid "painful sex", including having sex on all fours, which "might still be painful, but might feel good, so you may want to try it". A "retroverted or tilted uterus" was nothing more than a sham 'diagnosis' routinely employed by Hadden for the purpose of excusing his need to stick his hands deeply inside the vaginas of his unsuspecting victims, "feel around" for prolonged periods of time, and provide the appearance that he was doing something other than engaging in an abject digital-rape of the patient. Following this charade, Hadden would then engage his victims in a dialogue about sexual positions that may feel better, or more intense, for them on account of their wholly made up medical condition. None of this had any basis in medicine. And all of it was simply a ruse concocted by a wily and skillful, serial, sexual felon who, with the help of Columbia University, was given a license to sexually exploit and abuse women and girls on a daily basis.

316.    Hadden performed medically unwarranted and unnecessary, serial, prolonged breast examinations, at every visit, which culminated in squeezing, fondling, massaging, pulling, tugging and pinching of Jane Doe 28's breasts and nipples, causing her to wince and retract as a result of the unnecessary pain Hadden was inflicting upon her.

317.    Hadden conducted medically inappropriate, unnecessary and unwarranted "mole checks". Hadden would remove Jane Doe 28's gown, and instruct her to stand before him, completely naked, with her arms extended out to the sides. Hadden would walk around her body, and "trace" almost every inch of her body with his ungloved hands. Hadden informed the plaintiff that he could "save [her] money" by not referring her to a dermatologist, and instead, he would assume the role of a dermatologist and conduct skin checks himself. Hadden conducted inappropriate, medically unnecessary and unwarranted "scoliosis" or "spine" checks, directing Jane Doe 28 to stand before him, completely naked, turn her back to him, and bend her over for the "exam", exposing plaintiff's buttocks and genital area, while he ran his hands and fingers up and down her spine. These exams were done solely for the express purpose of satisfying Hadden's deviant sexual desires, and not for any legitimate medical purpose reason. Hadden would then use his pen to point out parts of the plaintiff's naked body to her, as if he were providing an "anatomy lesson".

318.    Hadden informed Jane Doe 28 that she had "pre-cancerous cells" that required a LEEP procedure. In or around 2005, Hadden performed the LEEP procedure, which was extraordinarily painful, and informed the plaintiff that the procedure was "successful", however, she was now required to be "monitored", and to be "examined" every six (6) months. Hadden used the procedure as an excuse to have further access to the plaintiff's body. Jane Doe 28's current gynecologist informed her that the LEEP procedure was unnecessary.

319.    Hadden inappropriately and improperly prescribed Prozac to Jane Doe 28 without benefit of referring her for consultation with a medical professional qualified to diagnose and treat the plaintiff.

320.    At a routine postpartum visit after Jane Doe 28 had delivered her child, Hadden made repeated, unwelcome and unsolicited comments and statements about her body, telling her that she was "looking good", that her body was "back to normal", and that she "bounced back nicely" from her pregnancy and delivery of her infant. Hadden asked detailed and explicit questions about Jane Doe 28's sex life with her husband. The questions, which were conducted in Hadden's office, with family photos prominently displayed to give patients the illusion that he was a "family man" and trustworthy, were awkward and were being posed for no-legitimate medical purpose. Jane Doe 28, having grown disgusted by Hadden's unwarranted, unwelcome and unsolicited sexual chattering, stood up to leave, causing Hadden to jump up, and run to the door, blocking her from exiting his office. Hadden then placed his arms around the plaintiff, in an attempt to hug her, and then attempted to kiss her on the lips - the plaintiff instinctively turned her head quickly, and Hadden's kiss landed on the corner of her lips and her left cheek. Jane Doe 28 shot Hadden a sharp, jarring look, and Hadden's facial expressions indicated that what he had done was perfectly normal, and was "surprised" by her reaction to his attempt to kiss her. Jane Doe 28, stunned and confused, walked out of the office in a daze, unable to process what had just happened, but she did contact her husband, who was rightfully angry about what his wife had just been subjected to.

321.    During Jane Doe 28's second pregnancy, after Hadden was no longer with the practice, she was assigned to Dr. Renata Scott-Ram. The plaintiff informed Dr. Scott-Ram about Hadden's attempt to kiss her, and Dr. Scott-Ram responded that she "wasn't surprised because" of the "stuff" she was hearing, and that she had "heard horrible stories" from Hadden's prior patients. Further, Dr. Scott-Ram told Jane Doe 28 that she was "cleaning up his mess".

Following the birth of her second child, and as a result of Hadden's actions, Jane Doe 28 did not see another gynecologist until 2019, when she sought the care of a gynecologist affiliated with a different institution.

322.    Jane Doe 28 has endured, and continues to endure, indescribable conflict, confusion, and mental injury due to her inability to comprehend the reasons and level of depravity of the abuse inflicted upon her by Hadden.

323.    At all times relevant to Jane Doe 28's experiences with Hadden, Hadden was well aware of the cognitive dissonance that his patients - who he was sexually abusing - would experience with regard to their inability to come to grips with the unfathomable idea that their own medical doctor was sexually exploiting and abusing them.

324.    Hadden exploited his position of trust and authority bestowed on him by the Corp. Entities Defendants, to his own depraved benefit, and in furtherance of his scheme to sexually abuse and exploit as many women as possible under the guise of performing routine medical procedures.

325.    As a result, Hadden was able (and enabled by the Corp. Entities Defendants) to sexually abuse countless female patients of the Columbia Defendants in a serial fashion, while carrying out his sick and disturbing fantasies surrounding doctor sexual abuse. Columbia University's (and its related entities) active concealment, lies, verbal, non-verbal, and written statements to the plaintiff in particular, and the public at large, were designed to cause, and did cause, plaintiff to forbear on pursing both civil and criminal legal action against the Defendants named here. As a result of the grooming, mental impact, psychological harm, physical trauma, and intentional acts of psychological manipulation that were inflicted upon the plaintiff,  by the

Corp. Entities Defendants, the plaintiff suffered cognitive dissonance and a qualified deficit that was designed to cause, and did cause, plaintiff to be unable to protect her own legal rights and interests. Finally, on account of Defendants' collective fraud, and fraudulent concealment, committed against Jane Doe 28, the plaintiff did not know, could not have reasonably known, and was not reasonably aware of any possible cause of action that she had against the Columbia Defendants until she spoke with counsel on or about December 6, 2018.

***Plaintiff Jane Doe 30:***

326.    Jane Doe 30 was born in 1978.

327.    Jane Doe 30 was a gynecology and obstetrics patient of Corp. Entities Defendants at all times relevant to this complaint.

328.    Jane Doe 30 was repeatedly sexually exploited and abused by Hadden, including during the time Jane Doe 30 was pregnant with her first child.

329.    The Corp. Entities Defendants enabled Jane Doe 30's abuse by their acts and omissions.

330.    Jane Doe 30 saw Hadden at the Corp. Entities Defendants' medical facilities, including NYPH, for what was purported to be gynecologic and obstetrical care and treatment between approximately 2002 and 2010.

331.    Beginning with Jane Doe 30's initial office visit, Hadden began subjecting her to a course of predatory grooming, boundary violating, mental, emotional, and physical sexual exploitation and abuse. During the visits, Hadden assailed the patient with a barrage of wily, inappropriate, invasive and exploitive questions and statements about her body, and physical

appearance. Hadden's approach to grooming was a mix of being awkward, authoritative, self-deprecating, disarming, self-pitying, alarming, and overtly offensive.

332.    A Chaperone was present in the room during some of the verbal and physical assaults and witnessed Hadden's verbal and physical sexual abuse firsthand, yet did nothing to prevent or stop Hadden's sexual exploitation and abuse of the plaintiff. The nurse's presence in the room, and failure to stop Hadden's abuse, left Jane Doe 30 with the impression that Hadden's actions were somehow consistent with a bona fide gynecologic or obstetric examination, and not a form of sexual exploitation or abuse. Other times, a Chaperone was not present - or would leave the room before the "examination" was complete at which point Hadden  would continue to physically sexually exploit and abuse Jane Doe 30. During the visits, while Hadden was actively and verbally breaking down the plaintiff's boundaries, he peppered her with a series of irrelevant and medically inappropriate questions for long periods while ogling and groping her breasts and unclothed body.

333.    Hadden conducted multiple, prolonged, serial, medically inappropriate and unwarranted breast examinations, wherein Hadden would squeeze, grope, pull, tug and pinch Jane Doe 30's breasts and nipples. At one visit, after the "breast"examination was over, and the plaintiff was alone in the room, preparing to dress herself, Hadden slipped back into the room, unchaperoned, to perform a "second" breast examination on the plaintiff. The second breast exams were a routine occurrence during visits. As Hadden put his hands on the plaintiff, she told him, "I think you've already done this". Jane Doe 30 made the comment on this particular visit because the breast examinations had started to make her uncomfortable. Hadden appeared surprised, stopped his second breast "exam" and quickly exited the examination room.

Undaunted, Hadden still continued to perform the breast exams at subsequent visits, and the plaintiff gave him the benefit of the doubt, thinking perhaps Hadden had forgotten he had conducted the breast exams already. Hadden always gave the impression that he was "very busy" as he and medical personnel were always darting in and out of the examination room.

334.    Hadden performed prolonged, serial, medically inappropriate and unwarranted PAP smears and vaginal exams. While conducting the vaginal exams, Hadden would "accidentally" touch and stroke Jane Doe 30's clitoris, on at least one occasion, her anus, with his bare hands. The plaintiff was initially on birth control medication, and Hadden required her to undergo vaginal exams and Pap smears every six (6) months in order to "refill" her prescription. Hadden conducted  medically inappropriate and unwarranted rectal exams. All the while, Hadden would engage in idle chatter, or begin divulging wholly improper and inappropriate personal information about himself and family - all in furtherance of his never-ending sexual exploitation and grooming of female patients.

335.    Hadden would launch into unwelcome, unsolicited, graphic and explicit discussions regarding sex. The plaintiff did not initiate this topic of conversation, and made Hadden aware that she was not comfortable discussing sex, genitals, etc., that she was from a "typical Irish Catholic" family, to which Hadden responded that he too was a Catholic, in an attempt to disarm the patient, so he could sexually abuse and exploit her. Hadden would ask the plaintiff improper and inappropriate questions, regarding her preferred method of hair removal. Hadden "complimented" her and commented that she was doing a "great job" with her chosen method.

336.     During her pregnancy with her first child, when Jane Doe 30 was accompanied by her husband, Hadden made inappropriate and unprofessional comments to her husband, remarking that her breasts while pregnant were "nature's greatest joke - you can look but you can't touch."  At one of the plaintiff's prenatal visits, a nurse informed her that Hadden would be checking her cervix at the next appointment, and intimated to the plaintiff that she should "groom [her] bikini area because he…", trailing off, however the implication was clear that Hadden preferred his patients to shave or wax their bikini areas prior to the exams, despite the fact that this was completely irrelevant to medical care or treatment.

337.     During another office visit, Jane Doe 30 told Hadden she had cold sores on her mouth, and she simply wanted to know whether a certain medication was effective for cold sores. Hadden instructed the plaintiff to lay down on the exam table, naked, and on her side, so he could examine her anus. It remains unknown why Hadden felt that performing a digital rectal examination was a prerequisite to answering the plaintiff's question. Hadden's actions had no basis in medicine, but were actually conducted to satisfy Hadden's deviant sexual desires in being able to have visual access to and anally penetrate the plaintiff. At Jane Doe 30's subsequent office visit, a Chaperone was present for a portion of the exam. At the end of the exam, the plaintiff turned to her side, as she had been previously instructed by Hadden, at which point Hadden feigned shock, looked sideways at the chaperone and said "Oh no! You don't need to do that." The Chaperone did not say anything, but instead simply continued to look straight ahead. In retrospect, it is clear that this sort of "misunderstanding" was not a surprise to the chaperone.

338.   Hadden further assaulted the plaintiff, at defendants' Hospital after the delivery of her son. Jane Doe 30 underwent a long and arduous trial of labor, after which an unplanned cesarian section had to be performed to deliver her of her son. Following the delivery of her son, while the plaintiff was in her hospital room alone, and recuperating from major surgery, Hadden entered her hospital room, stood at the foot of the bed, then moved to the head of the bed, and apparently, believing Jane Doe 30 was asleep, opened her gown, and exposed her naked breasts. The plaintiff  was under the influence of powerful pain medication, groggy, and not in full control of her faculties.  Despite plaintiff's incapacity, with no chaperone or nurse in the room, and without Jane Doe 30's authorization, or consent, Hadden conducted a wholly inappropriate, medically unnecessary and unwarranted vaginal exam. Jane Doe 30 recalls saying, "Dr. Hadden, thank you", as he was preparing to leave, which caused Hadden to quickly respond, "Oh, oh…", as he realized he had just been caught.  As the plaintiff tried to clarify that she was thanking him for delivering her baby, Hadden shuffled out to the room.

339.   At Jane Doe 30's postpartum visits, Hadden would require the plaintiff to remove her top so that he could fondle, grope, squeeze, pull, tug and pinch her nipples, while expressing breast milk from her engorged breasts and nipples. This so-called "examination" was performed by Hadden, despite the fact that the plaintiff had informed him that she was doing fine breast feeding her infant, and had been working with a lactation consultant. Jane Doe 30 had not expressed any concerns, nor made any complaints regarding her ability to breast feed her infant. Hadden apparently noticed a note from the plaintiff's lactation consultant in her file; Jane Doe 30 had initially encountered difficulty with her baby latching on, but the lactation consultant had been helpful, and the plaintiff had no difficulties expressing milk. The postpartum breast exams

were medically inappropriate, unnecessary and unwarranted and were only performed to satisfy Hadden's deviant sexual urges.

340.   Jane Doe 30 has endured, and continues to endure, indescribable conflict, confusion, and mental injury due to her inability to comprehend the reasons and level of depravity of the abuse inflicted upon her by Hadden.

341.   At all times relevant to Jane Doe 30's experiences with Hadden, Hadden was well aware of the cognitive dissonance that his patients - who he was sexually abusing - would experience with regard to their inability to come to grips with the unfathomable idea that their own medical doctor was sexually exploiting and abusing them.

342.   Hadden exploited his position of trust and authority bestowed on him by the Corp. Entities Defendants, to his own depraved benefit, and in furtherance of his scheme to sexually abuse and exploit as many women as possible under the guise of performing routine medical procedures.

343.   As a result, Hadden was able (and enabled by the Corp. Entities Defendants) to sexually abuse countless female patients of the Columbia Defendants in a serial fashion, while carrying out his sick and disturbing fantasies surrounding doctor sexual abuse. Columbia University's (and its related entities) active concealment, lies, verbal, non-verbal, and written statements to the plaintiff in particular, and the public at large, were designed to cause, and did cause, plaintiff to forbear on pursing both civil and criminal legal action against the Defendants named here. As a result of the grooming, mental impact, psychological harm, physical trauma, and intentional acts of psychological manipulation that were inflicted upon the plaintiff,  by the Corp. Entities Defendants, the plaintiff suffered cognitive dissonance and a qualified deficit that

was designed to cause, and did cause, plaintiff to be unable to protect her own legal rights and interests. Finally, on account of Defendants' collective fraud, and fraudulent concealment, committed against Jane Doe 30, the plaintiff did not know, could not have reasonably known, and was not reasonably aware of any possible cause of action that she had against the Columbia Defendants until she spoke with counsel on or about December 6, 2018.

### TOLLING, CONCEALMENT, AND ESTOPPEL

344.    The applicable statutes of limitation are tolled because of Corp. Entities Defendants' knowing and active concealment, fraud, fraudulent concealment, affirmative verbal statements, non-verbal statements, written statements, publications, and denials, that were directed to the plaintiffs herein, and the public at large, that what Hadden was doing was either unknown to the Corp. Entities Defendants, or was consistent with the standards of bona fide and legitimate medical care and treatment, and was not sexual exploitation and abuse.

345.    Hadden and the Corp. Entities Defendants concealed, and actively lied about, the legitimacy of Plaintiffs' claims, and the fact that Plaintiffs have valid causes of action against Hadden and the Corp. Entities Defendants at the time that Hadden's sexual assaults and abuse occurred, by making material and knowingly false representations to, and actively concealing material information from, Plaintiffs involving a past or existing fact, including by, among other things: (a) misrepresenting or lulling Plaintiffs into believing that Hadden's acts and/or misconduct were for the purpose of conducting legitimate and medically necessary obstetrics and gynecological services based on appropriate standard of care; and (b) misrepresenting or lulling Plaintiffs into believing that Hadden was unavailable or had simply chosen to voluntarily close

his private practice, when Hadden, in fact, had stopped practicing at Corp. Entities because he was arrested, and indicted, for sexually abusing patients.

346.    The material representations to, and fraudulent omissions made to, Plaintiffs by the Corp. Entities Defendants were knowingly false, in that Hadden was actually performing these examinations for his own sexual gratification and pleasure, and Hadden was not "unavailable" or "closed his practice," but instead was under investigation or arrested for committing sexual abuse of his patients on Corp. Entities Defendants' premises.

347.    When Hadden and the Corp. Entities Defendants made the material representations and omitted material facts regarding Hadden's "medical treatment" of Plaintiffs, the Corp. Entities Defendants knew that the statements were false, knew that the examinations were not proper, were inappropriate, illegitimate, and/or  violations of the standard of care by any physician in obstetrics and gynecology.

348.    Hadden and the Corp. Entities Defendants made the material representations and concealed material facts with the intent that the material representations and omitted facts should be acted upon (or not acted upon) by Plaintiffs, in that Plaintiffs should believe that the examinations were proper, appropriate, and legitimate; should not believe that they had been sexually exploited; should not believe that they had been sexually assaulted such that they would not discover that other patients had been similarly sexually exploited and abused; should continue to be seen by Hadden so that Hadden could continue to sexually assault them; should not question and/or report the conduct to appropriate authorities; and should not reasonably believe or be made aware of a possible cause of action that Plaintiffs have against Hadden and the Corp. Entities Defendants.

349.   Plaintiffs acted in reliance upon the material representations and the concealment of material facts in that they: (a) reasonably believed that the examinations were proper, appropriate, legitimate, and within the appropriate standard of care; (b) reasonably did not believe that they had been sexually assaulted; (c) did not believe that they should question and/or report the conduct to appropriate authorities; and (d) did not reasonably believe that they had and were not aware of a possible cause of action that they had against Hadden or the Corp. Entities Defendants.

350.   Hadden and the Corp. Entities Defendants further concealed the fraud by affirmative acts that were designed and/or calculated to prevent inquiry, escape investigation, and prevent subsequent discovery of Corp. Entities Defendants' fraud in that they: (a) prevented and/ or condoned the absence of other medical professionals, chaperones, and/or caregivers being in the room during examinations and treatments of Plaintiffs, so that Hadden could sexually assault Plaintiffs; (b) permitted and/or allowed medical professionals, chaperones and/or caregivers to be in the examination room, who ignored, dismissed and failed to report Hadden's sexual abuse and exploitation of Plaintiffs; (c) failed to comply with or did not abide by or follow the standard of care which requires another medical professional, chaperone, parent, guardian, and/or caregiver be in the room during the examination and treatment of minors and female patients; (d) violated the independent duty that the Corp. Entities Defendants owed to the Plaintiffs to safeguard their welfare and protect their patients from harm; and (e) failed to report Hadden's sexual exploitation and abuse to the New York State authorities including, but not limited to, the Office of Professional Medical Conduct as mandated under state law.

351.    Instead, the Corp. Entities Defendants took affirmative steps to fraudulently conceal Hadden's misconduct, including, but not limited to, by suppressing complaints made by patients, advising victims and survivors of Hadden's abuse that Hadden was not available or voluntarily closed his practice for reasons other than the truth – which is that he had been accused of sexually exploiting female patients, that he was under an internal investigation for the sexual abuse of patients, that he was under a criminal investigation for the sexual abuse of patients, or had actually been arrested by the police for the sexual abuse of patients. High ranking members of Columbia University were enlisted to help gas-light and defraud Plaintiffs into believing that Hadden's conduct was within the standard of accepted medical practice. In a letter, dated April 24, 2013, signed by Columbia's Chief of General Obstetrics and Gynecology, the Corp. Entities Defendants claim they "regret" to inform everyone that "Dr. Robert Hadden has closed his practice at Columbia University Medical Center" [as if to say this was his "choice"] and that the Columbia Defendants would like to "offer you the opportunity to continue your care at our facility with one of his excellent partners". Again, the use of a salutation before Hadden's name, and reference to his "excellent partners" implies not only that Hadden remains honorable and worthy of our respect, but also that he remains "a partner" to these other "excellent" physicians at Columbia University. All the while, Corp. Entities Defendants omit the key detail that Hadden was no longer there because he was caught surreptitiously licking a patient's vagina during a bogus pelvic examination, was caught with lewd imagery on his office computers, had images of another patient's anatomy on his personal cell phone which he took without her knowledge or consent, had a 20 year history of sexually exploiting and abusing female patients, was known to sexually assault a pregnant patient in 1993, was arrested at their medical clinic by

the New York City Police Department for sexual assault in 2012, and was under an active criminal investigation by the Manhattan District Attorney's Office—an investigation that ultimately led to Hadden's felony conviction for assaulting multiple patients under the guise of medical care and treatment. Further, Corp. Entities Defendants intentionally failed to disclose the reason Hadden's practice had closed, and then continued to display his name, professional profile, and phone number on Columbia University's website, up to and including 2015, just prior to Hadden's felony guilty plea in the criminal prosecution by the Manhattan District Attorney's Office. The failure to comply with state agency directives that Corp. Entities Defendants, and/or Columbia, report to Hadden's patients Hadden's loss of his license and sexual abuse of patients, is not only egregious, it's also an act of fraud, further undertaken by the corporate defendants, to prevent the victims and survivors from knowing that what they endured was not a form of legitimate medical treatment but was, in reality, sexual exploitation and abuse.

352.    The actions, inactions, and plain lies perpetrated by the Corp. Entities Defendants constitute affirmative fraudulent concealment of Hadden's conduct.

353.    The statute of limitations for each of Plaintiffs' causes of actions was equitably tolled, and Corp. Entities Defendants are equitably estopped from asserting the statute of limitations as a defense, by reason of their affirmative, egregious, intentional, and wrongful conduct.

354.    As part of Corp. Entities Defendants' wrongful attempt to conceal Hadden's long and documented history of sexually abusing female patients from public scrutiny and the criminal prosecutors, Corp. Entities Defendants implemented various measures to keep the bad news under wraps, with the objective and effect of making Hadden's conduct harder to detect,

and suppressing the voice of the countless victims and survivors who were unknowingly exposed to his abuse. These measures had the effect of practically ensuring that patients, who came into contact with Hadden, including the Plaintiffs, were also sexually abused and assaulted. Corp. Entities Defendants violated their own independent duty to protect their patients by: (a) permitting Hadden to remain in a position of authority and trust after the Corp. Entities Defendants knew, or should have known, that he sexually molested his patients; (b) scheduling female patients for appointments with Hadden, including appointments without a nurse or chaperone present, despite being aware of his improper conduct; (c) failing to ensure that a qualified, vigilant nurse or chaperone was present at all times to protect patients from sexual exploitation and abuse by Hadden; (d) holding out Hadden to Plaintiffs, and other patients, and the public at large, as a trustworthy person of good moral character who was capable and worthy of being granted unsupervised access to female patients; (e) failing to disclose, and actively concealing, Hadden's record, and ongoing complaints of misconduct, sexual exploitation, sexual abuse, harassment, and molestation, and his propensity to commit such acts towards patients; (f) concealing Hadden's known history of sexual exploitation and abuse of patients, from the patients themselves, to the point where the patients weren't even given the opportunity to make their own, informed choice, about who their provider was, and thereby effectively removing from the patients any opportunity they may have had to protect themselves from what was, to the Corp. Entities Defendants, a known serial sexual predator, but what appeared to be, from the patients' perspective, a qualified, safe, and competent OBGYN at a world renowned medical institution; (g) failing to investigate, or otherwise confirm or deny relevant facts about Hadden's history of sexual abuse, including prior complaints, claims, and investigations relating to sexual

abuse suffered at his hands; (h) failing to implement reasonable safeguards to avoid acts of unlawful sexual conduct by Hadden; and (i) failing to implement systems or procedures to supervise or monitor doctors, chaperones, and other agents of the Corp. Entities Defendants to ensure that they did not molest or abuse patients in Corp. Entities Defendants' care and, further, that they report all reasonable suspicions of sexual assault or battery to law enforcement as mandated by N.Y. Soc. Servs. Law §§413, 420.

355.    Corp. Entities Defendants' knowing and active concealment of Hadden's sexual abuse of patients is all the more egregious given the fact that low levels of patient health literacy[27] predominate the area of women's reproductive health, and that many of the patients exposed to Hadden were from low socioeconomic backgrounds.[28]

356.    Patients with inadequate health literacy often feel shame and are too embarrassed to ask their physicians questions regarding their medical care.[29]

357.    Many are so embarrassed by their lack of health literacy that they do not even tell their spouse, or partner, about being sexually abused by their doctors,[30] which further exacerbates and contributes to the problem that fewer than one in ten victims of sexual assault in medicine report the assault.[31]

---

[27]  "Health literacy is defined as the degree to which individuals have the 'capacity to obtain, process, and understand basic health information and services needed to make appropriate health decisions.'" *Health Literacy and Women's Reproductive Health*, *supra* note 15, at 1237.

[28]  While "[m]ore rigorous studies are clearly warranted," some studies have shown as high as "78% of women had less than adequate health literacy skills," and limited health literacy "is likely to be common in reproductive health practices." *Id.* at 1253.

[29]  *See The Gap Between Physicians and Patients*, *supra* note 16, at 464.

[30]  *See id.*

[31]  *See Sexual Violations of Patients by Physicians*, *supra* note 3, at 504. "Reasons for failing to report may include shame, fear of not being believed, not being aware of the abuse, … and being confused as to whether abuse occurred." *Id.*

358.   At all times relevant to this action, Hadden was an agent, apparent agent, servant, and employee of the Corp. Entities Defendants and operated within the scope of his employment and his negligence is imputed to each of the Corp. Entities Defendants. Further, Hadden's sexual exploitation and abuse of women under the guise of medical care and treatment was wholly foreseeable by the Corp. Entities Defendants. Not only are there national recommendations that chaperones be provided in all clinics with OBGYN care is offered, but the Corp. Entities Defendants themselves foresaw the potential that women receiving such care would be sexually exploited and abused, and so they enacted their own Policies and Procedures regarding the provision of chaperones during OBGYN examinations. Unfortunately, their Policies and Procedures proved to be inadequate, unenforced, or just simply wholly ignored by their medical staff.

359.   Defendants engaged in, joined in, and conspired with each of the other defendants and wrongdoers in carrying out the tortuous and unlawful activities described herein. Each defendant is legally responsible for the occurrences herein alleged, and Plaintiffs' damages, as herein alleged, were proximately caused by all defendants.

360.   On account of the fraud, and fraudulent concealment, committed by the Corp. Entities Defendants against Marissa Hoechstetter, Jane Doe 8, Jane Doe 9, Jane Doe 10, Jane Doe 11, Jane Doe 12, Jane Doe 13, Jane Doe 14, Jane Doe 15, Jane Doe 17, Jane Doe 18, Jane Doe 19, Jane Doe 21, Jane Doe 22, Jane Doe 26, Jane Doe 27, Jane Doe 28, and Jane Doe 30, the Plaintiffs did not know, could not have reasonably known, and were not reasonably aware of any possible cause of action that they had against the Corp. Entities Defendants until they contacted counsel at various times in 2018.

361.    Plaintiffs could not, with due diligence, have discovered the full scope of the Corp. Entities Defendants' and Hadden's misconduct, which is directly attributable to the Corp. Entities Defendants' efforts to conceal such misconduct. Tellingly, even after nearly 10-years of actual litigation, six (6) motions to compel, and countless notices for the depositions of the Corp. Entities defendants, not a single piece of document discovery related to the cover-up of Robert Hadden's abuse has been disclosed to the plaintiffs by Corp. Entities. All applicable statutes of limitation have been tolled by operation of the doctrine of equitable estoppel. Under the circumstances presented herein, the Corp. Entities Defendants were under an ongoing duty and responsibility to disclose to the plaintiffs the nature and significance of Hadden's pattern and practice of sexual abuse under the guise of legitimate and medically necessary obstetrics and gynecologic services, but did not do so.  Corp. Entities Defendants are, therefore, estopped from relying on any statute of limitations. The Corp. Entities Defendants' fraudulent concealment, knowingly false statements, and material omissions which were designed and calculated to make patients forbear from filing a civil case, or report their sexual exploitation and abuse to the criminal authorities, is common to all Plaintiffs.

362.    In addition, Plaintiffs' actions are also timely under N.Y. C.P.L.R. § 215 which states:

> Whenever it is shown that a criminal action against the same defendant has been commenced with respect to the event or occurrence from which a claim governed by this section arises, the plaintiff shall have at least one year from the termination of the criminal action . . . in which to commence the civil action, notwithstanding that the time in which to commence such action has already expired or has less than a year remaining.

363.    Marissa Hoechstetter, Jane Doe 8, Jane Doe 13, Jane Doe 14, Jane Doe 21, and Jane Doe 26, were victims and/or "Molineux witnesses"[32] with respect to the Manhattan District Attorney's Office's criminal prosecution against Hadden in June 2014, which concluded in 2016. Moreover, several plaintiffs, who shall not be named, are victims with respect to the United States Attorney's Office's Indictment against Hadden in *United States v. Hadden*, No. 1: 20-cr-00468-RMB (S.D.N.Y.), which remains an open case. Thus, these plaintiffs have either timely filed an action against the defendants "with respect to the [same] event or occurrence" involving the criminal prosecution commenced by the Manhattan District Attorney's Office, or their statutes of limitation are presently tolled until the resolution of the federal *Hadden* case, making their claims herein timely.[33]

## CAUSES OF ACTION
## FIRST CAUSE OF ACTION Title IX 20 U.S.C. § 1681

364.    Plaintiffs re-state and incorporate by reference each and every allegation contained herein above as though fully set forth and brought in this cause of action.

365.    Title IX of the Education Amendments Act of 1972 states, **"No person in the United States shall on the basis of sex, be ... subject to discrimination under any education program or activity receiving Federal financial assistance ..."** 20 U.S.C. § 1681, *et seq.*

366.    Plaintiffs are "persons" under Title IX. COLUMBIA UNIVERSITY and/or its related CORP. ENTITIES receive federal financial assistance for its education program and is

---

[32]  *People v. Molineux*, 168 N.Y. 264 (1901).

[33]  In the event the Manhattan District Attorneys' Office charges one or more of the Columbia Defendants following its investigation, the statutes of limitation will be further tolled pending the resolution of that criminal case.

therefore subject to the provisions of Title IX of the Education Act of 1972, 20 U.S.C. §1681(a), *et seq*.

367.    COLUMBIA UNIVERSITY and CORP. ENTITIES are required under Title IX to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

368.    ROBERT HADDEN's conduct described above constitutes sexual harassment, sexual abuse, and sexual assault, and also constitutes sex discrimination under Title IX.

369.    COLUMBIA UNIVERSITY and CORP. ENTITIES owe a duty to protect their patients, including the plaintiffs herein, from sexual exploitation and abuse, and their conduct and indifference as described above constitutes sexual harassment, sexual abuse, and sexual assault, and also constitutes sex discrimination under Title IX.

370.    The COLUMBIA UNIVERSITY and CORP. ENTITIES Defendants were on notice of ROBERT HADDEN's conduct as described above. The COLUMBIA UNIVERSITY and CORP. ENTITIES Defendants nonetheless failed to carry out their duties, responsibilities and/or obligations to investigate and take corrective and mandatory action under Title IX. As a direct and proximate result of Defendants' actions and/or inactions, Plaintiffs herein were damaged.

**SECOND CAUSE OF ACTION**
**COMMITTING & ENABLING GENDER VIOLENCE**
**IN VIOLATION OF NEW YORK CITY**
**VICTIMS OF GENDER-MOTIVATED VIOLENCE PROTECTION LAW**
**N.Y.C. ADMIN. CODE § 10-1101, *et seq*.**

371.    ROBERT HADDEN's acts of misconduct committed against each Plaintiff, as set-forth herein, including the sexual harassment, exploitation, molestation and physical abuse of the Plaintiffs, constitutes gender-violence and a form of sex discrimination in that one or more of

ROBERT HADDEN's acts would constitute a misdemeanor or felony under both Federal and New York State Law, that has as an element of the use of force, attempted use of force, or threatened use of physical force against the person of another, committed because of gender, or on the basis of gender, and due, at least in part, to an animus based on the victim's gender, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction, presented a serious risk of physical injury to each of the plaintiffs, and result in injury to each plaintiff. Further, each plaintiff herein experienced and had a fear of serious and imminent physical harm as a result of Hadden and the Columbia Defendants' misconduct, sexual exploitation, and sexual abuse as set forth herein.

372.   Each plaintiff has timely filed this action against the defendants on December 4, 2018, under New York City Victims of Gender-Motivated Violence Protection Act, N.Y.C. Admin. Code § 8-901, *et seq.*, within 9-years of the sexual exploitation and abuse. Further, the original criminal prosecution, which each plaintiff participated in, concluded on March 29, 2016. As a result, each plaintiff herein is similarly deemed to have filed this action within two-years (of the renewed 7 or 9 year GMVA statute of limitations under CPLR § 215), of the conclusion of the criminal action that was commenced by the Manhattan District Attorney's Office "with respect to the [same] event or occurrence," as set-forth herein. The action was removed to this court on April 4, 2019.

373.   ROBERT HADDEN's acts committed against Plaintiffs, as set-forth herein, including the sexual harassment, exploitation, molestation and abuse of the Plaintiffs constitute gender-violence and a form of sex discrimination, and racial discrimination, in that ROBERT HADDEN's conduct caused a physical intrusion or physical invasion of a sexual nature upon

Plaintiffs under coercive conditions, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction.

374.    Defendants COLUMBIA UNIVERSITY, THE NEW YORK AND PRESBYTERIAN HOSPITAL; COLUMBIA PRESBYTERIAN MEDICAL CENTER; COLUMBIA UNIVERSITY MEDICAL CENTER; COLUMBIA-PRESBYTERIAN MEDICAL CENTER, EAST SIDE ASSOCIATES; EAST SIDE ASSOCIATES; THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK; COLUMBIA UNIVERSITY COLLEGE OF PHYSICIANS AND SURGEONS; PRESBYTERIAN HOSPITAL PHYSICIAN SERVICES ORGANIZATION, INC.; COLUMBIA-CORNELL CARE, LLC; COLUMBIA CORNELL NETWORK PHYSICIANS, INC.,  and SLOANE HOSPITAL FOR WOMEN, not only knew of ROBERT HADDEN's propensity to commit such acts, but also *enabled and assisted* ROBERT HADDEN in the commission of those act by providing ROBERT HADDEN with access to the COLUMBIA and CORP. ENTITIES' female students and patients, including each of the plaintiffs herein, as well bestowing upon Hadden a special authority over those patients by virtue of his role as physician and member of the Department of Obstetrics and Gynecology. The CORP. ENTITIES defendants are every bit as liable, and responsible, for the sexual exploitation and abuse that was inflicted upon the plaintiffs as Hadden himself. Robert Hadden, and others like him, are merely symptoms of a much larger problem that is faced by institutions throughout the United States. The real issue that our society must reckon with is that our trusted institutions are the source of the problem when it comes to serial sexual abuse. Sexual abuse can happen at any institution. Whether or not an abuser becomes a serial sexual predator is directly related to how, and if, the administrators at the institution deal with the problem. If the

institution takes action and disciplines, reports, or terminates the perpetrator, the abuse stops. But when the culture of the institution is so toxic that the abuse is overlooked, ignored, enabled, or covered up, the abuse most surely continues and worsens. Therefore, Columbia University and the corporate defendants are liable for the serial sexual abuse committed by Robert Hadden, in their medical clinics and hospitals, because the institutions not only created the environment in which this kind of abuse can occur, but even went a step further by concealing the acts and existence of this known, serial sexual predator from their unsuspecting patients, the authorities, and the public at large. The university, corporate defendants, administrators and supervisors themselves—who failed to do their jobs and deal with a sexual predator employee—are the ones who created the toxic culture and sexually abusive environment, not Robert Hadden. The following facts and history about Columbia and Corp. Entities enabling and cover-up is known: (a) in or around 1993, a nurse, who had forgotten her stethoscope in the exam room, returned to retrieve it, and finding the door closed, knocked. Hearing no response, she opened the door slightly, only to witness Hadden, sitting at the base of a young, Spanish-only speaking patient's body, with his head beneath the drape that covered the patient's naked body,  so he wasn't visible to the patient, but was visible to the nurse, who witnessed "his eyes fully closed", "his face red and tight", "moving his fingers up and down and in and out of the patient's vagina". When this nurse reported Hadden's actions, to two supervisors employed by the Corp Entities' Defendants, nothing happened and Hadden was allowed to continue his abuse unabated. The nurse was merely told to "stay with your doctor" and "make sure he doesn't get himself in trouble"; (b) a former patient, survivor and whistleblower, who was exposed to and abused by Hadden at a prenatal visit, for her high risk pregnancy, in October, 1993, wrote a letter to the hospital's then

Acting Chairman named Harold E. Fox, dated May 30, 1994, detailing the abuse to which she had been subjected, and received a written response back from Chairman Harold E. Fox, dated June 14, 1994. Despite Fox's assertions that he would "have a discussion with" Hadden, nothing was done - no investigation was conducted, no suspension was issued, and the survivor never heard from Corp. Entities Defendants or any of their staff members again. Defendants claimed in a recent newspaper article that they didn't even keep a copy of the patient's letter, or their Chairman's letter back to the patient; (c) chaperones did not remain with the patients during physical examinations to avoid seeing the sexual exploitation and abuse that Hadden inflicted on women, and when the chaperones did remain in the room, they were not focused on the patient, but would have their back turned to the patient, or be looking out the window, or stare off into space. Some chaperones, who knew they were required to remain in the room with the patients, were ordered to leave by Hadden. Each time it happened, the chaperones complied with Hadden's directive—whose authority over them was provided by the toxic culture and abusive environment that was created by the Corp. Entities; (d) The Corp. Entities Defendants were well aware, as was their staff, nurses, assistants, chaperones, and even Hadden's colleagues, that Hadden was known as "a shark" who knew how to outmaneuver chaperones, make quick hits at sexually abusing female patients, and keep going; (e) in or around 1996, a patient, and former employee of Corp. Entities, complained to a receptionist, after Hadden had rubbed his penis on her arm and she noticed his erection, that Hadden was "a pervert", that she would not be making any future appointments, and would not pay for the visit, to which the receptionist responded, "I know", and "I'm sorry", while looking down at her desk and avoiding eye contact with the patient; (f) Another patient queried a nurse as to why she was not provided a gown for modesty

purposes, and the nurse responded with a "rolling of her eyes" as if to say, "not again"; (g) yet another patient experienced a chaperone being ordered out of the room by Hadden prior to her physical exam, and the chaperone's facial expression was one of "I know I shouldn't be leaving", and knew that she was doing something wrong by leaving Hadden alone with the patient; (h) in or around 1993, at the Audubon Clinic, a minor patient was examined by Hadden, without a chaperone present in the room. After Hadden had assaulted the teenager, a chaperone entered, instructed the girl to remove all her clothing, not aware that Hadden already violated the child while performing an invasive and unnecessary vaginal and breast exam. The minor informed the chaperone that "he already did this", to which the chaperone responded that it was impossible because an individual had to be present during ob/gyn examinations. Instead of reporting Hadden, the chaperone made the child go through the exam with Hadden a second time; (i) another patient called the police after Hadden licked her vagina during a postpartum office visit, on Friday, June 29, 2012. Shortly after the call, Hadden was arrested in Corp. Entities Defendants' office, and on their premises. The police spoke with Mary D'Alton, the Chairperson of the Department of OBGYN, and John Evanko, Hadden's superior. It appears that Corp. Entities contacted a criminal defense lawyer on Hadden's behalf, got his arrest vacated, and allowed Hadden to return to the office the following week (in or around the beginning of July, 2012), where Hadden continued to sexually assault, sexually abuse and sexually exploit more unsuspecting female patients, many of whom were pregnant.

375.    By ignoring and concealing Hadden's abuse of patients, dismissing patients and medical personnel complaints about Hadden's abuse, and failing to take any action against ROBERT HADDEN, such as firing him, reporting him to the police, and/or reporting him to the

New York State Medical Board and Office of Professional Medical Conduct as mandated by law, Defendants COLUMBIA UNIVERSITY, THE NEW YORK AND PRESBYTERIAN HOSPITAL; COLUMBIA PRESBYTERIAN MEDICAL CENTER; COLUMBIA UNIVERSITY MEDICAL CENTER; COLUMBIA- PRESBYTERIAN MEDICAL CENTER, EAST SIDE ASSOCIATES; EAST SIDE ASSOCIATES; THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK; COLUMBIA UNIVERSITY COLLEGE OF PHYSICIANS AND SURGEONS; PRESBYTERIAN HOSPITAL PHYSICIAN SERVICES ORGANIZATION, INC.; COLUMBIA-CORNELL CARE, LLC; COLUMBIA CORNELL NETWORK PHYSICIANS, INC., and SLOANE HOSPITAL FOR WOMEN, enabled, caused, and directly committed the abuse themselves, upon hundreds of female COLUMBIA UNIVERSITY and CORP. ENTITIES' patients, including each of the Plaintiffs herein.

376.    As a proximate result of ROBERT HADDEN's acts, as well as the Columbia Defendants' enabling, complicity, and direct cooperation in the commission of those acts, over a period of greater than 20-years, Plaintiffs are entitled to actual damages, compensatory damages, punitive damages, injunctive relief, any combination of those, or any other appropriate relief against all Defendants. Plaintiffs are also entitled to an award of attorney's fees and costs against all Defendants.

377.    Accordingly Compensatory and Punitive damages are necessary under these facts as to all defendants.

**THIRD CAUSE OF ACTION**
**COMMITTING AND ENABLING SEXUAL HARASSMENT,**
**PREDATORY GROOMING, SEXUAL EXPLOITATION**
**and SEXUAL ABUSE**

378.    Plaintiffs re-state and incorporate by reference each and every allegation contained herein above as though fully set forth and brought in this cause of action.

379.    ROBERT HADDEN, in sexually harassing, grooming, exploiting and abusing the Plaintiffs, and others as herein set-forth, including intending to subject Plaintiffs to numerous instances of sexual exploitation, abuse and molestation during Plaintiffs' time with Defendants at Defendants' COLUMBIA UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY, their related "CORP. ENTITIES", beginning in or around 1992, and lasting for the duration of Plaintiffs' tenures with these Defendants through in or around August of 2012 including, but not limited to, instances of ROBERT HADDEN groping and fondling the Plaintiffs' vaginas and breasts, all while ROBERT HADDEN acted in the course and scope of his agency/employment with Defendants, and each of them were intended to cause harmful or offensive contact with Plaintiffs' persons, or intended to put Plaintiffs in imminent apprehension of such contact.

380.    In doing the things herein stated, Plaintiffs were put in imminent apprehension of a harmful or offensive contact by ROBERT HADDEN and actually believed ROBERT HADDEN had the ability to make harmful or offensive contact with Plaintiffs' persons.

381.    Plaintiffs did not, and could not, consent to ROBERT HADDEN's intended harmful or offensive contact with Plaintiffs' persons, or intent to put Plaintiffs in imminent apprehension of such contact.

382.    In doing the things herein stated, ROBERT HADDEN and Defendants violated Plaintiffs' Rights of protection from bodily restraint or harm, and from personal insult. In doing the things herein stated, ROBERT HADDEN violated his duty to abstain from injuring the person of Plaintiffs or infringing upon their rights.

383.    As a result of the above-described conduct, Plaintiffs have suffered and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; have suffered and continue to suffer and were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

384.    Plaintiffs are informed and based thereon state that the conduct of Defendants was oppressive, malicious and despicable in that it was intentional and done in conscious disregard for the rights and safety of others, and were carried out with a conscious disregard of their right to be free from such tortious behavior, such as to constitute oppression, fraud or malice, entitling Plaintiffs to punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

385.    Accordingly Compensatory and Punitive damages are necessary under these facts as to all defendants.

**FOURTH CAUSE OF ACTION**
**COMMITTING AND ENABLING CRIMINAL**
**AND CIVIL SEXUAL BATTERY**

386.    Plaintiffs re-state and incorporate by reference each and every allegation contained herein above as though fully set forth and brought in this cause of action.

387.    During Plaintiffs' time as patients with Defendants COLUMBIA UNIVERSITY, TRUSTEES OF COLUMBIA UNIVERSITY, and "CORP. ENTITIES", ROBERT HADDEN intentionally, recklessly and wantonly did acts which were intended to, and did result in harmful

and offensive contact with intimate parts of Plaintiffs' persons, including but not limited to being subjected to numerous instances of sexual abuse and sexual exploitation by ROBERT HADDEN, during Plaintiffs' time with Defendants COLUMBIA UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY, their related "CORP. ENTITIES", beginning in or around 1992, and lasting for the duration of his tenure with Defendants COLUMBIA UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY, their related "CORP. ENTITIES" to in or around 2012, including but not limited to instances of ROBERT HADDEN groping and fondling the Plaintiffs' vaginas, clitorises, anuses, buttocks, breasts, nipples, and other parts of their anatomy, all while ROBERT HADDEN acted in the course and scope of his agency/employment with Defendants, and each of them. Worse yet, Robert Hadden engaged in acts of sadism wherein he would intentionally, and needlessly inflict pain upon the unsuspecting patient to doing various, medically inappropriate things like suddenly pinching and twisting their nipples during breast exams—while looking into their eyes to see the fear, horror or pain on their faces. Hadden would, of course, excuse his misconduct by telling patients that it was a necessary part of the breast examination in order to properly check for breast cancer, which he did to each of the plaintiffs herein. Hadden is also reported as having performed unnecessary cervical biopsies, breast biopsies, inserted his entire hand fully inside patients' vaginas, sutured perineal tears, and even performed a cesarean section on a woman, all (intentionally) without the use of any anesthesia. In each instance, Hadden would explain why doing this barbaric procedures, without any of analgesic, was consistent with the standards of accepted medical practice.

388.   ROBERT HADDEN did the aforementioned acts with the intent to cause harmful or offensive contact with intimate parts of Plaintiffs' persons, and would offend a reasonable

sense of personal dignity. Further, said acts did cause a harmful or offensive contact with intimate parts of Plaintiffs' persons that would offend a reasonable sense of personal dignity.

389.   Because of ROBERT HADDEN's position of status and authority over Plaintiffs, and Plaintiffs' physical, mental and emotional states (some of whom were pregnant, trying to get pregnant, or recent mothers), Plaintiffs did not give consent, and could not consent, to such acts and abuse.

390.   As a direct, legal and proximate result of the acts of ROBERT HADDEN, Plaintiffs sustained serious and permanent injuries to their persons, all of his damage in an amount to be shown according to proof and within the jurisdiction of the Court.

391.   As a direct result of the sexual abuse by ROBERT HADDEN, Plaintiffs have difficulty in reasonably or meaningfully interacting with others, including those in positions of authority over Plaintiffs including teachers, and supervisors, and in intimate, confidential and familial relationships, due to the trauma of the sexual abuse inflicted upon them by Defendants. This inability to interact creates conflict with Plaintiffs' values of trust and confidence in others, and has caused Plaintiffs substantial emotional distress, anxiety, nervousness and fear. As a direct result of the sexual exploitation, abuse and molestation by ROBERT HADDEN, Plaintiffs suffered immensely, including, but not limited to, encountering issues with a lack of trust, various psychological sequelae, depressive symptoms, anxiety, nervousness, fear of doctors and the medical profession, and self-medicating behavior.

392.   The conduct of ROBERT HADDEN and Columbia Defendants, was oppressive, malicious and despicable in that it was intentional and done with a conscious disregard for the rights and safety of others, including the Plaintiffs herein, and was carried out with a conscious

disregard of Plaintiffs' right to be free from such tortious behavior, such as to constitute oppression, fraud or malice, entitling Plaintiffs to punitive damages against ROBERT HADDEN in an amount appropriate to punish and set an example of ROBERT HADDEN and send a message to others similarly situated that they must avoid doing similar things.

393.    Further, "CORP ENTITIES" had an independent duty to protect their patients. Despite this duty, the "CORP ENTITIES" defendants permitted and enabled ROBERT HADDEN to commit these criminal and sadistic acts upon unsuspecting patients. Therefore "CORP ENTITIES" are liable to Plaintiffs herein, as a direct and proximate result of the negligence, carelessness, and wanton recklessness of Defendant "CORP. ENTITIES" and that of their agents, servants and/or employees through their failure to timely and properly train, supervise, monitor, discipline, terminate, and report ROBERT HADDEN to the Criminal Authorities and the New York State Office of Professional Medical Conduct — as well as their failure to take any disciplinary action against ROBERT HADDEN internally.

394.    As a direct and proximate result of the aforementioned sexual batteries, Plaintiffs have sustained in the past, and will continue to suffer in the future, physical injury, pain and suffering, serious psychological and emotional distress, mental anguish, embarrassment and humiliation.

395.    Accordingly Compensatory and Punitive damages are necessary under these facts as to all defendants.

**FIFTH CAUSE OF ACTION
COMMITTING AND ENABLING CRIMINAL
AND CIVIL SEXUAL ASSAULT**

396.    Plaintiffs re-state and incorporate by reference each and every allegation contained herein above as though fully set forth and brought in this cause of action.

397.    At all times material hereto, the acts of ROBERT HADDEN described herein above placed Plaintiffs in reasonable fear of harmful and injurious contact, including but not limited to further and continued intentional and malicious sexual assault, molestation, battery, abuse, and rape.

398.    At all times material hereto, ROBERT HADDEN acted with reckless disregard for the safety and well-being of Plaintiffs.

399.    At all times material hereto, ROBERT HADDEN acted willfully, wantonly, maliciously, and recklessly.

400. At all times material hereto, COLUMBIA UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY and the "CORP. ENTITIES", had a duty to warn and protect their patients, including the plaintiffs herein, and all the while ROBERT HADDEN was under the direct supervision, employ and/or control of COLUMBIA UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY, and the "CORP. ENTITIES". COLUMBIA UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY and the "CORP. ENTITIES" failed to protect each of the plaintiffs herein causing them to suffer fear of harm, apprehension of injury, and physical and emotional trauma at the hands of ROBERT HADDEN, a known serial sexual predator; and failed to train and supervise chaperones in issues and areas known to have a high level of sexual misconduct. *Supra* ¶42

401.    As a direct and proximate result of the aforementioned sexual assaults, Plaintiffs

sustained in the past, and will sustain in the future, physical injury, pain and suffering, serious psychological and emotional distress, mental anguish, embarrassment and humiliation.

402.   Accordingly Compensatory and Punitive damages are necessary under these facts as to all defendants.

## SIXTH CAUSE OF ACTION
## UNFAIR AND DECEPTIVE BUSINESS PRACTICES
### (NY General Business Law §349)

403.   Plaintiffs re-state and incorporate by reference each and every allegation contained herein above as though fully set forth and brought in this cause of action.

404.   N.Y. GEN. BUS. LAW §349 declares unlawful any deceptive act or practice in the conduct of any business, trade, or commerce in New York.

405.   The Columbia Defendants engaged in deceptive business practices in the advertising, marketing, sale, and provision of medical services by concealing sexual harassment and sexual abuse by Defendant Hadden, failing to adequately investigate, vet, and evaluate individuals employed by the Columbia Defendants, and failing to design, implement, and oversee policies regarding sexual harassment and sexual abuse.

406.   In particular, Columbia and NYPH Defendants engaged in a massive disinformation advertising campaign called "AMAZING THINGS" which was designed to flood television, print and billboard media with the message that "amazing things are happening here". Defendants' campaign was a resounding success, winning awards for artistic and advertising merit. When in reality, what was happening is that the "true story" involving the corporate defendants' 20-year cover-up of the most prolific serial sexual predator in the history of New York State, was starting to become news.

407.    In an effort to counter the bad publicity, squelch the voices of victims and survivors, and avoid further damage to their reputation, Columbia University, NYPH, and their related CORP. ENTITIES spent what is believed to be in excess of a hundred million dollars to flood the airwaves with disinformation, and drown out the emerging voices of actual patients who were sexually exploited and abused under the guise of medical care at defendants' medical clinics and hospitals—women who were putting themselves, their relationships, and their careers at risk by coming forward to report on Columbia University's sexual predator named Robert Hadden. The efforts of these women were noble: to try to hold the institution accountable so that no person would ever have to endure being sexually exploited and abused by her doctor ever again. The efforts of the corporate defendants is reprehensible: to silence, gas-light, and discredit victims and survivors of sexual exploitation and abuse in order to protect the reputation of the institution that enabled and allowed the abuse to occur for over 20 years.

408.    Not only did defendants' unlawful, unfair and deceptive business practices, injure the Plaintiffs here, it also injured other institutions who have been transparent about similar cases of sexual abuse, and gave defendants an unfair advantage over its competition both inside, and outside of New York. As a result, defendants COLUMBIA UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY, their related "CORP. ENTITIES" and ROBERT HADDEN benefited financially to the detriment of both the Plaintiffs herein, as well as defendants' competitors, who had to comply with the law.

409.    Unless the defendants are restrained, and called out for their misconduct, Plaintiffs will continue to suffer from irreparable harm from Columbia Defendants' unfair and unlawful business practices. As will all other medical institutions who operate in a legal and

ethical manner. Accordingly, Plaintiffs seek compensation and restitution for all amounts improperly obtained by the Columbia Defendants through their unfair and unlawful business practices, as well as disgorgement of all ill-gotten gains.

410.    Plaintiffs also seek preliminary and permanent injunctive relief enjoining the Columbia Defendants from continuing their unfair and unlawful business practices, as well as an injunction stopping defendants' misuse of *U.S. News'* dubious college and university ranking system that has no objective basis, or verifiable standards.[34] The Columbia and NYPH Defendants have willfully and knowingly violated N.Y. GEN. BUS. LAW §349, and as such Plaintiffs are entitled to treble damages. The Defendants are also liable to Plaintiffs for reasonable attorneys' fees.

### SEVENTH CAUSE OF ACTION
### COMMITTING AND ENABLING NEGLIGENT
### INFLICTION OF EMOTIONAL DISTRESS

411.    Plaintiffs re-state and incorporate by reference each and every allegation contained herein above as though fully set forth and brought in this cause of action.

412.    Defendants ROBERT HADDEN and "CORP. ENTITIES" owed a duty to Plaintiffs to not cause them emotional distress, the initiation of post-traumatic stress disorder, or other harm during the course of gynecological and/or obstetric examinations and other related treatment, which were and are of a very personal nature to the patients. Further, defendant "CORP. ENTITIES" owed a separate duty to protect their patients from harm, even from unknown third parties.

413. Defendant ROBERT HADDEN, was negligent as to the effect of his conduct in

---

[34] See, Malcolm Gladwell blogpost "Did Columbia University Cheat Its Way to the Top of the US News Rankings?" at https://malcolmgladwell.bulletin.com/columbia-university-web-illusions-us-news-rankings

performing unwanted sexual acts upon Plaintiffs, during the course and scope of his purported medical treatment of the Plaintiffs, and under the guise of legitimate medical care and treatment.

414.    Defendant "CORP. ENTITIES", their agents, servants, and/or employees were negligent as to the effect of their conduct in allowing and enabling defendant ROBERT HADDEN to perform unwanted sexual acts on the Plaintiffs herein, as well as countless other patients, during the course and scope of his purported medical treatment of their patients.

415.    Defendant "CORP. ENTITIES," as well as their agents, servants, and/or employees were further negligent and careless in failing to attend to Plaintiffs in a timely and proper manner after they were sexually assaulted by ROBERT HADDEN, and on multiple occasions after these facts were brought to the attention of defendants' own medical personnel upon the premises of defendant "CORP. ENTITIES".

416.    Defendants ROBERT HADDEN and "CORP. ENTITIES", as well as their agents, servants, employees and/or lawyers, were further negligent and careless in failing to timely and properly investigate the reports, claims, verbal complaints, written complaints, and legal filings about the sexual assaults being committed upon patients by ROBERT HADDEN, and even made false, disparaging and degrading oral and written statements about the lack of veracity of plaintiffs, and countless other women.

417.    As a direct and proximate consequence of Defendants' negligence, Plaintiffs have suffered physical, emotional, and psychological injuries, along with pain and suffering.

418.    Accordingly Compensatory damages are necessary under these facts as to all defendants.

**EIGHTH CAUSE OF ACTION**
**COMMITTING AND ENABLING INTENTIONAL INFLICTION**
**OF EMOTIONAL DISTRESS**

419.   Plaintiffs re-state and incorporate by reference each and every allegation contained herein above as though fully set forth and brought in this cause of action.

420.   Defendants COLUMBIA UNIVERSITY, THE NEW YORK AND PRESBYTERIAN HOSPITAL; COLUMBIA PRESBYTERIAN MEDICAL CENTER; COLUMBIA UNIVERSITY MEDICAL CENTER; COLUMBIA-PRESBYTERIAN MEDICAL CENTER, EAST SIDE ASSOCIATES; EAST SIDE ASSOCIATES; THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK; COLUMBIA UNIVERSITY COLLEGE OF PHYSICIANS AND SURGEONS; PRESBYTERIAN HOSPITAL PHYSICIAN SERVICES ORGANIZATION, INC.; COLUMBIA-CORNELL CARE, LLC; COLUMBIA CORNELL NETWORK PHYSICIANS, INC., and SLOANE HOSPITAL FOR WOMEN, ROBERT HADDEN, and their agents, servants, and/or employees' conduct toward Plaintiffs, as described herein, was outrageous and extreme.

421.   A reasonable person in Plaintiffs' position would not expect or anticipate the sexual harassment, exploitation, molestation and abuse by ROBERT HADDEN, or Defendants' collective knowledge, and callous indifference, thereof. Plaintiffs had placed their trust, faith and confidence in Defendants, which, by virtue of ROBERT HADDEN and Co-Defendants' wrongful conduct, turned to fear, abuse, shame and humiliation.

422.   A reasonable person would not expect or anticipate Defendants placing ROBERT HADDEN—who was known to Defendants to have physically and sexually abused other female-patients—in such a position of trust and care of the Plaintiffs, and other patients, which enabled

ROBERT HADDEN to commit wrongful and abhorrent acts of sexual abuse, including the misconduct described herein, with female patients, including Plaintiffs. Plaintiffs placed great trust, faith and confidence in Defendants, which, by virtue of Defendants' wrongful conduct, turned to fear, abuse, shame and humiliation.

423.    A reasonable person would not expect or anticipate that the Defendants, their agents, servants, and/or employees would be incapable of, or indifferent to, supervising or preventing ROBERT HADDEN from sexually exploiting and abusing patients, including Plaintiffs. Plaintiffs placed great trust, faith and confidence in Defendants, which, by virtue of Defendants' wrongful conduct, turned to fear, abuse, shame and humiliation.

424.    "CORP. ENTITIES DEFENDANTS" and defendant Hadden's infliction of emotional distress upon Plaintiffs has the character of outrage associated with a crime, and was criminal, which entitles Plaintiffs to an award of punitive damages against defendants.

425.    The sexual assaults, and Plaintiffs' injuries from the assaults, were caused in whole or in part, by the Columbia Defendants' gross negligence, wanton, willful, and/or reckless conduct, which consisted of, among other things, the following: allowing Defendant Hadden to continue to see patients for nearly twenty years after being notified in 1994 that he was a dangerous sexual predator; failing to adequately supervise Defendant Hadden; covering-up the serial sexual abuse committed by Defendant Hadden from the plaintiffs, other patients, the public, state officials, and law enforcement; allowing Defendant Hadden to continue to see patients for six (6) week after being notified that defendant Hadden had been arrested for licking a patient's vagina during an examination in 2012; failing to report the reasonable suspicion of abuse of children and adults, in the care of the Columbia Defendants, by Defendant Hadden;

failing to adequately investigate, supervise, and evaluate Defendant Hadden; failing to train and supervise chaperones in issues and areas known to have a high level of sexual misconduct. *Supra* ¶42; and failing to design, implement, enforce, and/or oversee policies and procedures regarding sexual exploitation and abuse that would have prevented the injuries and assaults suffered by Plaintiffs herein.

426.    Defendants' conduct described herein was deliberately indifferent, wanton, grossly reckless, premeditated, intentionally deceitful, reckless, intentional and malicious and done for the purpose of causing or with the substantial certainty that Plaintiffs would suffer humiliation, mental anguish, and emotional and physical distress.

427.    As a result of the above-described conduct, Plaintiffs have suffered and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, shame, humiliation, and loss of enjoyment of life; have suffered and continue to suffer and were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling, and many of which have been unable to return to see a gynecologist in over a decade on account of the extreme trauma that was inflicted upon them by the defendants.

428. In subjecting Plaintiffs to the wrongful treatment herein described, Defendants COLUMBIA UNIVERSITY, THE NEW YORK AND PRESBYTERIAN HOSPITAL; COLUMBIA PRESBYTERIAN MEDICAL CENTER; COLUMBIA UNIVERSITY MEDICAL CENTER; COLUMBIA-PRESBYTERIAN MEDICAL CENTER, EAST SIDE ASSOCIATES;

EAST SIDE ASSOCIATES; THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK; COLUMBIA UNIVERSITY COLLEGE OF PHYSICIANS AND SURGEONS; PRESBYTERIAN HOSPITAL PHYSICIAN SERVICES ORGANIZATION, INC.; COLUMBIA-CORNELL CARE, LLC; COLUMBIA CORNELL NETWORK PHYSICIANS, INC., and SLOANE HOSPITAL FOR WOMEN, and ROBERT HADDEN acted willfully and maliciously with the intent to harm Plaintiffs, and in conscious disregard of Plaintiffs' rights, so as to constitute malice and/or oppression. Plaintiffs are informed, and on that basis state, that these willful, malicious, and/or oppressive acts, as stated herein above, were ratified by the officers, directors, and/or managing agents of the Defendants. Plaintiffs are therefore entitled to recover punitive damages, in an amount to be determined by the Court and Jury, against Defendants COLUMBIA UNIVERSITY, THE NEW YORK AND PRESBYTERIAN HOSPITAL; COLUMBIA PRESBYTERIAN MEDICAL CENTER; COLUMBIA UNIVERSITY MEDICAL CENTER; COLUMBIA-PRESBYTERIAN MEDICAL CENTER, EAST SIDE ASSOCIATES; EAST SIDE ASSOCIATES; THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK; COLUMBIA UNIVERSITY COLLEGE OF PHYSICIANS AND SURGEONS; PRESBYTERIAN HOSPITAL PHYSICIAN SERVICES ORGANIZATION, INC.; COLUMBIA-CORNELL CARE, LLC; COLUMBIA CORNELL NETWORK PHYSICIANS, INC., and SLOANE HOSPITAL FOR WOMEN, and ROBERT HADDEN.

**NINTH CAUSE OF ACTION**
**CONSTRUCTIVE FRAUD and FRAUDULENT CONCEALMENT**

429.   Plaintiffs re-state and incorporate by reference each and every allegation contained herein above as though fully set forth and brought in this cause of action.

430.   By holding ROBERT HADDEN out as an agent of Defendants, and by allowing him to undertake the medical care of female patients such as Plaintiffs, Defendants entered into a confidential, fiduciary, and special relationship with Plaintiffs.

431.   By holding themselves out as a preeminent university medical center, thereby enticing over thousands of OBGYN patients to seek medical care and treatment through Defendants' hospitals, medical centers, and clinics, Defendants entered into a confidential, fiduciary and special relationship with Plaintiffs.

432.   Defendants breached their confidential, fiduciary duty and special duties to Plaintiffs by the wrongful and negligent conduct described above and incorporated into this cause of action, and in so doing, gained an advantage over Plaintiffs in matters relating to Plaintiffs' safety, security and health. In particular, in breaching such duties as stated, Defendants were able to sustain their status as an institution of high moral repute, and preserve their reputation, all at the expense of Plaintiffs' further injury and in violation of Defendants' mandatory duties. By virtue of their confidential, fiduciary, and special relationship with Plaintiffs, Defendants had the duty to obtain and disclose material information relating to sexual misconduct of ROBERT HADDEN to Plaintiffs, the public, the school community, the state medical board, and law enforcement agencies the wrongful, tortious, and sexually exploitive acts that ROBERT HADDEN and his enablers had engaged in with patients.

433.    By virtue of their confidential, fiduciary and special relationship with Plaintiffs, Defendants additionally owed Plaintiffs a duty to:

Investigate or otherwise confirm or deny such claims of sexual abuse;

Refuse to place ROBERT HADDEN and other molesters, sexual predators, and enablers in positions of trust and authority within Defendants' institutions;

Refuse to hold out ROBERT HADDEN and other molesters to the public, the community, parents and law enforcement agencies as being in good standing, reputable and, trustworthy in keeping him and his position as a physician, faculty member and authority figure; and

Refuse to assign ROBERT HADDEN and other molesters and enablers to positions of power within Defendants COLUMBIA UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY, their related "CORP. ENTITIES", and over female patients.

434.    Defendants' violations of their respective duties include:

Failing, on countless occasions, to conduct a reasonable investigation of ROBERT HADDEN;

Failing to issue warnings to the Plaintiffs, other patients, and medical staff about ROBERT HADDEN;

Failing to conduct a reasonable investigation of ROBERT HADDEN's enablers and protectors;

Failing to issue warnings to the Plaintiffs, other patients, and medical staff about the existence of ROBERT HADDEN's enablers;

Enabling ROBERT HADDEN to be supervised by untrained and unskilled chaperones, who were consistently derelict in their duty to report ROBERT HADDEN's sexual abuse to law enforcement;

Enabling ROBERT HADDEN attend to patients without any chaperones or supervision at all;

Not adopting and implementing policies and procedures to prevent ROBERT HADDEN from routinely having Plaintiffs and patients in his unsupervised control;

Failing to report written complaints, verbal complaints, and other allegations regarding ROBERT HADDEN's sexual exploitation and abuse of patients prior to or during his employment or agency at Defendants COLUMBIA UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY, AND their related "CORP. ENTITIES";

Assigning, and continuing to assign, ROBERT HADDEN to duties which placed him in positions of authority and trust over female patients, positions in which ROBERT HADDEN could easily isolate, sexually exploit, and sexually abuse the Plaintiffs herein, as well as other patients; and

Enabling ROBERT HADDEN to serially sexually assault female patients for a period of over twenty (20) years upon Defendants' medical facilities, clinics and/or premises.

435.    Defendants engaged in suppression, concealment, gas-lighting, and disinformation regarding ROBERT HADDEN's known, tortious, exploitative and despicable acts for the purpose of causing Plaintiffs to forbear from enforcing their rights in the criminal and civil justice system.

436.    Defendants' concerted and collective misconduct reasonably caused Plaintiffs to forbear on Plaintiffs' Rights.

437.    Defendants affirmatively misrepresented, actively concealed, and failed to disclose information relating to sexual misconduct of ROBERT HADDEN to Plaintiffs, other patients, the public at large, state regulators, and law enforcement.

438.    Defendants' misrepresentations, suppression and concealment of facts were intended to, and did, mislead Plaintiffs and others into believing that Defendants had no knowledge of the fact that ROBERT HADDEN was a known serial sexual predator; had no knowledge of Hadden's propensity to commit wrongful and sexually exploitative acts upon female patients, including Plaintiffs herein; had no knowledge of any criminal or civil charges against ROBERT HADDEN; and had no knowledge of other instances of unlawful, or sexual

misconduct, asserted against ROBERT HADDEN; and therefore, there was no need for Defendants to take further action or precaution. All of these misrepresentations by defendants were false, and were carried out by "CORP. DEFENDANTS" in an effort to make plaintiffs forebear from asserting their rights in the criminal and civil justice system.

439.    Defendants suppressed and concealed the true facts regarding ROBERT HADDEN's sexual abuse of patients, all in an effort to prevent Plaintiffs, and others, from learning that ROBERT HADDEN was, in fact, sexually harassing, sexually exploiting, molesting and sexually abusing patients under the guise of medical care and treatment. Further, all of Hadden's misconduct and abuse was happening with Defendants' full knowledge, and while Hadden was under Defendants' control, direction, and guidance. In doing so, CORP. DEFENDANTS' scheme was designed to induce the public, the Plaintiffs, and other benefactors and donors, to financially support Defendants' programs and other enterprises; prevent further reports and outside investigations into ROBERT HADDEN's misconduct; prevent discovery of Defendants' own conduct; avoid damage to Defendants' reputation; protect Defendants' power and status in the community; and avoid all civil and criminal liability of Defendants, ROBERT HADDEN, and ROBERT HADDEN's stable of enablers.

440.    Defendants knew or should have known that they misrepresented, concealed and failed to disclose information related to sexual misconduct of ROBERT HADDEN.

441.    Defendants knew or should have known at the time that the facts known to them regarding ROBERT HADDEN's sexual misconduct were material, and that, Defendants had a duty both to protect the Plaintiffs, as well as to disclose these important facts to the Plaintiffs and others.

442.    At all times mentioned herein, Defendants, and in particular Defendants COLUMBIA UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY, and ROBERT HADDEN, with knowledge of the tortious and exploitative nature of their own, and ROBERT HADDEN's conduct, knowingly and collectively conspired and provided each other substantial assistance to perpetrate the misrepresentations, fraud and deceit stated herein—covering up the past allegations of sexual misconduct lodged against ROBERT HADDEN, and allowing and enabling ROBERT HADDEN to remain in his position as a physician and faculty member, so they could maintain their reputations and continue with their positions within the organization.

443.    Plaintiffs and others were misled by Defendants' suppressions and concealment of facts, and in reliance thereon, were induced to act or induced not to act, exactly as intended by Defendants. Specifically, Plaintiffs were induced to believe that there were no allegations of criminal or sexual abuse against ROBERT HADDEN, and that HADDEN posed no danger to his patients. This inducement was caused by intentional and knowingly false statements about the cause of ROBERT HADDEN's abrupt, but silent departure as a physician at the hospitals, offices, and medical clinics of CORP. ENTITIES.

444.    Plaintiffs justifiably relied on the misleading actions and omissions of Defendants, and at no time did Plaintiffs have knowledge of the falsity of Defendants' representations.

445.    By giving ROBERT HADDEN the position of physician and faculty member, Defendants both impliedly and affirmatively represented that ROBERT HADDEN was safe and morally fit to render gynecologic and obstetric care and treatment.

446.    When Defendants made these affirmative or implied representations and non-

disclosures of material facts, Defendants knew, or should have known, that the facts were otherwise. Defendants knowingly and intentionally suppressed the material facts that ROBERT HADDEN, had on numerous, prior occasions sexually, physically, and mentally abused patients of Defendants, including Plaintiffs, and knew of, or learned of conduct, or should have known of conduct by ROBERT HADDEN which placed Defendants on notice that ROBERT HADDEN had previously been suspected of, and committed, felonies, including unlawful sexual conduct with patients, and was sexually exploiting and abusing students and patients under his care.

447.    Because of the status of ROBERT HADDEN with CORP. ENTITIES, as a trusted, authority figure to Plaintiffs, Plaintiffs were vulnerable, unsuspecting, and unable to protect themselves against ROBERT HADDEN's sexual exploitation and abuse. As predators do, ROBERT HADDEN sought Plaintiffs out, and was empowered by Plaintiffs' vulnerability.

448.    Defendants COLUMBIA UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY, CORP. ENTITIES and ROBERT HADDEN, in concert with each other and with the intent to conceal and defraud, conspired and came to a meeting of the minds whereby they would misrepresent, conceal, and fail to disclose material information relating to the sexual misconduct of ROBERT HADDEN, the inability or unwillingness of Defendants to supervise or stop ROBERT HADDEN from sexually harassing, exploiting, molesting and abusing Plaintiffs, and their own failure to properly investigate, supervise and monitor his conduct with patients. By so concealing, **Defendants committed at least one act in furtherance of the conspiracy.**

449.    As a result of the above-described conduct, Plaintiffs have suffered and continue to suffer great pain of mind and body, shock, emotional distress, shame, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliation, and

loss of enjoyment of life; have suffered and continue to suffer and were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

450.   In addition, when Plaintiffs finally discovered the fraud of Defendants, and continuing thereafter, Plaintiffs experienced recurrences of the above-described injuries. Plaintiffs experienced extreme and severe mental anguish and emotional distress that Plaintiffs had been the victim of Defendants' fraud and conspiracy; that Plaintiffs had not been able to help other female patients to avoid being molested because of the fraud committed by defendants, that Plaintiffs have not been able, because of the fraud, to receive timely medical treatment needed to deal with their injuries and disabilities, and that Plaintiffs have not been able, because of the fraud, to receive timely legal consultations to protect and enforce their legal rights. Further, Plaintiffs have suffered, and continue to suffer, as a result of the sexual harassment, molestation and abuse they were subjected to by the defendants herein.

451.   In subjecting Plaintiffs to the misconduct and wrongful treatment herein, Defendants COLUMBIA UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY, CORP. ENTITIES and ROBERT HADDEN acted willfully and maliciously with the intent to harm Plaintiffs, and in conscious disregard of Plaintiffs' rights, so as to constitute malice, gross recklessness and/or oppression. Plaintiffs are informed, and on that basis state, that Defendants' willful, wanton, malicious, and oppressive acts, as stated herein above, were ratified by Columbia University's and New York Presbyterian Hospital's Administrators, Chairpeople, Corporate Officers, Directors, Trustees, and Presidents. Plaintiffs are therefore entitled to recover

punitive damages, in an amount to be determined by the Court, against Defendants COLUMBIA UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY, CORP. ENTITIES and ROBERT HADDEN.

452.    Finally, Plaintiffs did not know of defendants' fraud and fraudulent concealment involving material facts related to Robert Hadden's history of sexual exploitation and abuse of patients at CORP. ENTITIES medical clinics and hospitals. Nor did Plaintiffs know what the standards of obstetrical and gynecologic care are. The vast majority of victims that Hadden selected to exploit and abuse had little to no prior experience with a gynecologist, and were first-time mothers. As a result, with regard to what Hadden was doing to them, they had nothing to compare it to. Plaintiffs believed, at the time that the sexual exploitation and abuse they were being subjected to was, instead, a form of legitimate medical care and treatment. This belief was not only reasonable, it is completely understandable in light of the fact that they were in a place that is supposed to be home to the top doctors in the City of New York, and is regarded as one of the most prestigious Universities and hospitals in the world. Therefore, Plaintiffs' expectations and belief that they were receiving bonafide medical care and treatment is completely reasonable. In fact, the sheer number of Plaintiffs' who've come forward speaks volumes about: (a) how reasonable each of the Plaintiffs herein were being in *not* questioning what was being done to them by Hadden; (b) how skilled Robert Hadden was at sexually exploiting and abusing women under the guise of medical care and treatment; (c) how pervasive Hadden's abuse was at the medical clinics and hospitals of CORP. ENTITIES; (d) how many times the nurses, chaperones, administrator, supervisors (John Evanko and Katarina Eisinger), and chairpeople (Harold E. Fox and Mary E. D'Alton) conspired with Hadden, failed to do their jobs, were

inadequately trained in their job, or simply left the room in order to not witness any further abuse —knowing that if they spoke up for the patient, the culture of the institution was such that they wouldn't be listened to, and that they, the nurses themselves, would likely be fired before Columbia or NYPH ever fired Robert Hadden; and (e) how far the "CORP. ENTITIES" have gone to conceal, lie, gas-light, and cover-up Hadden's sexual abuse of patients over the past 20-years. Due to CORP. DEFENDANTS' fraud and fraudulent concealment, Plaintiffs were caused to believe that what Hadden was doing to them was a form of legitimate medical care and treatment at one of the world's top-University medical clinics. As a result of defendants' affirmative misstatements of material facts, which the defendants knew to be untrue, the Plaintiffs herein, as well as countless other patients, were caused to forbear in filing a civil or criminal complaints against the Defendants. Accordingly, Defendants are equitably estopped from asserting the defense of a statute of limitations, and Plaintiffs' actions are timely.

453.    Compensatory and Punitive damages are necessary under these facts as to all defendants.

### TENTH CAUSE OF ACTION
### COMMITTING AND ENABLING NEGLIGENCE, SEXUAL ASSAULT AND RAPE OF THE PLAINTIFFS

454.    Plaintiffs re-state and incorporate by reference each and every allegation contained herein above as though fully set forth and brought in this cause of action.

455.    At all relevant times, the Columbia Defendants were engaged in the business of operating medical clinics and hospital centers in New York. Plaintiffs were patients at the Columbia Defendants' medical centers, and as such were entitled to be protected by the

Columbia Defendants, the medical centers, its agents, and its employees, against assault and negligence.

456.    By virtue of a letter issued by one of Defendants' Chairman from the Department of Obstetrics and Gynecology, the Columbia Defendants were on notice of the fact that Defendant Hadden posed a danger to Plaintiffs and other patients at least as far back as 1994. *See,* CNN Report, attached as ***Exhibit 'A'***. Plaintiffs were sexually assaulted and exploited by Defendant Hadden, an agent, servant, or employee of the Columbia Defendants, causing Plaintiffs to sustain injuries, including, but not limited to: physical injury; pain; suffering; serious psychological distress; serious emotional distress; mental anguish; embarrassment; humiliation; loss of trust in the medical profession, loss of trust in others; and PTSD.

457. Prior to, and after the 1993-1994 incident involving ROBERT HADDEN's sexual harassment, exploitation, molestation and abuse of one of Defendants' patients, through the present, Defendants, knew (and clearly knew) that ROBERT HADDEN had, and was capable of, sexually, physically, and mentally abusing, exploiting and harassing female patients, including each of the Plaintiffs herein.

458.    Defendants, and each of them, had special duties to protect the Plaintiffs and other female patients, when such individuals were entrusted to Defendants' care. Plaintiffs' care, welfare and physical custody was entrusted to Defendants. Defendants voluntarily accepted the entrusted care of Plaintiffs. As such, Defendants owed Plaintiffs as women, students, minors, as well as pregnant and non-pregnant female patients, a special duty of care that ethical adults and medical professionals dealing with vulnerable medical patients owe to protect them from harm.

The duty to protect and warn arose from the special, trusting, confidential, and fiduciary relationship between Defendants and Plaintiffs.

459. Further, Defendant ROBERT HADDEN and defendant "CORP. ENTITIES" owed a duty to Plaintiffs herein to not cause them emotional distress, the initiation of post-traumatic stress disorder, the trigger of past sexual abuse, or other harm during the course of gynecological and/or obstetric examinations and other related treatment, which are of a very personal nature to these patients.

460. Defendant ROBERT HADDEN, performed unwanted sexual acts without the knowledge or consent of Plaintiffs herein, during the course and scope of his purported medical treatment of the Plaintiffs and other women.

461. Defendant CORP. ENTITIES, their agents, servants, and/or employees allowed and enabled defendant ROBERT HADDEN to perform unwanted sexual acts on Plaintiffs herein, as well as other patients, during the course and scope of his purported medical treatment of their patients.

462. Defendant CORP. ENTITIES, as well as their agents, servants, and/or employees failed to attend to Plaintiffs in a timely and proper manner after they were sexually assaulted by ROBERT HADDEN, and after these facts were brought to the attention of the medical personnel upon the premises of defendant CORP. ENTITIES.

463. Defendants ROBERT HADDEN and CORP. ENTITIES, as well as their agents, servants, employees, administrators and/or legal teams failed to timely and properly investigate the reports, claims and legal filings about the sexual assaults upon patients being committed by

ROBERT HADDEN, and made false, disparaging and degrading oral and written statements about the lack of veracity of Plaintiffs and other women.

464.    Defendants allowed ROBERT HADDEN to come into contact with the Plaintiffs and other female students and patients whom they permitted and enabled to have access to Plaintiffs; by concealing from Plaintiffs, the public and law enforcement that ROBERT HADDEN was sexually abusing, exploiting, harassing, molesting, raping and abusing patients; and by holding ROBERT HADDEN out to Plaintiffs as being of high moral and ethical repute, in good standing and trustworthy.

465.    Defendants failed to investigate or otherwise confirm or deny such facts of sexual abuse by ROBERT HADDEN to Plaintiffs, failed to reveal such facts to Plaintiffs, the community and law enforcement agencies, and placed ROBERT HADDEN into a position of trust and authority, holding him out to Plaintiffs and the public as being in good standing and trustworthy.

466.    Defendants failed to prevent ROBERT HADDEN from committing wrongful sexual acts with medical patients, including Plaintiffs. Defendants' past observations, reports, and records of sexual misconduct by ROBERT HADDEN caused Defendants to know, or gave them information where they should have known, of ROBERT HADDEN's incapacity to serve as a physician, and faculty member at Defendants' institutions, providing for the physical care of pregnant and non- pregnant, adult and minor, female patients.

467.    The assault and Plaintiffs' injuries were caused, in whole or in part, by the Columbia Defendants' negligence, which consisted of, among other things, the following: allowing Defendant Hadden to continue to see patients for nearly twenty (20) years after being

notified in 1994 that he was a dangerous sexual predator; failing to adequately supervise Defendant Hadden; covering-up the serial sexual abuse committed by Defendant Hadden; allowing Defendant Hadden to continue to see patients for six week after being notified that Defendant Hadden had been arrested for licking a patient's vagina during an examination; failing to report reasonable suspicion of abuse of children in the care of the Columbia Defendants by Defendant Hadden; failing to adequately investigate, vet, and evaluate Defendant Hadden; and failing to design, implement, enforce, and/or oversee policies regarding sexual harassment and sexual abuse. Consequently, Plaintiffs have been substantially damaged.

468.    As a result of the above-described conduct, Plaintiffs have suffered and continue to suffer great pain of mind and body, shock, emotional distress, shame, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; have suffered and continue to suffer and were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

469.    Accordingly Compensatory damages are necessary under these facts as to all defendants.

## ELEVENTH CAUSE OF ACTION
## NEGLIGENT SUPERVISION

470.    Plaintiffs re-state and incorporate by reference each and every allegation contained herein above as though fully set forth and brought in this cause of action.

471.   By virtue of Plaintiffs' special relationships with Defendants, and Defendants' relation to ROBERT HADDEN, Defendants owed Plaintiffs a duty to provide reasonable supervision of ROBERT HADDEN, to use reasonable care in investigating ROBERT HADDEN's background, and to provide adequate warning to Plaintiffs and other patients of ROBERT HADDEN's dangerous propensities and unfitness. As organizations and individuals responsible for, and entrusted with, the welfare of patients, Defendants COLUMBIA UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY, and CORP. ENTITIES had a duty to protect, supervise, monitor, and prevent the Plaintiffs from being preyed upon by sexual predators, and to supervise and monitor ROBERT HADDEN such that he would not be placed in seclusion with vulnerable medical patients, including the Plaintiffs.

472.   As representatives of Defendants COLUMBIA UNIVERSITY, THE BOARD OF TRUSTEES OF COLUMBIA UNIVERSITY, and CORP. ENTITIES, Defendants' agents servants and/or employees expressly and implicitly represented that physicians, faculty and staff, including ROBERT HADDEN, were not a sexual threat to those individuals and others who would fall under ROBERT HADDEN's influence, control, direction, and care.

473.   Defendants, by and through their respective agents, servants and employees, knew or should have known, of ROBERT HADDEN's dangerous and exploitive propensities and that ROBERT HADDEN was an unfit agent and practitioner. Despite such knowledge, Defendants negligently failed to supervise ROBERT HADDEN in his position of trust and authority as a physician, gynecologist, faculty member and authority figure over female patients and young women, where he was able to commit wrongful acts of sexual misconduct against Plaintiffs. Defendants failed to provide reasonable supervision of ROBERT HADDEN, failed to use

reasonable care in investigating ROBERT HADDEN, and failed to provide adequate warning to Plaintiffs of ROBERT HADDEN's dangerous propensities and unfitness. Defendants further failed to take reasonable steps to ensure the safety of patients, including Plaintiffs, from sexual harassment, sexual assault, sexual battery, molestation, and abuse.

474.    At no time during the periods of time set-forth herein did Defendants have in place a reasonable system or procedure to investigate, supervise and monitor ROBERT HADDEN, to prevent pre-sexual grooming and sexual harassment, sexual exploitation, molestation and abuse of those individuals, nor did they implement a system or procedure to oversee or monitor conduct toward patients and others in Defendants' care.

475.    Defendants were aware, or should have been aware, of how vulnerable these patients were to sexual grooming, harassment, exploitation, molestation and abuse by physicians, male- gynecologists in particular, faculty members and other persons of authority within Defendants' entities. Recent news reports about the Dean of Students having sexually exploited and abused an incoming female freshman shows that the exploitation and abuse of women at Columbia University and its affiliated offices, clinics, hospitals, and entities is a systemic problem which Defendants are not capable of handling or managing.

476.    Defendants were put on notice, knew and/or should have known that ROBERT HADDEN had previously engaged in, and was continuing to engage in, unlawful sexual conduct with female patients, minors, and other pregnant and non-pregnant patients, and that he had committed and perpetrated sexual felonies against those patients, for his own personal sexual gratification, and that it was foreseeable that he was engaging, or would engage, in illicit sexual

activities with Plaintiffs, and others, under the cloak of the authority, confidence, and trust, bestowed upon him by Defendants.

477.    Defendants were placed on actual or constructive notice that ROBERT HADDEN had molested, groomed, abused, and exploited other student and non-student female patients during his employment with Defendants. Defendants were informed of molestations of patients committed by ROBERT HADDEN prior to Plaintiffs' sexual abuse, and of conduct by ROBERT HADDEN that would put a reasonable person on notice of such propensity to molest, groom, exploit and abuse young female patients.

478.    Even though Defendants knew, or should have known, of the illicit, criminal, and exploitative sexual assaults being perpetrated by ROBERT HADDEN upon defendants' unsuspecting patients, Defendants failed to reasonably investigate, supervise, monitor, and end ROBERT HADDEN's access to female patients. Instead, Defendants simply enabled ROBERT HADDEN to keep exploiting and sexually abusing more and more female patients.

479.    Defendants' conduct was a breach of their duties to Plaintiffs and all female patients, as well as their family members.

480.    Defendants, and each of them, have breached their duty to Plaintiffs by, *inter alia*, failing to adequately monitor and supervise ROBERT HADDEN and stop ROBERT HADDEN from committing wrongful sexual acts upon female patients, including Plaintiffs.

481.    As a result of the above-described conduct, Plaintiffs have suffered and continue to suffer great pain of mind and body, shock, emotional distress, shame, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; have suffered and continue to suffer and were prevented and will

continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

482.     Accordingly Compensatory damages are necessary under these facts as to all defendants.

## TWELFTH CAUSE OF ACTION
## VIOLATION OF MANDATORY DUTY TO REPORT PROFESSIONAL MISCONDUCT, NY SOCIAL SERVICES LAW §§ 413, 420; NY EDUCATION LAW §§ 6527, 6530; and NY PUBLIC HEALTH LAW § 230

483.     Plaintiffs re-state and incorporate by reference each and every allegation contained herein above as though fully set forth and brought in this cause of action.

484.     Pursuant to NY SOCIAL SERVICES LAW §§ 413, 420, NY EDUCATION LAW §§ 6527, 6530, and NY PUBLIC HEALTH LAW § 230, the Columbia Defendants are under a mandated duty to report the reasonable suspicion of professional misconduct, including the sexual exploitation or abuse of patients by a medical practitioner.

485.     The Columbia Defendants breached their duty to protect their patients, and their duty to report ROBERT HADDEN's sexual exploitation and abuse of patients. As a direct and proximate result of their breach, Plaintiffs herein have suffered injuries, including, but not limited to: physical injury; pain; suffering; serious psychological distress; serious emotional distress; mental anguish; embarrassment; humiliation; loss of trust in the medical profession, loss of trust in others; and PTSD.

486.     Under applicable law, Defendants, by and through their employees and agents, were medical care providers and were under a statutory duty to report known or suspected

incidents of sexual molestation or abuse of patients, or any individuals in their care, to the appropriate authorities, and not to impede the filing or investigation of any such report.

487.    Defendants knew, and should have known, that their gynecological physician, ROBERT HADDEN, had sexually molested, abused, exploited, or caused touching, battery, harm, and/or other injuries to female patients including Plaintiffs, giving rise to a duty to report such conduct.

488.    Defendants knew, and should have known, in the exercise of reasonable diligence, that an undue risk to patients, including Plaintiffs, existed because Defendants did not comply with mandatory reporting requirements.

489.    By failing to report the continuing sexual molestations and abuse by ROBERT HADDEN, which Defendants knew and should have known about, and by ignoring the fulfillment of the mandated compliance with the reporting requirements, Defendants created the risk and danger contemplated by the applicable mandated reporting laws, and as a result, unreasonably and wrongfully exposed Plaintiffs and other patients to sexual molestation and abuse.

490.    Further, defendant COLUMBIA UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY, and CORP. ENTITIES actively and intentionally impeded the criminal indictment and investigation of ROBERT HADDEN through the intimidation of Assistant District Attorneys, as well as the intimidation of Defendants' own agents, servants, and/ or employees, all in an effort to dissuade them from reporting the exploitation and abuse to the authorities and others. In doing so, defendants illegally interjected themselves into the criminal prosecution of ROBERT HADDEN, used force and coercion in an effort to derail the criminal

investigation, and sent high- ranking risk-managers and corporate personnel to accompany and intimidate its nurses and medical chaperones before, during, and after their interviews with the Manhattan District Attorneys office relative to the criminal indictment and prosecution of ROBERT HADDEN.

491.   Plaintiffs were members of the kind and class of people for whose protection the applicable mandated reporting laws were specifically designed and enacted to protect.

492.   Had Defendants adequately reported the molestation of female patients, including Plaintiffs, as required by applicable mandated reporting laws, further harm to Plaintiffs and other individuals would have been avoided.

493.   As a proximate result of Defendants' failure to follow the mandatory reporting requirements, Defendants wrongfully denied Plaintiffs, and other women, the intervention of law enforcement and the appropriate authorities. Such public agencies would have changed the then-existing arrangements and conditions which provided the necessary access and opportunities for the molestation of Plaintiffs by ROBERT HADDEN.

494.   The physical, mental, and emotional damages and injuries resulting from the sexual molestation of Plaintiffs by ROBERT HADDEN were the type of occurrence and injuries that the applicable mandated reporting laws were designed to prevent.

495.   As a result of the above-described conduct, Plaintiffs have suffered and continue to suffer great pain of mind and body, shock, emotional distress, shame, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; have suffered and continue to suffer and were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of

life; will sustain loss of earnings and earning capacity, and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

496.     Accordingly Compensatory and Punitive damages are necessary under these facts as to all defendants.

## THIRTEENTH CAUSE OF ACTION
## NEGLIGENT HIRING, RETENTION and RATIFICATION

497.     Plaintiffs re-state and incorporate by reference each and every allegation contained herein above as though fully set forth and brought in this cause of action.

498.     By virtue of Plaintiffs' special relationship with Defendants, and Defendants' relation to ROBERT HADDEN, Defendants owed Plaintiffs a duty to not hire and/or retain HADDEN, given his dangerous and exploitive propensities, which Defendants knew, or should have known, about had they engaged in a reasonable, meaningful and adequate investigation of his background prior to his hiring or retaining him.

499.     Defendants expressly and implicitly represented that ROBERT HADDEN was a legitimate gynecologist and obstetrician, and not a sexual threat to female patients.

500.     At no time during the periods of time stated herein did Defendants have in place a reasonable system or procedure to timely and properly investigate, supervise and monitor its hospitals, offices, medical clinics, physicians and healthcare personnel, including ROBERT HADDEN, to prevent sexual grooming, sexual harassment, sexual exploitation, molestation and abuse of female patients, nor did they implement a system or procedure to oversee or monitor conduct toward female patients and/or others in Defendants' care.

501.     Defendants were aware, or should have been aware, and understood how

vulnerable female patients were to sexual grooming, sexual harassment, sexual exploitation, molestation and abuse by faculty members, physicians, and other persons of authority within the control of Defendants prior to Plaintiffs' sexual abuse and exploitation by ROBERT HADDEN.

502.    Defendant "CORP. ENTITIES", their agents, servants, and/or employees, failed to timely and properly investigate complaints made by the sexual assault survivors of ROBERT HADDEN, as well as suspicious circumstances wherein ROBERT HADDEN and other medical staff, agents, servants, and/or employees placed patients in compromised and unprotected situations which either led, or should have led, to an investigation of defendant ROBERT HADDEN and other medical staff, agents, servants, and/or employees' negligence, carelessness, recklessness, and/or criminal and wanton misconduct.

503.    Defendants were put on notice, and should have known that ROBERT HADDEN had previously engaged, and continued to engage, in unlawful sexual conduct with female patients, and was committing other felonies, for his own deviant sexual gratification, and that it was foreseeable, or should have been foreseeable, that ROBERT HADDEN was engaging in, or would engage in, illicit deviant sexual activities with Plaintiffs, and others, under the cloak of his authority, confidence, and trust, bestowed upon him through Defendants, their agents, servants and/or employees.

504.    Defendants were placed on actual or constructive notice that ROBERT HADDEN had molested or was molesting female patients, both before his employment with the within named Defendants, and during that employment. Defendants had knowledge of inappropriate conduct, exploitation and serial molestations committed by ROBERT HADDEN before and

during his employment, yet chose to allow him to remain unsupervised where he serially sexually abused Plaintiffs herein.

505.   Despite the fact that Defendants knew, or should have known, of these sexually exploitive activities being perpetrated by ROBERT HADDEN, Defendants failed to use reasonable care in investigating ROBERT HADDEN and did nothing to reasonably investigate, supervise or monitor and/or terminate ROBERT HADDEN to ensure the safety of patients.

506.   Defendants' conduct in enabling ROBERT HADDEN to serially sexually assault countless female Patients upon its premises was a long-standing, gross, and inexcusable violation of the duty of care owed to Plaintiffs herein.

507.   Because Defendants:

(a)   had actual knowledge of the sexual exploitation, abuse and harassment being committed by HADDEN;

(b)   failed to take action such as terminating their employment of ROBERT HADDEN, reporting ROBERT HADDEN to the police, and/or reporting ROBERT HADDEN to the New York State Medical Board as mandated by State Laws;

(c)   failed to take action such as terminating their employment of ROBERT HADDEN, reporting ROBERT HADDEN to the police, and/or reporting ROBERT HADDEN to the New York State Medical Board as mandated by Federal Laws;

(d)   failed to take action such as terminating their employment of ROBERT HADDEN, reporting ROBERT HADDEN to the police, and/or reporting ROBERT HADDEN to the New York State Medical Board as mandated by medical and academic standards of care;

(e)   failed to take action such as terminating their employment of ROBERT HADDEN, reporting ROBERT HADDEN to the police, and/or reporting ROBERT HADDEN to the New York State Medical Board as mandated by basic standards of ethics and decency;

(f)      consciously and intentionally enabled ROBERT HADDEN to continue to sexually exploit, abuse, molest, and harass female patients by failing to take any of the above actions; and

(g)      consciously and intentionally concealed all of ROBERT HADDEN's exploitative, abusive, and harassing behaviors from female patients, the Plaintiffs herein, and the public at large, Defendants have enabled, permitted, and ratified the conduct of ROBERT HADDEN as set forth herein.

508.    Defendants, their agents, servants, and/or employees knew ROBERT HADDEN was sexually exploiting, abusing, molesting and harassing female patients and refused to take any action to stop him. Moreover, Defendants, their agents, servants, and/or employees hid this information so ROBERT HADDEN could continue to work for COLUMBIA UNIVERSITY, its hospital, offices, medical clinics and facilities. With knowledge of ROBERT HADDEN's sexual misconduct, no disciplinary action was taken by Defendants and he was inexplicably allowed to be alone with female patients. Defendants, their agents, servants, and/or employees are thus responsible for ROBERT HADDEN's acts of sexual exploitation, sexual assault, sexual abuse, sexual battery, discrimination, and harassment.

509.    Further, defendant "CORP. ENTITIES" prior to the granting or renewing of privileges or employment of defendants, residents, nurses and others medical personnel involved in Plaintiffs' care, failed to investigate the qualifications, competence, capacity, abilities and capabilities of said defendants, residents, nurses and other employees, including but not limited to obtaining the following information: patient grievances, criminal investigations, governmental inquiries, negative health care outcomes, incidents injurious to patients, medical malpractice actions commenced against said persons, including the outcomes thereof, any history of association, privilege and/or practice at other institutions, and discontinuation of said association,

employment, privilege and/or practice at said institution, and any pending professional misconduct proceedings in this State or another State, the substance of the allegations in such proceedings and any additional information concerning such proceedings and the findings of the proceedings and defendant "CORP. ENTITIES" failed to make sufficient inquiry of the physicians, nurses, employees other personnel and institutions which should and did have information relevant to the capacity, capability, ability and competence of said persons rendering treatment, including defendant ROBERT HADDEN - as well as the medical staff with which he was associated - upon Defendants' premises.

510.    Defendant "CORP. ENTITIES" failed to timely and properly educate, train, supervise and/or monitor its agents, servants, and/or employees with regard to the policies and procedures that must be followed when sexual abuse by a physician is suspected or observed, and instead created an environment where sexual misconduct by physicians was tolerated.

511.    Defendant "CORP. ENTITIES" created an environment where its agents, servants and/or employees who suspected - or even witnessed - sexual misconduct by a physician, were more fearful about their prospects for future employment if they said something, than they were about the safety and well-being of the patients who were being sexually abused.

512.    Had defendant "CORP. ENTITIES" made the above stated inquiry, or in the alternative, had it reviewed and analyzed the information obtained and available to it in a timely and proper manner, privileges and/or employment would not have been granted and/or renewed.

513.    Defendant "CORP. ENTITIES" were additionally negligent, grossly reckless, wanton and willful, in failing to supervise, monitor, chaperone and/or investigate defendant ROBERT HADDEN, and/or failed to create, institute and/or enforce rules, policies, procedures

and/or regulations for defendant ROBERT HADDEN's treatment of Plaintiffs and countless other women.

514.    By reason of defendant "CORP. ENTITIES" failures to meet the aforementioned obligations, Plaintiffs were treated by physicians, nurses, medical personnel and other employees who were lacking the requisite skills, abilities, competence, capacity and supervision, as a result of which Plaintiffs sustained significant injuries and complications.

515.    The aforesaid injuries resulting therefrom were caused wholly and solely as a result of the defendant "CORP. ENTITIES"'s negligent and reckless supervision of its agents, servants, and/or employees, and created a foreseeable risk of harm to its patients.

516.    Specifically, on Friday, June 29, 2012 a female patient known as JANE DOE #1 was sexually abused by ROBERT HADDEN who touched his tongue to her vagina during a postpartum vaginal examination. JANE DOE #1, in shock and fear, hurriedly dressed and ran out of Defendants' offices. A short while later, two (2) members of the New York City Police Department presented to the medical office, located at 16 East 60th Street, seeking ROBERT HADDEN. Defendants' staff informed ROBERT HADDEN of the police officers' desire to speak with him. The police officers then proceeded to question ROBERT HADDEN about sexual assault he committed and escorted ROBERT HADDEN out of the main office area. ROBERT HADDEN informed the police that he had called JANE DOE #1 on her cell phone after the assault "to straighten out a situation". The police and the District Attorney's Office then proceeded to engage in a verbal altercation over the telephone - the Police Officers wanted to arrest ROBERT HADDEN but the District Attorney's Office insisted that ROBERT HADDEN be let go. The District Attorney then overrode the Police and mandated that ROBERT HADDEN

be released from their custody. The following week ROBERT HADDEN returned to Defendants'

medical offices, and continued to sexually exploit and abuse female patients as if nothing had

happened. Despite the knowledge of a female patient running out of the office - and the Police

Officers' arrival at Defendants' offices a short-time later in an effort to apprehend ROBERT

HADDEN - Defendants took no action against ROBERT HADDEN, wholly failed to investigate

the matter, failed to suspend ROBERT HADDEN, failed to report the incident to other people of

authority at COLUMBIA and its related CORP. ENTITIES, failed to terminate ROBERT

HADDEN, and utterly failed to protect the sanctity of the relationship of trust which is supposed

to exist between the Defendants through their agents, servants, employees, and the patients who

they are supposed to serve.

517.    Defendant "CORP. ENTITIES"'s negligence and recklessness further lies in

having placed Defendant ROBERT HADDEN in a position to cause foreseeable harm, of which

Plaintiffs would have been spared, had the defendant "CORP. ENTITIES" taken reasonable care

in the supervision and investigation of its employees - including, but not limited to, defendant

ROBERT HADDEN, himself.

518.    In a claim for negligent hiring and/or retention, an employer is held liable and

responsible for its negligence or recklessness in hiring, retaining and/or supervising an employee,

whereas under respondeat superior, the employer is vicariously liable for the torts of the agent,

servant or employee. Thus, while Defendant "CORP. ENTITIES" may or may not be vicariously

liable under respondeat superior for an act of an employee that was committed outside the scope

of the employee's employment, Defendant "CORP. ENTITIES" are nevertheless liable for their

failure to exercise reasonable care in hiring, retention and/or supervising their agents, servants

and/or employees - including, but not limited to, defendant ROBERT HADDEN, himself, as well as its useless and complicit chaperones who failed to report ROBERT HADDEN's conduct.

519.     In a claim for negligent supervision, the employer is held liable and responsible for its negligence or recklessness in failing to timely and properly supervise an agent, servant, and/or employee, whereas under respondeat superior, the employer is vicariously liable for the torts of the employee. Thus, while Defendant "CORP. ENTITIES" may or may not be vicariously liable under respondeat superior for an act of an agent, servant, or employee that was committed outside the scope of the employee's employment, Defendant "CORP. ENTITIES" are nevertheless liable for their own failure to exercise reasonable care in hiring, retaining, monitoring, investigating, and/or supervising their agents, servants and/or employees - including, but not limited to, defendant ROBERT HADDEN, himself.

520.     As a result of the above referenced conduct, Plaintiffs have suffered and continue to suffer great pain of mind and body, shock, emotional distress, shame, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; have suffered and continues to suffer and were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

521.     As a result of Defendants' reckless conduct, gross indifference, and wanton lack of regard for the safety and well-being of its patients, malice, criminal indifference to civil obligations, and outrageous disregard of moral and professional obligations, both Compensatory and Punitive damages are necessary under these facts as to all Defendants.

## FOURTEENTH CAUSE OF ACTION
## FAILURE TO WARN, TRAIN OR EDUCATE

522.   Plaintiffs re-state and incorporate by reference each and every allegation contained herein above as though fully set forth and brought in this cause of action.

523.   Defendants COLUMBIA UNIVERSITY, THE NEW YORK AND PRESBYTERIAN HOSPITAL; COLUMBIA PRESBYTERIAN MEDICAL CENTER; COLUMBIA UNIVERSITY MEDICAL CENTER; COLUMBIA-PRESBYTERIAN MEDICAL CENTER, EAST SIDE ASSOCIATES; EAST SIDE ASSOCIATES; THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK; COLUMBIA UNIVERSITY COLLEGE OF PHYSICIANS AND SURGEONS; PRESBYTERIAN HOSPITAL PHYSICIAN SERVICES ORGANIZATION, INC.; COLUMBIA-CORNELL CARE, LLC; COLUMBIA CORNELL NETWORK PHYSICIANS, INC., and SLOANE HOSPITAL FOR WOMEN, owed Plaintiffs a duty to take reasonable protective measures to safeguard Plaintiffs, and other female patients, from the risk of sexual harassment, sexual exploitation, molestation and abuse by ROBERT HADDEN by properly warning, training or educating Plaintiffs and others, including their own medical personnel, medical staff, Administrators, and other agents, servants, and/or employees about how to avoid such a risk and what to do when such inappropriate conduct is witnessed, observed, reported, and/or discovered.

524.   Defendants breached their duty to take reasonable measures to protect Plaintiffs, and other female patients, from the risk of sexual harassment, sexual exploitation, molestation and abuse by ROBERT HADDEN, such as the failure to properly warn, train and/or educate Plaintiffs, and other patients, about how to avoid such a particular risk that ROBERT HADDEN

posed.

525.    Defendants breached their duty to take reasonable protective measures to safeguard Plaintiffs and other patients from the risk of sexual harassment, sexual exploitation, molestation and abuse by ROBERT HADDEN, by failing to supervise and stop employees of Defendants, such as ROBERT HADDEN, and prevent them from committing sexually abusive and exploitive acts upon female student and patients, including Plaintiffs.

526.    As a result of the above-referenced conduct, Plaintiffs have suffered and continue to suffer great pain of mind and body, shock, emotional distress, shame, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; have suffered and continue to suffer and were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

527.    Accordingly Compensatory and Punitive damages are necessary under these facts as to all defendants.

### FIFTEENTH CAUSE OF ACTION
### GROSS NEGLIGENCE, WANTON, WILLFUL and RECKLESS CONDUCT

528.    Plaintiffs re-state and incorporate by reference each and every allegation contained herein above as though fully set forth and brought in this cause of action.

529.    Defendants COLUMBIA UNIVERSITY, THE NEW YORK AND PRESBYTERIAN HOSPITAL; COLUMBIA PRESBYTERIAN MEDICAL CENTER; COLUMBIA UNIVERSITY MEDICAL CENTER; COLUMBIA-PRESBYTERIAN MEDICAL

CENTER, EAST SIDE ASSOCIATES; EAST SIDE ASSOCIATES; THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK; COLUMBIA UNIVERSITY COLLEGE OF PHYSICIANS AND SURGEONS; PRESBYTERIAN HOSPITAL PHYSICIAN SERVICES ORGANIZATION, INC.; COLUMBIA-CORNELL CARE, LLC; COLUMBIA CORNELL NETWORK PHYSICIANS, INC., SLOANE HOSPITAL FOR WOMEN, and ROBERT HADDEN owed Plaintiffs, and other female patients, a duty to use due care to ensure their safety and freedom from sexual assault, sexual exploitation, sexual abuse, sexual discrimination, misogyny, racial discrimination, and molestation while interacting with their agents, servants, and/or employees, including ROBERT HADDEN.

530. By seeking medical treatment from ROBERT HADDEN in the course of his employment, agency, and/or representation of the Defendants, a special, confidential, and fiduciary relationship between Plaintiffs and ROBERT HADDEN was created.

531. Since at least 1994, the Columbia Defendants were on notice of the fact that Defendant Hadden posed a danger to Plaintiffs and virtually any female patient who walked into a medical office where defendant ROBERT HADDEN was present. See, **Exhibit 'A'** (CNN Report about the letter that a sexual assault survivor and whistleblower, sent to Dr. Harold Fox, then Acting Chairman of the Department of Obstetrics and Gynecology, dated May 30, 1994, along with the letter response from Chairman Harold Fox, back to sexual assault survivor/ whistleblower, dated June 14, 1994).

532. Defendants' failures to properly protect their patients, and adequately supervise ROBERT HADDEN, especially after they knew or should have known of complaints regarding ROBERT HADDEN's nonconsensual sexual abuse, exploitation, touching and assaults during

medical examinations was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

533.   ROBERT HADDEN's conduct in sexually assaulting, sexual exploiting, sexually abusing, and molesting Plaintiffs in the course of his employment, agency, and/or representation of the Defendants, and under the guise of rendering "medical treatment", was so wanton and reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and hundreds of other female patients.

534.   Defendants, their agents, servants, and/or employees, failed to timely and properly investigate complaints made by the sexual assault survivors of ROBERT HADDEN, and chaperones, as well as suspicious circumstances wherein ROBERT HADDEN and other medical staff, agents, servants, and/or employees placed patients in compromised and unprotected situations which either led, or should have led, to an investigation of defendant ROBERT HADDEN and other medical staff, agents, servants, and/or employees' negligence, carelessness, recklessness, and/or criminal and wanton misconduct.

535.   Defendants, their agents, servants, and/or employees, failed to timely and properly act upon complaints made by the sexual assault survivors of ROBERT HADDEN, and chaperones, as well as suspicious circumstances wherein ROBERT HADDEN, and/or other medical staff, agents, servants, and/or employees, placed patients in compromised and unprotected situations, all of which caused and/or enabled further and additional negligent, careless, reckless, criminal and/or wanton acts and harm to be inflicted upon Plaintiffs, as well as hundreds of other female students and patients.

536.    By reason of Defendants, and/or their agents, servants, and/or employees' failures to meet the aforementioned obligations and duties, Plaintiffs, as well as hundreds of other female students and patients, were subjected to physical and mental injury, mental manipulation, harm, duress, sexual objectification, sexual exploitation, racial discrimination, sexual assault, and sexual abuse.

537.    Defendant ROBERT HADDEN's sexual assaults of Plaintiffs - and hundreds of other named and unnamed patients - as well as Defendant COLUMBIA UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY, and CORP. ENTITIES's gross negligence, willfulness, and wantonness concerning the improper hiring, retention, blatant coverups and concealments, lack of supervision, abject enabling, and other reckless acts and omissions set forth herein, constitute intentional, extreme, and outrageous conduct of the highest order.

538.    Such grossly reckless conduct is motivated by greed, self-seeking, self-interest, deliberate indifference, deviant sexual desire, and is the product of malicious and evil minds such that the imposition of punitive damages are warranted.

539.    Punitive damages are justified in cases like this to both punish the wrongdoers - and also to hold them out as examples to the rest of the community - such that these Defendants, and others that may be similarly situated, are clearly and explicitly discouraged from engaging in these kinds of grossly deviant and abhorrent behaviors in the future.

540.    For purposes of particularization of the acts and omissions of the within named Defendants which constitute, warrant, and mandate the imposition of punitive damages, it is stated that defendant ROBERT HADDEN - while pretending to render medical care to female patients - serially, and criminally, sexually exploited, assaulted, demeaned, and abused hundreds

of female patients at Defendants' medical facilities and clinics. Further, evidence exists that Defendants enabled ROBERT HADDEN to continue to sexually assault, exploit and abuse their patients, including Plaintiffs herein, and instead of terminating him and reporting him to Criminal Authorities and the State Medical Board, they took no action and further enabled him to continue to sexually exploit and abuse even more female patients in new and different ways. Moreover, evidence has surfaced which demonstrates that defendant ROBERT HADDEN has been sexually assaulting, sexually exploiting, and sexually abusing patients on the premises of Defendants and their medical facilities and clinics for over 20 years — as far back as the late 1980's. All the while, Defendants COLUMBIA UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY and CORP. ENTITIES, knew of the abuse but instead of terminating ROBERT HADDEN and immediately reporting him to law enforcement, they moved him from clinic to clinic in an intentional, but covert, effort to hide and conceal the abuse from their patients, the Plaintiffs herein, and the public at large.

541.    Defendant ROBERT HADDEN should have already been the subject of an internal, Criminal, and State Medical Board Investigation by the time that he sexually assaulted each of the Plaintiffs herein. However, Defendants failed to act on the information they had and enabled defendant ROBERT HADDEN to continue to sexually assault, sexually abuse and sexually exploit other female patients on its premises - despite a long history of sexually assaulting patients - for in excess of 20 years.

542.    While being allowed to continue preying on young female patients at Defendant COLUMBIA UNIVERSITY and CORP. ENTITIES' hospitals, offices, and medical facilities and

clinics without any restrictions, limitations, preceptors, chaperones or additional supervision, defendant ROBERT HADDEN continued to sexually exploit and assault female patients.

543.   While sexually exploiting, abusing and assaulting female patients - seemingly at will due to the utter indifference of Defendants, their agents, servants, and/or employees - Defendant ROBERT HADDEN sexually exploited, abused, and assaulted Plaintiffs and hundreds of other female patients upon Defendants' premises.

544.   Plaintiffs were patients of Defendants COLUMBIA UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY, and CORP. ENTITIES at the time when defendant ROBERT HADDEN sexually exploited, abused, and assaulted them.

545.   On several occasions, no chaperones were present in the room when Defendant ROBERT HADDEN, sexually exploited, abused, and assaulted Plaintiffs on the premises of Defendants' medical offices, facilities and clinic. The fact that the Chaperones weren't present in the room, or were present and then left, led the patients to believe that Hadden was a reputable and trusted OBGYN at Columbia University, and that his actions were somehow consistent with a bona fide gynecologic or obstetric examination, and not a form of sexual exploitation or abuse.

546.   On other occasions, chaperones were present in the room when Defendant ROBERT HADDEN, sexually exploited, abused, and assaulted Plaintiffs on the premises of Defendants' medical offices, facilities and clinics, and yet stood by and did nothing to protect the Plaintiffs and hundreds of other female patients. The nurse's presence in the room, and failure to stop Hadden's abuse, also left patients with the impression that Hadden's actions were somehow consistent with a bona fide gynecologic or obstetric examination, and not a form of sexual exploitation or abuse.

547.    On many occasions, since the early 1990's, chaperones were present in the room when Defendant ROBERT HADDEN, sexually exploited, abused, and assaulted Plaintiffs, and other female patients, on the premises of Defendants' medical offices, hospitals, facilities and clinics, who then tried to report the illegal conduct of ROBERT HADDEN to supervisors and other administrators of the within named Defendants, but whose reports were wholly and utterly ignored and/or dismissed as not important, and not followed up on by the COLUMBIA UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY and CORP. ENTITIES.

548.    The history of sexual exploitation, sexual assault, and sexual abuse of female patients at the COLUMBIA UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY and CORP. ENTITIES at the hands of serial predator ROBERT HADDEN spans a period of over 20-years.

549.    Defendants, their agents, servants, and/or employees had knowledge and/or awareness of the prior sexually exploitive and sexually abusive conduct by ROBERT HADDEN, and chose to do nothing to protect their female patients, including Plaintiffs herein, from being sexually exploited and abused by Defendant ROBERT HADDEN.

550.    As a result of Defendants' gross indifference and wanton lack of regard for the safety and well-being of its patients, malice, criminal indifference to civil obligations, and outrageous disregard of moral and professional ethics, duties and standards, Plaintiffs have each become yet another one of the countless sexual assault survivors of Defendant ROBERT HADDEN and Defendants COLUMBIA UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY and CORP. ENTITIES.

551.    Defendants' indolence and complicity in enabling serial sexual predator ROBERT HADDEN, is abhorrent conduct worthy of punishment.

552.    Defendants' conduct demonstrates a willful disregard of any and all precautions necessary to ensure Plaintiffs' safety.

553.    Defendants' conduct as described above, demonstrated a willful disregard for the substantial and known risks that ROBERT HADDEN posed to Plaintiffs and other female students and patients.

554.    Defendants have breached the duties owed to Plaintiffs, and other female patients, and were grossly negligent when they conducted themselves as described above, said acts having been committed with reckless disregard for Plaintiffs, and other female patients' health, safety, constitutional and/or statutory rights, and with a substantial lack of concern as to whether an injury would result.

555.    As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs and other female patients were damaged.

556.    Accordingly Compensatory and Punitive damages are necessary under these facts as to all Defendants.

### SIXTEENTH CAUSE OF ACTION
### INVASION OF PRIVACY & HIPAA VIOLATIONS

557.    Plaintiffs restate and incorporate by reference the preceding paragraphs as if fully set forth herein, and, to the extent necessary, pleads this cause of action in the alternative.

558.    Defendants COLUMBIA UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY, CORP. ENTITIES and ROBERT HADDEN have intruded upon Plaintiffs'

solitude, seclusion or private affairs and concerns by illegally accessing Plaintiffs' protected and private medical records, illegally viewing protected and private healthcare information, and intruding into their private and personal medical conditions - not for purposes of rendering medical care and treatment - but instead for the sole purpose of gaining a tactical advantage in litigation.[35] Plaintiffs herein have never authorized the access of their medical records, and yet upon information and belief, COLUMBIA UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY, CORP. ENTITIES and ROBERT HADDEN have illegally and surreptitiously accessed their records in abject violation of both State and Federal Law. This intrusion is highly offensive to reasonable individuals, such as Plaintiffs, and was totally unwarranted and unjustified, constituting invasion of privacy, and a violation of the Health Insurance Portability and Accountability Act (HIPAA). *See,* attached email, annexed as ***Exhibit "H"***.

559.   Defendants carried out such actions through their agents and/or representatives by querying their medical records, medical archives, and electronic medical records (EMR) for information related to the Plaintiffs, their health related issues, complications, conditions, and treatments.

560.   Defendants COLUMBIA UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY, CORP. ENTITIES, ROBERT HADDEN, and each of their agents, servants, employees, lawyers, and representatives have accessed, and continue to access, Plaintiffs' private

---

[35] See, Internal memorandum from Cori Scheiner, Associate Counsel for NY-Presbyterian Hospital's Office of Legal Affairs & Risk Management, sent to Susan Tabickman, Ann Lawson, Vivian Hammer and Joselin Duran, all of NYPH, instructing hospital staff to illegally provide defendants' legal team with protected healthcare information of their patients—without any of the patients' knowledge or consent. Defendants' actions are not only repugnant, but also violative of both New York State and Federal Laws, attached hereto as **Exhibit 'H'** (All identifying patient information has been redacted by our office. The original version is available to the court for an in-camera inspection if necessary).

and protected HIPAA information for purposes other than the diagnosis, care and treatment of Plaintiffs.

561. Specifically, Defendants have accessed, and continue to access, read, and use Plaintiffs' private HIPAA information - without Plaintiffs' knowledge, authorization and consent - in order to try to defend themselves against the myriad of lawsuits they now face for enabling ROBERT HADDEN to sexually exploit and sexually abuse female patients over the past couple decades at their hospitals, offices, and medical clinics.

562. Defendants have illegally used said information, *inter alia*, in an effort to dissuade Plaintiffs, and other female patients, from filing lawsuits against Defendants. Defendants have also illegally accessed and used Plaintiffs' protected health information for the purpose of obtaining facts and statements from Plaintiffs, and other female patients, such that Defendants will, and are, using said information to try and defend themselves against said lawsuits.

563. Accordingly, Plaintiffs are entitled to compensatory and punitive damages.

### SEVENTEENTH CAUSE OF ACTION
### VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW
### N.Y. Exec. Law §290, *et seq.*

564. Plaintiffs restate and incorporate by reference the preceding paragraphs as if fully set forth herein, and, to the extent necessary, pleads this cause of action in the alternative.

565. Defendants discriminated against Plaintiffs in a place of public accommodation based on their gender, in violation of the New York State Human Rights Law, N.Y. Exec. Law §290, *et seq.*, by subjecting them to sexual exploitation, sexual abuse, sexual assault, and sexual harassment.

566.    The discrimination suffered by Plaintiffs was severe. Defendants' unlawful and gender-based discrimination against Plaintiffs caused them to suffer emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and suffering, and economic damages.

567.    Defendants are liable to Plaintiff for compensatory and punitive damages, attorneys' fees, and costs. Punitive damages are warranted because Defendant Hadden's actions amount to willful or wanton negligence, or recklessness, or because there was a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

### EIGHTEENTH CAUSE OF ACTION
### VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW
### N.Y.C. ADMIN. CODE §8-101, *et seq.*

568.    Plaintiffs restate and incorporate by reference the preceding paragraphs as if fully set forth herein, and, to the extent necessary, pleads this cause of action in the alternative.

569.    Defendants discriminated against Plaintiffs in a place of public accommodation based on their gender, in violation of the New York City Human Rights Law, N.Y.C. ADMIN. CODE §8-101, *et seq.*, by subjecting them to sexual exploitation, sexual abuse, sexual assault and sexual harassment by one their agents, servants, and employees who were known and documented sexual predators, and enablers of a sexual predator. The discrimination suffered by Plaintiffs was so severe as to be criminal.

570.    Defendants' unlawful discrimination against Plaintiffs caused them to suffer emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and suffering, economic damages, and PTSD.

571.     Defendants are liable to Plaintiffs for compensatory and punitive damages, attorneys' fees, and costs. Punitive damages are warranted because the Corp. Entities Defendants' actions amount to willful or wanton negligence, or recklessness, or because there was a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

**NINETEENTH CAUSE OF ACTION**
**AIDING AND ABETTING**

572.     Plaintiffs restate and incorporate by reference the preceding paragraphs as if fully set forth herein, and, to the extent necessary, pleads this cause of action in the alternative.

573.     The Corp. Entities Defendants aided and abetted Defendant Hadden by encouraging, allowing, ratifying, permitting, facilitating, and covering-up, Defendant Hadden's sexual abuse and sexual assault of girls and women when they knew, or should have known, since at least 1994 that Defendant Hadden was a dangerous serial sexual predator who victimized Corp. Entities Defendants' patients, including Plaintiffs.

574.     The Corp. Entities Defendants' aiding and abetting of Defendant Hadden was a substantial factor in bringing about the injuries and losses Plaintiffs have suffered.

575.     The Corp. Entities Defendants' aiding and abetting of Defendant Hadden was long-standing, intentional, malicious, reckless and undertaken in willful and conscious disregard for Plaintiffs' rights and personal autonomy.

576.     The Corp. Entities Defendants are jointly and severally liable with Defendant Hadden to Plaintiffs or, among other things, compensatory damages, punitive damages, statutory damages, attorneys' fees, and costs. Punitive damages are warranted because the Columbia

Defendants' actions amount to willful or wanton negligence, or recklessness, or because there was a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

### TWENTIETH CAUSE OF ACTION
### FALSE ADVERTISING, N.Y. GEN. BUS. LAW §350, *et seq.*

577.    Plaintiffs restate and incorporate by reference the preceding paragraphs as if fully set forth herein, and, to the extent necessary, pleads this cause of action in the alternative.

578.    N.Y. GEN. BUS. LAW §350 declares unlawful any false advertising in the conduct of any business, trade, or commerce, or in the furnishing of any service, in New York.

579.    The Corp. Entities Defendants engaged in false advertising in the marketing, sale, and provision of medical services to Plaintiffs by, among other things, expressly or implicitly holding out their medical centers and medical services to be safe and for their patients' safety to be free from sexual abuse and sexual assault when the Corp. Entities Defendants knew or should have known that their medical centers and medical services were not safe, and that their patients were not safe from sexual abuse and sexual assault from Defendant Hadden.

580.    The Corp. Entities Defendants also engaged in false advertising by failing to reveal to Plaintiffs material facts, including, but not limited to, those regarding the safety of their medical centers and medical services by failing to reveal that Defendant Hadden was a dangerous sexual predator who serially sexually assaulted and sexually abused patients.

581.    Plaintiffs were injured as a result of violations of this statute by the Corp. Entities Defendants.

582.    Unless restrained, Plaintiffs will continue to suffer from irreparable harm from the Corp. Entities Defendants false advertising because, despite wanting to receive medical services from the Corp. Entities Defendants, they are unable to do so because they will not be able to rely on the Corp. Entities Defendants' statements regarding the safety of their medical centers and services.

583.    Plaintiffs seek restitution for all amounts improperly obtained by the Corp. Entities Defendants through their false advertising, disgorgement of all ill-gotten gains, actual damages or fifty dollars in statutory damages, whichever is greater.

584.    Plaintiffs also seek preliminary and permanent injunctive relief enjoining Corp. Entities Defendants from continuing their false advertising.

585.    Corp. Entities Defendants violated N.Y. GEN. BUS. LAW §350 willfully and/or knowingly, and as such Plaintiffs are entitled to treble damages up to one thousand dollars.

586.    The Corp. Entities Defendants are also liable to Plaintiffs for reasonable attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter an Order:

A.    Awarding damages, including general, special, actual, compensatory, nominal, statutory, and punitive damages where applicable, to Plaintiffs in an amount to be determined at trial;

B.    Awarding Plaintiffs their reasonable litigation expenses and attorneys' fees where applicable;

C.    Awarding Plaintiffs pre- and post-judgment interest, to the extent allowable;

D.    Entering a permanent injunction against the Corp. Entities Defendants enjoining the Corp. Entities Defendants from engaging in the wrongful conduct complained of herein pertaining to the hiring, monitoring, retaining, training, and firing of healthcare employees;

      E.     Entering a permanent injunction compelling the Corp. Entities Defendants to utilize appropriate methods, policies, safeguards, disclosures, and warnings with respect to the hiring, monitoring, retaining, training, and firing of healthcare employees;

      F.     Entering a permanent injunction requiring restitution and disgorgement of the revenues wrongfully retained by the Corp. Entities Defendants as a result of Defendants' wrongful conduct as stated herein;

      G.     Entering a permanent injunction prohibiting Corp. Entities and defendant Robert Hadden from illegally accessing protected health information of their patients for any purpose, including defending themselves from a pending or a potential civil or criminal lawsuit, without a duly executed HIPAA authorization from the patient;

      H.     Awarding such other further injunctive and declaratory relief as is necessary to protect the interests of Plaintiffs; and

      I.     Awarding such other and further relief as the Court deems reasonable and just.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.


Dated: New York, New York
       June 1, 2022

                                    Law Office of Anthony T. DiPietro, P.C.

                                      By: _____

                                      Anthony T. DiPietro, Esq.
                                      Attorney for Plaintiffs
                                      233 Broadway, Suite 880
                                      New York, New York 10279
                                      (212) 233-3600

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 1, 2022.

Law Office of Anthony T. DiPietro, P.C.

By: _____

Anthony T. DiPietro, Esq.
Attorney for Plaintiffs
233 Broadway, Suite 880
New York, New York 10279
(212) 233-3600